*In the United States District Court*
*For the Northern District of Illinois*
*Eastern Division*

| | |
|---|---|
| Diane O'Sullivan, Janice Roche, and Nancy Lipman, | **No.: 01 C 9856** |
| Plaintiffs, | |
| – v – | Magistrate Judge Levin |
| City of Chicago, | **Jury Trial Demanded** |
| Defendant. | |

DOCKETED MAY 0 3 2004

FILED APR 3 0 2004 MICHAEL W DOBBINS CLERK. U.S. DISTRICT COURT

## Plaintiff's Rule 56.1(b)(3) Statement and Evidentiary Appendix

Pursuant to Northern District of Illinois Rule 56.1(b)(3), plaintiffs Diane O'Sullivan, Janice Roche, and Nancy Lipman ("plaintiffs") respond as follows to Defendant's Statement of Material Facts and present the following Additional Facts Requiring the Denial of Summary Judgment:

## Response to Defendant's Statement of Material Facts:

**Jurisdiction and Venue**

1. Jurisdiction is proper and is invoked pursuant to the terms of 28 U.S.C. §§ 1331, 1343. (Answer to Complaint, Jurisdiction Statement).

<u>Response</u>:    Agree.

2. Venue is proper in this Court by virtue of 28 U.S.C. § 1391(b). (Answer to Complaint, Statement of Venue).

<u>Response</u>:    Agree.

RECEIVED IN CHAMBERS OF APR 30 11:51 CLERK U.S. DISTRICT COURT

1



**Background of the Parties**

3. Plaintiff Nancy Lipman ("Plaintiff Lipman") is a Caucasian female employee of the City of Chicago Police Department. (Complaint ¶ 3).

Response:    Agree.

4. Plaintiff Diane O'Sullivan ("Plaintiff O'Sullivan") is a Caucasian female employee of the City of Chicago Police Department. (Complaint ¶ 3).

Response:    Agree.

5. Plaintiff Janice Roche ("Plaintiff Roche") is a Caucasian female employee of the City of Chicago Police Department. (Complaint ¶ 3).

Response:    Agree.

6. Defendant City of Chicago is a municipal corporation created pursuant to the laws of State of Illinois. (65 ILCS 20/21-1).

Response:    Agree.

7. Commander Marienne Perry is an African American female employee of the City of Chicago Police Department who, at all times relevant to this lawsuit, held the position of District Commander of the Second District of the Chicago Police Department. (Complaint ¶ 9).

Response:    Agree, except that Commander Perry is no longer the commander of the Second District and because aspects of this complaint address continued damage to plaintiffs' reputation, plaintiffs deny that she was a commander of the Second District during all times relevant to this lawsuit.

**Procedural Posture of the Case**

8. Plaintiffs filed charges with the EEOC more than 30 days prior to December 26, 2001, the

date that this lawsuit was filed. (Ex. G, Answer to Plaintiffs' Complaint ¶ 6).

Response:    Agree.

9. The EEOC issued Plaintiffs a Dismissal and Notice of Rights on September 26 and 27, 2001 stating that Plaintiffs could timely file civil actions for their respective charges under Title VII within 90 days. (Ex. G, Answer to Complaint ¶ 6).

Response:    Agree.

10. On December 26, 2001, Plaintiffs filed a complaint naming the City of Chicago, the Chicago Police Department, and Commander Marienne Perry as Defendants and asserting four claims of relief. (Plaintiffs' Complaint ¶¶ 25-30).

Response:    Agree.

**Plaintiff Nancy Lipman's Employment History**:

11. In September of 1985, Plaintiff Lipman entered the Police Academy and became a police officer with the Chicago Police Department. (Ex. C, Lipman Dep. p. 9).

Response:    Agree, except that the cite for the reference is Lipman Dep. p. 8.

12. In April of 1996, Plaintiff Lipman was promoted to the position of Sergeant and    assigned to the Twenty first District. (Ex. C, Lipman Dep. pp. 9-10).

Response:    Agree.

13. In December of 1999, Plaintiff Lipman was promoted to the position of Lieutenant and transferred to the Second District. (Ex. C, Lipman Dep. p. 11).

Response:    Agree.

14. Plaintiff Lipman currently holds the rank of Lieutenant and was assigned as a lieutenant at the Second District of the Chicago Police Department from December 1999 to April 2001. (Ex.

C, Lipman Dep. p. 125).

Response:     Agree, except that the reference to the deposition should be Lipman Dep. p. 12.

15. Lipman was assigned to the position of watch commander under Commander Perry. (Ex. C, Lipman Dep. pp. 40-42).

Response:     Agree to the extent that Lipman served as watch commander under Commander Perry, but dispute the allegation that she was assigned to the position of watch commander under Commander Perry. When specifically asked this question by counsel for Defendant, Lipman stated:

> I wasn't per se assigned as the watch commander. I was the interim lieutenant on the watch and highest ranking officer of the watch, so I would assume the watch commander responsibilities. (Pl. Ex. C, Lipman Dep. p. 41).

**Plaintiff O'Sullivan's Employment History**

16. In June of 1981, O'Sullivan entered the Police Academy and began her employment with the Chicago Police Department. (Complaint ¶ 7).

Response:     Agree.

17. In April of 1996, O'Sullivan was promoted to the position of Sergeant. (Ex. A, O'Sullivan Dep. p. 9).

Response:     Agree.

18. In December of 1999, Plaintiff O'Sullivan was promoted to the position of Lieutenant (Ex. A, O'Sullivan Dep. p. 9).

Response:     Agree.

19. Plaintiff O'Sullivan currently holds the rank of Lieutenant. (Ex. A, O'Sullivan Dep. p. 125).

Response:     Agree, except the reference should be O'Sullivan Dep. p. 10-11.

4

20. O'Sullivan was assigned to the Second District of the Chicago Police Department from December 1999 to March 2001. (Ex. A, O'Sullivan Dep. p. 125-126).

Response:     Agree, except that the reference should be O'Sullivan Dep. p. 10.

21. Commander Perry appointed Lt. O'Sullivan as the watch commander over the first watch (the midnight shift) in February 2000. (Ex. A, O'Sullivan Dep. pp. 18-19).

Response:     Agree.

22. As the watch commander, O'Sullivan received an out of grade pay increase and was paid at captain's pay while holding the career service rank of lieutenant. (Ex. A, O'Sullivan Dep. p. 17).

Response:     Agree.

23. In March of 2001, Plaintiff transferred from the Second District to the Eleventh District. (Ex. A, O'Sullivan Dep. p. 10).

Response:     Agree.

**Plaintiff Janice Roche's Employment History**

24. In September of 1992, Janice Roche began her employment with the Chicago Police Department. (Roche Dep. Vol. I, p. 10).

Response:     Agree.

25. In June 1999, Janice Roche was promoted to the position of Sergeant. (Ex. B, Roche Dep. Vol. I, p. 11).

Response:     Agree.

26. Plaintiff Roche was assigned to the Second District of the Chicago Police Department as a sergeant from July 1999 to April 2001, earned a law degree and was admitted to practice in

2001, and was promoted to lieutenant in 2003 (Ex. B, Roche Dep. Vol. I, p. 10, 13, Vol. II pp. 90-91).

Response:     Agree.

**Plaintiffs' Allegations**

27. On December 26, 2001, Plaintiffs filed a complaint naming the City of Chicago, the Chicago Police Department, and Commander Marienne Perry as Defendants and asserting four claims of relief.  (Plaintiffs' Complaint ¶¶ 25-30).

Response:     Agree.

28. Plaintiffs allege Defendants have violated 42 U.S.C. § 1983, and that Defendants subjected Plaintiffs to the deprivation of rights, privileges, and immunities secured by the Constitution and the laws of the United States including equal protection of the laws as guaranteed by the Fourteenth Amendment to the U.S. Constitution when Defendants intentionally made employment decisions based on Plaintiffs' race and color.  (Plaintiffs' Complaint ¶ 25).

Response:     Agree.

29. In addition, Plaintiffs allege Defendants have violated 42 U.S.C. § 1981, by depriving Plaintiffs of their right to the full and equal benefit of Defendants' regulations and laws and proceedings for the security of Plaintiffs' employment because of Plaintiffs' race and national origin.  (Plaintiffs' Complaint ¶ 26).

Response:     Agree.

30. Plaintiffs also allege Defendants have violated Title VII of the Civil Rights Act of 1964, by discriminating against the Plaintiffs because of their race, color and national origin with respect to the terms and conditions of their employment by harassing the Plaintiffs,

intentionally pursuing false charges against the Plaintiffs, by giving preferential treatment for assignments by Defendants for those of African American race, and by Defendants' retaliation against Plaintiffs for their filing of harassment charges with the Chicago Department of Police and the Equal Employment Opportunity Commission. (Plaintiffs' Complaint ¶ 26).

Response:    Agree to the extent that the plaintiffs filed an action based on defendants' violation of their protected rights pursuant to Title VII of the Civil Rights Act of 1964, dispute to the reference as it is contained in Plaintiffs' Complaint ¶ 27 rather than ¶ 26.

**Chicago Police Department Procedure for Initiating Complaint Registers**

31. "Complaint Register" (referred to as "CR") is the term for a Complaint Register Investigation, an internal investigation regarding alleged police misconduct. (Ex. A, O'Sullivan Dep p. 39).

Response:    Agree.

32. The Chicago Police Department policy regarding Complaint Registers is set forth in the Chicago Police Department General Order 93-3. (Exhibit I, Chicago Police Department General Order 93-3).

Response:    Agree.

33. Pursuant to General Order 93-3, the Superintendent's responsibility and authority to maintain discipline includes internal investigations and all members of the Police Department are required to comply with Department Rules and Regulations. (Chicago Police Department General Order, Exhibit I).

Response:    Agree.

34. Police officers and police personnel who fail to comply with a request for information concerning an internal investigation hinder the effective performance of the Department's

functions. This failure will be considered just cause for disciplinary action. (Ex. I, 1. Introduction)

Response: Dispute. The above language is an interpretation of G.O. 93-3 and as such does not exactly reflect the actual language of G.O. 93-3.

35. Sworn police officers will be held strictly accountable for properly exercising the authority they have been given to protect the rights, lives and property of all individuals. (Ex. I – I. Introduction).

Response: Agree.

36. In addition, the Complaint and Disciplinary Procedures help to protect members of the Department against false allegations of misconduct. (Ex. I, Addendum 1 - Department Bill of Rights).

Response: Agree, except that the document referenced to is Ex. I, I. Introduction.

37. A consistently thorough investigative process is required and the purpose of this process is to conduct prompt thorough investigations which can absolve the innocent and identify the guilty. (Ex. I – Addendum 3 - Conduct of Investigation).

Response: Agree, except that the document referenced to is Ex. I, I. Introduction.

38. Members of the Department can be disciplined, even separated from the Department for refusing to answer questions, narrowly directed, relating to their official actions or obligations which were assumed upon appointment to the Department. (Ex. I, I. Introduction).

Response: Agree.

39. All alleged or suspected violations of Department Rules and Regulations or directives by any member of the Department, sworn or civilian (with the exception of temporary employees)

are required to be processed pursuant to the provisions of 93-3 and its addenda. (Ex. I – II Disciplinary Process).

Response:    Dispute, as there is no indication that this is the stated policy of the department. References provided do not permit verification of this proposed statement of fact.

40. Any member who has knowledge of circumstances surrounding a complaint will submit an individual written report to a supervisor before reporting off duty on the day he becomes aware of the investigation. The report will include all facts relating to the incident known and reported to him and the CR number. The supervisor will forward one copy of any report or document he receives from members, without unnecessary delay, directly to either the Office of Professional Standards or the Internal Affairs Division. (Ex. I – Addendum 3 - Conduct of the Investigation).

Response:    Agree, except for the fact that the statement cited above is not contained in Ex. I – Addendum 3 – Conduct of Investigation, but instead is contained in G.O. 93-03-02B Specific Responsibilities.

41. When misconduct is observed or a complaint relative to misconduct is received by a non-supervisory member, such member will immediately notify a supervisory member and prepare a written report to his commanding officer containing the information received, observations, and any action taken.   (Ex. I, Addendum 2 – Specific Responsibilities).

Response:    Agree.

42. When misconduct is observed or a complaint relative to misconduct is received by supervisory or command personnel, they will initiate a complete and comprehensive investigation in accordance with 93-3 and other directives without looking to higher authority for such action.

(Ex. I, Specific Responsibilities, II. B, Initiation Responsibilities and Procedures).

Response:    Agree.

43. The Office of Professional Standards investigates complaints of excessive force and other matters as directed by the Superintendent. (Ex. I, Specific Responsibilities, II. C. Office of Professional Standards).

Response:    Agree.

44. The Internal Affairs Division investigates all complaints of misconduct against Department members not conducted by the Office of Professional Standards. (Ex. I, Specific Responsibilities, II D. Internal Affairs Division).

Response:    Agree.

45. The Internal Affairs Division may assist District personnel that are engaged in complaint register investigations when requested to do so, and may provide such assistance without request if the seriousness of the alleged violation appears to warrant a higher level of investigation. (Ex. I, Specific Responsibilities, D. Internal Affairs Division, paragraph 2).

Response:    Agree.

46. Any member of the Department who feels that he has been the subject of a false accusation or a contrived situation may request an investigation by the Internal Affairs Division by submitting a written report of his situation directly to the Superintendent of Police or the Assistant Deputy Superintendent, Internal Affairs Division. The member may submit this request without prior report to his superiors. (Ex. I, Specific Responsibilities, D. Internal Affairs Division, paragraph 3).

Response:    Agree.

47. The Internal Affairs Division upon receipt of a complaint for investigation from the Office of Professional Standards, will (a) investigate the complaint or refer it to the appropriate command for investigation with photocopies of any related reports, and (b) inform the complainant and the accused member by mail of the *final classification at the conclusion of the investigation.* (Ex. I, Specific Responsibilities, D. Internal Affairs Division, paragraph 4).

Response: Agree that the statement exists, dispute the emphasis placed by change in font at the end of the proposed statement of fact.

48. The investigator has the power to order Chicago Police Department personnel who have knowledge of the circumstances surrounding a CR to submit a statement to assist in the investigation of a Complaint Register. Under the provisions of General Order 93-3, an officer must submit a statement when ordered to submit a statement pertaining to the investigation of a Complaint Register. (Ex. I; II Conduct of the Investigation A, C).

Response: Dispute, as it does not appear that the reference defendant cites to expressly states the language contained in the proposed statement of fact. Further, it is impossible to determine whether or not the intent of General Order 93-3 contains the proposed statement of fact.

49. The interrogation of a Department member other than in the initial stage of the investigation, or the interview of a department member shall be scheduled at a reasonable time, preferably while the member is on duty, or if feasible, during daylight hours. (Ex. I, I. Purpose B, M).

Response: Agree.

**Complaints Registers Against The Plaintiffs**

50. On June 8, 2000, CR # 262939 was initiated against Plaintiff Roche and two other officers by

11

Lt. William Sutherland for being inattentive to duty for her failure to ensure that the inventory taken from an arrestee was accurate. This allegation was sustained against Roche. (Ex. C, Roche Dep. Vol. II, p. 45; Ex. J; CR No. 262939).

Response: Agree as to the initiating of the CR; dispute as to its having been sustained, as Roche has never been informed that it has been sustained.

51. On August 15, 2000, CR #264869 was initiated against Plaintiff O'Sullivan and Lieutenant Lillie Crump-Hales, an African American, by Commander Perry for acting unprofessional during a verbal argument between O'Sullivan and Lieutenant Crump-Hales. This allegation was sustained against O'Sullivan and she received a reprimand for her actions. (Ex. A, O'Sullivan Dep. pp. 39-40; Ex. K, CR No. 262939).

Response: Agree that CR #264869 was initiated against O'Sullivan and Crump-Hales. Dispute that it was a verbal argument. O'Sullivan testified that she was "threatened with bodily injury." Further, although the action was initially sustained against O'Sullivan, the decision was later changed to either not sustained or unfounded (O'Sullivan Dep. p.43-44). Further, CR No. referenced above in the citation is incorrect and should read #264869.

52. On September 11, 2000, Commander Perry initiated CR # 265581 after she heard that Sullivan and Lipman had alleged that she was accused of discrimination against them. (Ex. E. Garcia Dep. pp. 26 – 27, Perry Dep. pp. 161-163; Ex. L. CR No. 265581).

Response: Agree that Commander Perry initiated CR No. 265581. Dispute that it was because she heard that O'Sullivan and Lipman had alleged that she was accused of discrimination. Instead she stated that:

As far as can be determined due to the fact that most of this information has been

12

anonymous, certain First Watch supervisory personnel from 002 including Lt. Diane O'Sullivan, possibly Lt. Nancy Lipman....have conspired to spread that certain personal changes made to facilitate the smooth and efficient operation of the District have instead been made for racial reasons.
(Defendant's document C008808).

53. Police Agent Geraldo Garcia, who was assigned to handle the investigation of CR #265581, cannot recall having any conversations with Commander Perry before the investigation of this complaint register. (Ex. E, Garcia Dep. p. 23).

Response:     Agree.

54. Commander Perry initiated CR # 265581 against herself because she felt that she was accused of being a racist, and she wanted a thorough investigation into whether she had done anything that would indicate that she was a racist. (Ex. E, Garcia Dep. p. 26-27; Perry Dep. p. 161-163; Ex. L).

Response:     Agree that this is one reason why Commander Perry initiated the CR. However, she also desired to have the plaintiffs punished. She stated in the letter initiating the CR:

> I am asking that a thorough fair and unbiased investigation be conducted and, once my name is cleared, I ask that those who have made the false allegations be properly disciplined. (Defendant's document C008808).

55. Agent Garcia contacted Plaintiff O'Sullivan and informed her that he needed a report from her in regard to her allegations against Commander Perry related to his investigation of CR # 265581. (Ex. E, Garcia Dep. p. 40-41).

Response:     Agree.

56. Plaintiff O'Sullivan informed Agent Garcia that she needed to talk to an attorney, and that she needed a week to respond to his request. Agent Garcia informed her that he usually only gives 72 hours to respond, but he did grant her one week to respond, and told her that her response was needed within one week. (Ex. E, Garcia Dep. p. 42).

Response:    Agree that this is Garcia's account of the conversation. Dispute as to this being an

agreed upon fact. According to O'Sullivan, Garcia did not provide a time frame to give the

report. (O'Sullivan Deposition p. 71-73).

57. Agent Garcia also contacted Plaintiff Lipman by phone, and informed her that he needed a

report from her in regard to her allegations against Commander Perry in regard to his

investigation of CR #265581. (Ex. E, Garcia Dep. pp. 45-46).

Response:    Agree.

58. Agent Garcia informed Plaintiff Lipman that he needed a report from her within a week in

regard to his investigation of CR # 265581. (Ex. E, Garcia Dep. p. 46).

Response:    Agree that this is Garcia's account of the conversation. Dispute as to this being an

agreed upon fact. According to Lipman, Garcia did not provide a time frame to give the report.

(Lipman Deposition p. 88-89).

59. Plaintiff Lipman did not provide Agent Garcia with a written report within the week that he

allotted her, so Agent Garcia sent a notice to Plaintiff Lipman at the station to come to the

Internal Affairs Department for the purpose of a statement. (Ex. E, Garcia Dep. p. 46).

Response:    Dispute. See response to proposed fact 58. Further, Agent Garcia did not send a

notice to Lipman to come to Internal Affairs Department; he sent her a fax which she did not

receive until two days after the meeting. (Lipman Deposition p. 99-101),

60. Plaintiffs Lipman and O'Sullivan did not submit statements within the time requested by

Agent Garcia with respect to his investigation of CR # 265581, which had been initiated by

Commander Perry, and as a result claims against Plaintiffs Lipman and O'Sullivan were

brought as part of CR #265581 for their failure to submit a timely report. These claims were

sustained against Plaintiffs Lipman and O'Sullivan. (Ex. E, Garcia Dep. p. 33; Ex. L).

Response:     Dispute. See responses to 58 and 59. Dispute that Garcia Dep. p. 33 represents the
proposed fact.

61. In response to Agent Garcia's request for a written report regarding the Plaintiffs' grievance
filed on September 27, 2000, O'Sullivan told Garcia that they were in the process of filing an
EEOC complaint and that all of the information was with her attorney. O'Sullivan failed to
give a further report until the end of October of 2000. (Ex. A, O'Sullivan Dep. p. 73).

Response:     Agree except to the characterization that she "failed to give further report."

62. Plaintiff Lipman met with Agent Garcia on November 1, 2000. Plaintiff Lipman refused to
give a statement. After being ordered to give a statement by Agent Garcia's supervisor, she
submitted a written report which did not contain the specifics of her allegations against
Commander Perry. (Ex. E, Garcia Dep. p. 53).

Response:     Agree that she met with Agent Garcia on November 1, 2000. Dispute that she failed
to submit a written report. (Lipman Deposition p. 103-104).

63. Agent Garcia interviewed Sergeant John Hickney, who according to Plaintiffs' allegations
heard Commander Perry making racial statements; Sergeant Hickney denied that Commander
Perry made any such comments. (Ex. E, Garcia Dep. p. 57).

Response:     Agree.

64. Agent Garcia's investigation into Plaintiffs allegations did not produce any evidence to
substantiate the Plaintiffs' claims against Commander Perry. (Ex. E, Garcia Dep. pp. 56-57).

Response:     Agree that according to Garcia no evidence came to light to substantiate Plaintiffs'
claim; dispute as to whether or not this was indeed the case.

65. Agent Garcia's commanding officer Lieutenant Bresnahan filed the CRs against Plaintiffs
Lipman and O'Sullivan for their failure to file a report. (Ex. E, Garcia Dep. p. 58).

Response:       Agree.

66. In May 2001, CR # 271488 was initiated against Plaintiffs O'Sullivan and Roche by two

detention aides who worked at the 2nd District. These two detention aides alleged that

Plaintiffs O'Sullivan and Roche disciplined them disproportionately due to their race (African

American). These allegations were not sustained. (Ex. A, O'Sullivan Dep. pp. 102-103; Ex.

B, Roche Dep. Vol. II, pp. 74-76; Ex. M, CR No. 271488)

Response:       Agree.

67. Plaintiff O'Sullivan has admitted that she does not have any knowledge whether or not

Commander Perry had anything to do with these two detention aides filing claims against her.

(Ex. A, O'Sullivan Dep. p. 104).

Response:       Dispute. This mischaracterizes the testimony solicited by counsel during the

deposition. The actual exchange was as follows:

> Q. Commander Perry had nothing to do with them filing these charge against you, is
> that correct?
>
> A. I don't know that she didn't have anything to do with it.
> (O'Sullivan Deposition p. 104).

68. Lipman did not submit a report to Agent Garcia until November 1, 2000 and that report was

not a substantive report and was not an adequate response to the investigation. (Ex. C,

Lipman Dep. pp. 101-105; Ex. E, Garcia Dep. p. 50).

Response:       Dispute. See answer to proposed fact 62.

**Additional Relevant Facts Concerning Plaintiffs Allegations**

69. During the time that Plaintiff Lipman was assigned to the Second District, she was not

removed from her position and replaced by an African American. (Ex. C, Lipman Dep. p. 39).

<u>Response:</u>    Dispute. In fact, the very page that defendant cites directly contradicts this proposed fact. Lipman testified that she was replaced as the watch commander of first watch by Richard Johnson. (Lipman Deposition p. 39).

70. Plaintiff O'Sullivan admitted that she did not hear Commander Perry make any statements to the effect that when a person walks into the Second District they expect to see a black face. (Ex. A, O'Sullivan Dep. pp. 129-130).

<u>Response:</u>    Agree.

71. Plaintiff O'Sullivan admitted that she did not hear Commander Perry make a statement that a tactical team that did not have any black officers should not be sent to the Bud Billiken Parade. Her testimony is as follows:

Q.    During your time at the 2nd District, did you hear any other statements made by Marienne Perry or by somebody else reporting what Marienne Perry said that struck you as racial?

A.    Yes.

Q.    When was the first such statement made?

A.    I don't recall when it was, but it was in an incident surrounding the Bud Billiken Parade which occurs in the 2nd District. *It was related to me by oh, one of the sergeants on the watch, that he had heard from a friend from another district,* because when there's events like that, tactical teams from other districts get assigned for crowd control and various other things because the district does not have enough man power. And that the sergeant stated that Commander Perry had gone up to him and told him to go back and tell his Commander not to send them there anymore because there were no black officers on the team." (O'Sullivan Dep. p. 136-137).

<u>Response:</u>    Agree.

72. Plaintiff O'Sullivan alleges that Commander Perry told a tactical team that was at the Opening Ceremony for the Police Headquarters to get out of sight, because they did not look diverse

enough. (Ex. A, O'Sullivan Dep. pp. 137-139; 191-193).

Response:     Agree.

73. Plaintiff O'Sullivan admitted that she did not hear Commander Perry make this statement and she does not recall who relayed the statement to her, nor does she know if the person who relayed that message to her heard that statement being made directly from Commander Perry. (Ex. A, O'Sullivan Dep. pp. 137-139; 191-193).

Response:     Agree.

74. Plaintiff Lipman alleges that Virginia Drozd was removed as watch commander because she was white (Ex. C, Lipman Dep. p. 53), but also testified that she believes Ms. Drozd was removed because of rumors that Ms. Drozd was actually running the district. (Ex. C, Lipman Dep. p. 52).

Response:     Agree that this is part of Lipman's testimony. However, dispute this fact, as it was not the main gist of the testimony. The main focus of the testimony is that Commander Perry transferred Drozd because of her race. (Lipman Deposition p. 51-53).

75. Virginia Drozd was replaced as Watch Commander of the Second Watch in the Second District by Eugene Daly who was also Caucasian. (Ex. A, O'Sullivan Dep. pp. 34-35; Ex. F, Crump-Hales Dep. p. 96).

Response:     Agree that Daly temporarily replaced Drozd. However, the permanent replacement was not by Daly, but by Michael Johnson, who was African American. (Lipman Deposition p. 54).

76. Lt. Virginia Drozd was removed as watch commander because people in the District indicated that they could not work for Lt. Drozd because of her temperamental behavior; Drozd yelled,

screamed, and cursed at her members of the Police Department and often used profanity. (Ex. D, Perry Dep. pp. 102 - 104).

Response:   Agree that this is Perry's characterization of Drozd. Dispute that this is an agreed upon material fact. Drozd was characterized by Lipman as being a tenured lieutenant with a great deal of experience who was performing admirably in her position as second watch watch commander. (Lipman Deposition p. 54).

77. Commander Perry informed Plaintiffs Lipman and O'Sullivan that Plaintiff Roche was not allowed to be the desk sergeant. (Ex. C, Lipman Dep. p. 56, Ex. D, Perry 109 - 112).

Response:   Agree.

78. Commander Perry did not want Plaintiff Roche to be the desk sergeant because in the past, as the relief desk sergeant, Roche did not exhibit the understanding and communication skills that Commander Perry wanted of a desk sergeant -- she essentially rubs people the wrong way, and for that reason not because of her race, Perry did not want her to be the desk sergeant. (Ex. A, O'Sullivan Dep. p. 36; Ex. D, Perry Dep. p.109 -112; Roche Dep. Vol. II, p. 29).

Response:   Dispute. Perry's proffered reason is that Roche rubbed people the wrong way. This is a contested fact and it is plaintiffs' argument that this reason is pretextual for discrimination.

79. Commander Perry would not consider Sergeant Penny for the desk sergeant position because he did not have adequate communication skills. (Ex. D, Perry Dep. p. 113-114).

Response:   Dispute. Perry's proffered reason is that Penny rubbed people the wrong way. This is a contested fact and it is plaintiffs' argument that this reason is pretextual for discrimination.

80. Perry informed O'Sullivan and Lipman that either Sergeant Timothy Gerich, a white male, or Vernon Crawford, a black male, would be an acceptable choice for the desk sergeant. Gerich

did not inform Commander Perry that he had family obligations that prevented him from accepting the position of desk sergeant. (Ex. D, Perry Dep. pp. 117-120).

Response:     Agree that Perry informed O'Sullivan and Lipman that either Gerich or Crawford would be acceptable. Dispute that Perry was not informed that Gerich had family obligations that prevented him from accepting the position of desk sergeant. In a memo written on August 15, 2000 she stated to O'Sullivan "Since Gerich obviously cannot work the hours needed by the desk, then it is my choice to have Sgt. Crawford, who was the relief Desk Sergeant, assume the position of Desk Sergeant." (Defense Document C 008930).

81. Commander Perry did not state that when people walk into the Second District, they expect to see a black face. (Ex. D, Perry Dep. p. 119).

Response:     Agree that Perry states that she never stated this. Dispute that she never said it.

82. Plaintiff Lipman believes that Vernon Crawford, an African American who was assigned the position of desk sergeant, was qualified for the position. (Ex. A, O'Sullivan Dep. p. 35; Ex. C, Lipman Dep. p.55; Ex. O).

Response:     Agree.

83. Commander Perry did not tell Lieutenant Crump-Hales to initiate a CR against anyone. (Ex. F, Crump-Hales Dep. p. 74).

Response:     Agree that Crump-Hales stated this. Dispute that it is in fact the truth.

84. Commander Perry has never related any incidents of her family or her being harassed by the police when she was younger. (Ex. D, Perry Dep. p. 37-38).

Response:     Agree that Perry states that she never stated this. Dispute that she never said it.

85. Commander Perry had no control in the bid process, which is controlled by the collective bargaining agreement between the City of Chicago and Fraternal Order of Police and the

Policemen's Benevolent & Protective Association of Illinois, Unit 156 – Sergeants. (Ex. D, Perry Dep. p. 97-98; Ex. P, Agreement between the City of Chicago Department of Police and the Fraternal Order of Police, Bates No. 8583, 8562, 8564, Ex. P, Agreement between the City of Chicago Department of Police and the Policemen's Benevolent & Protective Association of Illinois, Unit 156 – Sergeants, Bates No. 8350-8353).

Response:    Agree that Perry does not have control of the bid process once it is initiated. Dispute that she does not have any control over bidding. Perry has control over when bid notices were published at the district. As a result, she had control over who bid if they were not aware that the bidding was open.

86. As a commander, Commander Perry had the authority to obtain a Complaint Register on behalf of another person as the complainant. (Ex. D, Perry Dep. p. 145-146).

Response:    Agree.

87. Commander Perry has often made the determination that an investigation should be sent back to IAD to investigate the matter as opposed to the District personnel. (Ex. D, Perry Dep. p. 148-149).

Response:    Agree that Perry stated this during her deposition. Dispute whether or not this is true.

88. Commander Perry did not assist Officer Gregory Gilmer in obtaining a Complaint Register against Sergeants Cain or Gerich. (Ex. D, Perry Dep. p.169-180).

Response:    Agree that Perry stated this during her deposition. Dispute whether or not this is true.

89. During the opening ceremony of the Police Headquarters, Commander Perry did not tell a tactical sergeant from the Eighth District that he needed more blacks on his tactical team. (Ex. D, Perry Dep. p. 214).

Response:    Agree that Perry stated this during her deposition. Dispute whether or not this is true.

A letter written by Sgt. Lawrence R. Pasco raises questions on whether or not this is true. He states that she questioned the make up of the A/1 Saturation Team. (Defendant's document C009002)

90. During the 2000, Bud Billiken Parade, Commander Perry did not tell a tactical sergeant from another District not to come back to the Parade unless he had some people of color in his tactical team. (Ex. D, Perry Dep. p. 214-215).

Response:     Agree that Perry stated this during her deposition. Dispute whether or not this is true.

91. Lipman testified that when she started working in the Second District in 1999, not all of the desk sergeants were African-Americans, nor were all of the desk sergeants African Americans when she left the Second District in 2001. (Ex. C, Lipman Dep. pp. 46-47).

Response:     Agree.

92. The only category of officers that Plaintiffs allege were systematically replaced by African American officers were the categories of desk sergeant and watch commander. (Ex. C, Lipman Dep. p. 47).

Response:     Agree.

93. Roche testified in her deposition that her allegations of Perry systematically removing white officers and replacing them with black officers is based upon the fact that Perry transferred her to the midnight shift from afternoons. (Ex. B, Roche Dep. Vol. II, pp. 17, 21).

Response:     Agree that this was part of Roche's analysis. Dispute that this was her sole analysis.

94. Plaintiffs allege that Perry discriminated against O'Sullivan by reassigning her from the midnight shift where she worked as the watch commander to the afternoon shift where she continued to work as the watch commander on many occasions. (Ex. C, Lipman Dep. pp. 42-43; O'Sullivan Dep. p. 38).

Response:    Agree that she continued to work as the watch commander; disagree with the characterization that this occurred on many occasions.

95. O'Sullivan testified that she believed Perry removed her from the first shift as a result of a verbal altercation that O'Sullivan had with Lieutenant Crump-Hales which resulted in a CR investigation which initially resulted in a sustained finding. (Ex. A, O'Sullivan Dep. pp. 38-46).

Response:    Dispute.

96. After an investigation, a request to order O'Sullivan to receive counseling was withdrawn because she had not received two sustained complaint registers within a year. (Ex. A, O'Sullivan Dep. pp. 93-94).

Response:    Agree.

97. Roche was suspended from work on August 31, 2001 because she had a sustained CR against her. (Ex. B, Roche Dep. Vol. II, p. 88).

Response:    Agree.

98. Lipman testified that she did not receive any loss in salary due to the actions that she alleges in her Complaint. (Ex. C, Lipman Dep. p 144).

Response:    Agree that she stated this, but the statement was in error. Dispute that this is an uncontested fact; both Lipman and O'Sullivan received more pay when they were assigned as Watch Commander. Therefore the assignment of others to that position caused financial loss to O'Sullivan and Lipman.

99. Commander Perry requested that both O'Sullivan and Lipman be transferred to the Second District. ( Ex. N, Perry December 15, 1999 Memo).

Response:    Agree.

100. Both O'Sullivan and Lipman served as a watch commander while working under Commander Perry in the Second District. (O'Sullivan Dep. p 78; Lipman Dep. p 40-42).

Response:    Agree.

101. O'Sullivan admitted that her allegations that Perry systematically removed white officers and replaced them with black officers was based on Roche's shift change:

Q.    ...was she removed as watch commander or was she transferred to another shift?
A.    She was sergeant at the time, so she would not have been watch commander. She was just moved from one shift to another.
Q.    Okay. And you consider that a part of systematically removing white officers and she was replaced with an African American officer?
A.    Correct.
Q.    So she was moved from one shift, one watch to another watch?
A.    Correct.

(Ex. A., O'Sullivan Dep. P. 32).

Response:    Agree that the above was part of the reasoning; dispute that this was the sole basis for the reasoning.

# Additional Facts Requiring the Denial of Summary Judgment:

**Hostile Environment**

1. During 2000, Lt. Crump-Hale had daily access to Commander Perry and spoke to her in person about 70% of the time. (Crump-Hale Deposition p. 46)

2. Commander Perry permitted the front office to hold CR investigations, and as a result white officers were served with formal reprimands for failure to turn work in on time. (Roche Deposition volume II, p. 8.)

3. African American police officers did not receive the same type of unwarranted reprimands as those received by the white officers. (Roche Deposition volume II, pp. 11-13.)

4. Roche complained to Ron Jablon, who was the Area Deputy, about incidents occurring at the 002 District. His response to her complaint was "oh, use it as fodder for a lawsuit, sergeant." (Roche Deposition volume II, pp. 14-15.)

5. Commander Perry, in her response to CR # 265581, stated "It is ironic because officers and personnel of color perceived Lieutenant O'Sullivan to be a racist. In fact, Vance Henry of the C.A.P.S. Program, a City employee, once filed a complaint against Diane O'Sullivan alleging racism. At that time, I assumed that there was a misunderstanding and that he had perceived her actions to be racist when they were not. I actually backed her. I have since come to believe that Mr. Henry did correctly judge her conduct. " (Defendant's Documents # C009111.)

6. Commander Perry, in her response to CR # 265581, stated "I must also add that by the time I replaced Diane O'Sullivan with Richard Johnson the working relationship between us had deteriorated so badly that there was no communication whatsoever. She and the other members involved in the action against me were holding extended closed-door meetings in the watch

commander's office on an almost nightly basis. Black personnel had begun to refer to these as "Klan Meetings". There was an atmosphere of tension and distrust. I had also come to believe that not only did Lt. O'Sullivan not have people skills but she also lacked integrity. " (Defendant's Documents # C009111.)

7.　　　Commander Perry, in her response to CR # 265581, stated "Since being assigned to 002, Sgt. Roche has wanted a more lenient standard of discipline for herself and those she perceives to be her equals while wanting another more stringent standard for those she does not care for. In most cases, the people who are on the receiving end of her stronger discipline standards are people of color. She is rude, abrasive and, based upon what I have seen of her, including what she has written in this complaint, I believe that she is untruthful and unethical. " (Defendant's Documents # C009112.)

8.　　　Commander Perry, in her response to CR # 265581, stated "As to the matter of black supervisors, I have initiated Complaint Register Numbers against them also. What must be kept in mind with this is that the black supervisors do not often have the same kind of conflict as the complainants in this action have with others. From my perspective it appears to be a case of this particular group, for the most part, not having the ability to speak to people of color in a non-condescending manner. " (Defendant's Documents # 009114.)

9.　　　Commander Perry, in her response to CR # 265581, stated "I asked Lieutenants Lipman and O'Sullivan to monitor the conduct of those working under their command. I told them I had heard rumors relative to alleged abuses, both physical and verbal, supposedly committed by certain male white first watch personnel led by Sgt. Allen Cain. I informed them that I had no specifics but some of the rumors that I had heard had to do with insensitivity to the community

such as the personnel in question cutting their hair very short, particularly during warmer weather, in the style of skinheads, wearing their pants tucked into their boots as if they were storm troopers and going into CHA Developments along State and Federal where they treated the residents as second class citizens." (Defendant's Documents # C009116.)

10.     Commander Perry, in her response to CR # 265581, stated "This is a situation in which a group of supervisors believe that they should not be held to the same rules of behavior as are other District personnel. Some members believe they have been inequitably scrutinized by Diane O'Sullivan, Allen Cain, and Janice Roche in particular. Among them are Sgt. Tony Brown, Officers Gail Martin, Gregory Gilmer, Renee Sanders, and Etienne Davis, all of whom are African American. " (Defendant's Documents # C009120.)

11.     Commander Perry, in her response to CR # 265581, stated "Diane O'Sullivan, Allen Cain, and Janice Roche are perceived as being people who have no respect for and who treat most African American people, including myself, with disdain and condescension. They do not seem to be capable of speaking to black people in a manner that affords them the dignity that is due them as human beings. " (Defendant's Documents # C009120.)

12.     Commander Perry, in her response to CR # 265581, stated "One of the lieutenants even told Personnel that I was having a nervous breakdown. They have tried to destroy me. I ask that this entire matter be thoroughly investigated. When it is found that I am not guilty as accused, I ask that they be treated as harshly as they treated me." (Defendant's Documents # C009129.)

13.     Commander Perry interfered with Roche's right to bid for the day watch in summer of 2000 and did this by posting the bidding for the day watch on Roche's off-day. (Roche Deposition volume II, pp. 18-27.)

14.     Sgt. Pasco, in a letter to Perry dated April 17, 2001, stated that she never said that the Saturation Team was not black enough, but did state that she questioned him regarding a rumor circulating through the district that an officer had to be white to be detailed to the team. (Defendant's Documents # C009002; Roche Deposition volume II, p. 70.)

15.     Commander Perry, in her response to CR # 265581, stated that "First, Sergeant Roche's statement as fact that no other sergeant wanted the midnight desk sergeant position is not true. I learned that Sgt. Vernon Crawford, who is black and who has been on watch far longer than Sgt. Roche did want the position but had never been offered the opportunity to be the desk sergeant. When Sgt. Roche came onto the watch, Lt. O'Sullivan, gave her the position in spite of her having a reputation of often being unable to speak to people in a pleasant manner. This attitude encompassed both citizens and police personnel. Desk personnel and other personnel, both sworn and civilian, were of the opinion that she did not respect anyone who was not white. Many people who believed that she spoke down to them can be found on both the First and Third Watches in 002. Many police personnel including myself, feel that Sgt. Roche is self-centered, arrogant, condescending, difficult, overbearing and pushy, particularly toward people of color." (Defendant's Documents # C009106.)

16.     Commander Perry, in her response to CR # 265581, stated "The staff of the Community Policing Office were assigned prior to my assuming command. They are veteran officers who have been working in the office for several years. I saw no reason to replace them until I determined their job performance. We developed a tremendous working relationship. They are extremely capable and I would be hurting myself if I removed them from their positions. When the Community Policing Sergeant of ten years retired, I allowed the staff to select their new

28

sergeant. I did this because I had so much confidence in them and I wanted to ensure that their cohesive hard-working unit did not fall apart when their beloved long-time sergeant retired; I have not been disappointed with their choice." (Defendant's Documents # C009108.)

17.     Sgt. Roche was unable to talk to Commander Perry during April 2001 and afterwards. Roche testified that Perry did not make herself available. She had instructed her staff not to let Roche be alone with her and not to converse with her. (Roche Deposition volume II, pp. 104-105.)

18.     According to Lt. Crump-Hale, Commander Perry had an open door policy. (Crump-Hale Deposition p. 47).

19.     In October 2000, Roche initiated a CR against officer Gilmer. During the investigation of that CR, which occurred at Roche's home while she was on medical leave, Roche was informed that IAD was doing the investigation as opposed to the 002 District because the commander did not have confidence in white supervisors to give Gilmer a fair investigation. This information from Commander Perry was given to the investigator through a letter. (Roche Deposition volume II, pp. 59-60.)

20.     Lieutenants O'Sullivan and Lipman noticed a marked difference in how Commander Perry treated the white officers as opposed to the black officers. O'Sullivan stated in the deposition that Commander Perry treated the black officers (Lieutenant Michael Johnson, Lieutenant Hugh Holton and Lieutenant Richard Johnson) in a friendly manner and made time for them, while she did not do this for the white officers. (O'Sullivan Deposition p. 145-150).

21.     Lt. Crump-Hale told Lipman that she had had a conference with the Commander regarding the CR # against Roche and Lipman and the domestic battery situation, indicating the

Commander's encouragement to Crump-Hale to initiate a CR. (Lipman Deposition p. 112-113.)

22.     Lt. Lipman was improperly accused of failing to make court notifications to police officers by Commander Perry, and despite the fact that she informed her that it was Lt. Johnson that was the watch officer on the night the notification should have been made out, she was still reprimanded for it. (Lipman Deposition p. 139.)

23.     Sergeants and Lieutenants filed grievances against Commander Perry on September 27, 2000. (Document #C008811-008812.)

24.     Sgt. Penny provided information regarding discriminatory actions of Commander Perry in a sworn statement taken on November 20, 2000 and contained in a transcript provided by defendant. (Defendant's Documents # C008851-C008855.)

25.     Lt. Lipman provided information regarding discriminatory actions of Commander Perry in a sworn statement taken on November 27, 2000 and contained in a transcript provided by defendant. (Defendant's Documents # C008861-C008870.)

26.     Lt. O'Sullivan provided information regarding discriminatory actions of Commander Perry in a sworn statement taken on December 13, 2000 and contained in a transcript provided by defendant. (Defendant's Documents # C008903-C008915.)

27.     Sgt. Roche provided information regarding discriminatory actions of Commander Perry in a report dated December 27, 2000. This was in relation to CR #265581. (Defendant's Documents # C008925-C008928.)

28.     The front office personnel were treated in a more favorable manner than plaintiffs. The front staff is primarily African American. Commander Perry would often have animated conversations with the staff. However, when she was having conversations with Lt. Lipman she

was short with her, would refuse to look her in the eye, and in fact discouraged conversations between Lipman and herself. (Lipman Deposition pp. 128-129.)

29.   When Lt. Lipman complained about her treatment by the front office staff, Commander Perry did not respond or address the hostile environment. (Lipman Deposition p. 129.)

30.   In her report in response to CR #265581, Commander Perry stated that "I told my office staff that I did not want to have any contact with Janice Roche. I also told them that I did not want Ms. Campbell to speak with her or to have any personal with her either. I said I wanted everything involving her to be handled through reports or through her supervisors. I also told them that I never wanted to be left alone with her under any circumstances if I could not avoid a personal meeting with the Sergeant." (Defendant's Documents # C009105.)

31.   Lt. Crump-Hale never had a CR brought against her by Commander Perry except for CR #264869 which involved O'Sullivan. (Crump-Hale Deposition p. 75).

32.   Commander Perry instructed Lt. Lipman to be reprimanded for failing to inform officer Daniels about a court call despite the fact that it was an African American officer, Richard Johnson, rather than Nancy Lipman, who had made the error. (Perry Deposition p. 205-212.)

**Commander Perry's Favoring of African American Officers in Positions of High Visibility**

33.   O'Sullivan worked as a Watch Commander from February 2000 – September 2000. (O'Sullivan Deposition p. 21)

34.   Lt. O'Sullivan was replaced as a Watch Commander in September 2000 by Commander Perry. She was replaced by Lieutenant Richard Johnson, an African American (O'Sullivan Deposition p. 22; Perry Deposition p. 125).

35.   Commander Perry, in her response to CR # 265581, stated "I have not systematically

removed white supervisors from high profile positions to replace them with non-whites. In the matter of Sgt. McBride's removal as Desk Sergeant, first, as District Commander, it is my prerogative to choose the desk sergeant. The removal of Sgt. McBride had nothing to do with racism. She is not a "people person" and her temperament did not present the image of the Department that I wanted to represent me at the desk. " (Defendant's Documents # C009110).

36. Commander Perry, in her response to CR # 265581, stated "Lt. Drozd was removed because she also was not a 'people person'. Lt. Diane O'Sullivan was also replaced for the same reason. I found it increasingly difficult to work with Lt. O'Sullivan because she was not knowledgeable about Department Rules and seemed to believe that I was out to get her when I followed those rules. " (Defendant's Documents # C009111.)

37. Lieutenant Richard Johnson had less experience being a lieutenant than either Diane O'Sullivan or Nancy Lipman. (Perry Deposition p. 125).

38. After being replaced by Commander Perry in September 2000, Lt. O'Sullivan only served as a watch commander on the watch commander's days off. (O'Sullivan Deposition p. 22)

39. Sergeant McBride, a female Caucasian, was replaced by Sergeant Prentiss Jackson, a male African American, on the order of Commander Perry. (O'Sullivan Deposition p. 28; Perry Deposition p. 91).

40. Traditionally it is the Watch Commander who determines the Desk Sergeant, and not the Commander of the district. (O'Sullivan Deposition p. 31)

41. At the time of McBride's transfer, Lieutenant Drozd was the Watch Commander. She did not choose to transfer McBride; that was ordered by Commander Perry. (O'Sullivan Deposition p. 31).

42.     Lieutenant Drozd, a Caucasian Watch Commander, was told by Commander Perry that

she did not fit in at the district and was told to find a new assignment. She was temporarily

replaced by Lieutenant Daly, a Caucasian, as Watch Commander. However, the permanent

replacement was Michael Johnson, an African American. (O'Sullivan Deposition p. 34).

43.     Commander Perry stated that the reason for this transfer was that the people in her office

complained about Lieutenant Drozd. These people are Marilyn McGuire, Crystal Knowles,

Martrice Campbell and Wanda Torres. All of these individuals except for Wanda Torres are

African Americans. (Perry Deposition p. 97-99).

44.     Sgt. Roche was banned from working as a desk sergeant and the position was given to an

African American sergeant, Vernon Crawford. (Roche Deposition volume II, p. 36; Defendant's

Document # C008929-COO8930.)

45.     Commander Perry could not provide specificity about when McGuire, Knowles, Campbell

and Torres complained about Lieutenant Drozd. (Perry Deposition p. 102).

46.     Lieutenant Crump-Hale was appointed as Tactical Lieutenant by Commander Perry.

(Crump-Hale Deposition p. 20).

47.     It is established practice that the watch commander chooses the desk sergeant who works

underneath her, and in Lt. Lipman's experience, she has not seen a commander outside of

Commander Perry decide who the desk sergeant would be for a watch commander. (Lipman

Deposition p. 22.)

48.     When Lt. O'Sullivan was removed from her position as watch commander by Commander

Perry, Lt. Lipman took over being the watch commander, being the only lieutenant on the watch,

until she was replaced by Lt. Richard Johnson, an African American, whose replacement was

made by Commander Perry. (Lipman Deposition p. 41.)

49.     Sergeant McBride, a Caucasian, did not receive any complaints regarding her work and there is no reason other than race for her removal as desk sergeant. (Lipman Deposition p. 46-47.)

50.     Lt. Drozd was removed on or about June 22, 2000 as watch commander, and she had exceptional experience in this position. (Lipman Deposition p. 51-52, 54.)

51.     Lt. Drozd was replaced by Lt. Michael Johnson, an African American, as watch commander. (Lipman Deposition p. 54.)

52.     Prior to Sergeant Roche's being informed by Commander Perry that she would not be the desk sergeant, Sgt. Roche had been trained to be the desk sergeant and had experience in that position. (Lipman Deposition p. 55-56.)

53.     Vernon Crawford informed Roche that he did not want to be the desk sergeant. (Roche Deposition volume II, p. 100.)

54.     Lieutenant Michael Shields, an African American, was appointed as C.A.P.S. Lieutenant by Commander Perry. (Crump-Hale Deposition p. 28).

55.     Lt. Crump-Hale stated that there is more prestige in being a Tactical Lieutenant than in being a Field Lieutenant. (Crump-Hale Deposition p. 41).

56.     Other Caucasian lieutenants at the time of the appointments of Lt. Crump-Hale and Lt. Shield had more time in service as a lieutenant than did Shield and Crump-Hale. (Crump-Hale Deposition p. 44, Perry Deposition p. 134).

57.     Lieutenants O'Sullivan and Lipman were informed by Commander Perry that Sgt. Roche could not be a desk sergeant. (Perry Deposition p. 112).

58.    During her deposition, Commander Perry could not provide a single other incident of a commander dictating who could and could not be a desk sergeant. (Perry Deposition p. 112).

**Commander Perry's Complaint Register Number 265581 Against Herself**

59.    Commander Perry worked for the Internal Affairs Division. She told Lt. O'Sullivan and others that she had had many connections with the Internal Affairs Division and she maintained those many relationships. O'Sullivan stated that she felt that Commander Perry used those relationships to retaliate against her. The basis for this belief is that in the CRs filed against her Internal Affairs Division did not follow the proper procedures in investigating the case. (O'Sullivan Deposition p. 83-85).

60.    Commander Perry initiated a CR against herself on the basis that she felt that charges of discrimination were going to be made against her and wanted them to be investigated. In the request she stated that she wanted those who were going to accuse her to be punished. (Garcia Deposition p. 25-28).

61.    Despite having completed the investigation into Perry's complaint in January 2002 no action had been taken to close the CR up to April 11, 2003. (Garcia Deposition p. 32).

**The Garcia Retaliatory Investigation**

62.    Lt. O'Sullivan received a CR against her for allegedly failing to complete a report required by Agent Garcia. However, Agent Garcia never provided a time frame in which to provide the report. (O'Sullivan Deposition p. 66-68, 71-73). According to Garcia he gave her and Lipman only seven days to file a report. (Garcia Deposition p. 41, 45).

63.    Lt. Lipman was retaliated against by Garcia when he initiated a complaint against her for failing to submit a report. (Lipman Deposition pp. 87-88.)

64.    Agent Garcia failed to provide sufficient notice to Lt. Lipman to appear at his office for an investigation and as a result she did not have her notes at the time of her meeting with him in October 2000. When Lipman informed Garcia that no notice had been given, he proceeded with the meeting. (Lipman Deposition p. 100; Defendant's Documents # C008832.)

65.    When Lipman stated that she needed time to complete the report, to contact her attorney and to get notes, Garcia refused to give her this time and filed a CR against her for failure to provide a report. (Garcia Deposition p. 49-53).

**Retaliation Against Sergeant Roche**

66.    Being on the scene of a crime and requesting back up and receiving no backup can be life threatening. (Perry Deposition p. 224-225).

67.    It is police procedure that when someone asks for backup, officers come. Having no officers respond for a significant period of time is highly unusual. (Roche Deposition volume II, p. 101.)

68.    Martrice Campbell was a civil employee under Commander Perry who began the petition drive. (Roche Deposition volume I, pp. 17, 23; Roche Deposition volume II, p. 78.)

69.    The petition was seen by Roche at radio call and police officers were being intimidated into signing it while getting their radios. (Roche Deposition volume I, pp. 21, 25; Roche Deposition volume II, pp. 80, 82.)

70.    "White cops: Black boss biased," an article written by Frank Main and Fran Spielman, appeared in the Chicago Sun-Times on April 18, 2001. (Document # C008999-009000.)

71.    Roche talked to Jeff Wilson, the lieutenant who is an attorney with the union, regarding being stranded. Roche told him that she did not feel it was safe to go on the street when no one

responded to her request for backup. (Roche Deposition volume I, pp. 45-46.)

72.    When Roche and Jeff Wilson called to complain about the incident to the EEO office of
the Chicago Police Department, the EEO office, manned by Gary Ashimero, told them that if she
didn't want trouble she shouldn't put her name in the newspaper. This was referring to the
Chicago Sun-Times article where Commander Marienne Perry was accused of discriminating
against the white officers under her. (Roche Deposition volume I, pp. 48-49; Roche Deposition
volume II, p. 97.)

73.    Sgt. Roche contacted Lt. O'Sullivan as well about having no one responding to her
request for backup. During the call, she was hysterical because she was so afraid. (Roche
Deposition volume I, p. 53.)

74.    Although Commander Perry could not remember precisely how she found out that Sgt.
Roche was stranded at a crime scene on April 13, 2001 (the same day as the Sun-Times article
was printed) without backup, she did testify that she heard about the incident at a later date.
(Perry Deposition p. 224).

75.    A petition was prepared by one of the civilian in Commander Perry's office in support of
Commander Perry and police officers were intimidated into signing the petition. (Roche
Deposition p. 13-15).

76.    During the deposition of Crump-Hale the following exchange took place:

    Q.  Were you ever aware of a petition?
    A.  No, I never saw it.
    Q.  What petition do you think I'm referring to?
    A.  You said a petition. I said no, I never saw one.
    Q.  You never seen a petition ever or any type?
    A.  You said was I aware of a petition.
    Q.  Right. And I was – I hadn't finished my question yet. So I'm wondering what petition

you think I'm referring to since you since you seem to know the answer before I finish my
question.
A. You said was I aware of a petition. I thought you had finished. I'm not aware of a
petition.
(Crump-Hale Deposition p. 77-78).

77.     According to Lt. Crump-Hale she was the first to inform Commander Perry regarding the

Sun-Times article. (Crump-Hale Deposition p. 79.) Crump-Hale got a copy of the article from

another police officer because the article was floating around the district. (Crump-Hale

Deposition p. 82). This contradicts the testimony of Commander Perry, who stated that she

received information from the reporter the day before. (Perry Deposition p. 220-222).

**The Crump-Hale/O'Sullivan Complaint Register Number 264869**

78.     Commander Perry initiated a CR # 264869 against Lieutenant O'Sullivan and Lieutenant

Crump-Hale after an incident occurred between Lieutenant O'Sullivan and Lieutenant Crump-

Hale on August 16, 2000. (O'Sullivan Deposition p. 39, 86).

79.     Despite the fact that the allegation in the CR addressed a conflict between the O'Sullivan

and Crump-Hale which had few if any witnesses, IAD never discussed the charge with

O'Sullivan, creating an inference that the investigation was improper and improperly motivated.

(O'Sullivan Deposition p.171-172).

80.     Despite a finding that the CR against Lt. O'Sullivan was not sustained, Commander Perry

stated in the report that she did not concur with the report. (O'Sullivan Deposition p. 45-50,

101).

81.     Lt. O'Sullivan was never informed of the result of the CR until she was told in April 13,

2001 that it was sustained and that she was to have a formal counseling. (O'Sullivan Deposition

p. 45-50, 160-161; Defendant's Documents # C009085).

82.     April 13, 2001 was the same day that an article on the EEOC charges came out from the Sun-Times. (O'Sullivan Deposition p.198).

83.     After the matter was resent to IAD for failure to inform O'Sullivan of the results of the CR, it was returned as not sustained. This occurred most likely in the spring of 2002. (O'Sullivan Deposition p. 45-50, 82-83, 86-91).

**O'Sullivan I-Bond Complaint Register Number 264868**

84.     On August 16, 2000, Commander Perry initiated a CR #264868 against Lt. O'Sullivan with respect to I-bonding a prisoner. (O'Sullivan Deposition p. 185.)

**Roche/O'Sullivan Complaint Register Number 271488**

85.     In July of 2001, three months after the filing of EEOC charges against Commander Perry and the City of Chicago Police Department, detention aide workers Shannon Lang and Lloyd Huddleston under Commander Perry initiated a CR against Plaintiff Roche and Plaintiff O'Sullivan for racial harassment. This CR was clearly improper, as it was for a period of time when neither O'Sullivan or Roche worked at 002 District. After an investigation the charge was found to be not sustained against either plaintiff. (O'Sullivan Deposition p.102-105.)

**Cain/Lipman Complaint Register Number 260723**

86.     Sergeants and lieutenants filed an allegation of discrimination against Commander Perry discrimination on September 27, 2000. (Garcia Deposition p. 36).

87.     On March 6, 2000, an incident occurred regarding Cynthia Hudson and Sergeant Cain. The result of that incident was a CR #260723 being filed against Lipman by Cynthia Hudson. (Lipman Deposition p. 70-71.)

88.     CR #260723, although addressing an incident happening on March 6, was not procured

until March 10. (Lipman Deposition p. 71.)

89.     The CR was based on a complaint by Hudson that Lipman failed to institute a Complaint
Register investigation against Cain. Lipman testified that this incident was clearly retaliatory for
the allegations made against Perry, because the delay in procuring the investigation can only be
explained by Commander Perry deciding to use a four-day old incident against Lipman. (Lipman
Deposition p. 71-73.)

90.     Despite Commander Perry's being Lt. Lipman's commanding officer, Perry never
discussed the issue with Lipman. (Lipman Deposition p. 73-74.)

91.     The CR initiated was unfounded. (Lipman Deposition p. 74.)

92.     Commander Perry failed to do any initial investigation during the one hour allotted prior
to filing a report and as such supported an improper CR in being filed. (Lipman Deposition p. 74-
77.)

**Commander Perry's Unilateral Change of Officer Gilmer's Performance Rating**

93.     Commander Perry changed the score of Officer Gilmer, an African American officer,
without seeking a discussion with the Caucasian supervisors and failed to take into account
uniform violations which Gilmer had on his record. (Perry Deposition p. 170, 174, 181-182)

**Damages**

94.     For each day that a lieutenant works as a Watch Commander, that lieutenant receives an
out-of-grade pay increase for that period. (O'Sullivan Deposition p. 17).

95.     As a result of the discrimination and retaliation by Commander Perry and the Chicago
Police Department Lt. O'Sullivan stated that she felt that she no longer has the same job
advancement potential as those who have not made such complaints. (O'Sullivan Deposition p.

108-109).

96.     Many of the officers promoted with O'Sullivan and Lipman to lieutenant have been appointed to exempt positions. Despite exemplary careers neither Lipman or O'Sullivan has been given such opportunities. (O'Sullivan Deposition p. 182-184).

97.     Captain Crump-Hale during her deposition testified that assignments are typically made by the request of a Commander rather than by the request of the police officer and as such appointments are often the result of reputation rather than an action taken by the police officer. (Crump-Hale Deposition p. 14).

98.     During late Spring 2003, Roche was assigned to work in 002 District, as she was a floater. When she arrived, she found someone else had taken the position and while she was there, the phone rang and on the phone was Commander Perry, making sure that the alternative police officer, Lt. Isaacs, was at the assignment rather than Roche. (Roche Deposition volume II, p. 107-108.)

99.     As a result of the stress created by the discrimination of Commander Perry and the retaliation of the Chicago Police Department, Roche began suffering migraines and other stress-related illnesses, including a gallbladder attack. (Roche Deposition volume II, p. 83-85.)

100.    Because of the CRs incurred by Roche as a result of the discrimination of Commander Perry, Roche was required to attend a disciplinary review board prior to being admitted by the Illinois Attorney Registration and Disciplinary Committee. (Roche Deposition volume II, p. 87.)

101.    Perry damaged Roche's reputation. (Roche Deposition volume II, p. 89, 93-94.)

102.    Captain Crump-Hale's testimony regarding who recommended her for Captain contradicted Commander Perry's testimony regarding the fact that she recommended Captain

Crump-Hale. Crump-Hale stated that Marienne Perry did not recommend her (Crump-Hale Deposition p. 22), while Perry stated that she did. (Perry Deposition p. 133)

103.    Lipman stated that as a result of filing this charge she has been professionally hindered. She has not been able to procure positions that she would have been able to absent the charge, including Tactical Lieutenant. (Lipman Deposition p. 136.)

104.    Lipman as a result of the treatment suffered at the hands of Commander Perry, the police department, and Commander Perry's front office staff, has experienced substantial anxiety and depression. (Lipman Deposition p. 138.)

105.    As a result of the stress caused by Commander Perry, Lieutenant uO'Sullivan was directed to take Wellbutrin by her doctor. (O'Sullivan Deposition p. 115)


                                    Diane O'Sullivan, Nancy Lipman and Janice Roche,
                                                                            Plaintiffs,


                                    By: _Elisabeth Shoenberger_
                                                    Their attorney

**Proof of service**:  I, Elisabeth Shoenberger, an attorney, certify that I served this Rule 56.1(b)(3) Statement and Evidentiary Appendix on defendant on April 30, 2004, by delivering a copy of the same to a person in charge of the office of its attorney:

> Kevin T. Lee
> Carl Turpin
> Greene and Letts
> Attorneys for Defendant
> 111 West Washington Street
> Suite 1650
> Chicago, IL 60602

from the U.S. Post Office, Loop Station, Chicago, Illinois, with proper 1st-class postage affixed, on April 30, 2004.

*Elisabeth Shoenberger*

Elisabeth E. Shoenberger

Law Offices of Elisabeth Shoenberger
770 N. Halsted Street, Suite 205
Chicago, Illinois 60622
312-733-1601

| Diane O'Sullivan, Janice Roche, and Nancy Lipman,<br><br>      Plaintiffs,<br><br>– v –<br><br>City of Chicago,<br><br>      Defendant. | **No.: 01 C 9856**<br><br><br>Magistrate Judge Levin<br><br><br>**Jury Trial Demanded** |
| --- | --- |

## Evidentiary Appendix

1.     Deposition of Captain Crump-Hale

2.     Deposition of Agent Garcia

3.     Deposition of Lieutenant Lipman

4.     Deposition of Commander Perry

5.     Deposition of Janice Roche (Volume I and II)

6.     Deposition of Diane O'Sullivan

7.     Defendant's Documents referenced in Plaintiffs' Brief