# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| DIANE O'SULLIVAN, JANICE ROCHE, and NANCY LIPMAN | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 01 C 9856 |
| v. | ) ) | Magistrate Judge Jeffrey Cole |
| CITY OF CHICAGO, | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER RE DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

### I.
### BACKGROUND

The trial in this case began with jury selection on April 10, 2006 and ran through April 21, 2006, when the case was turned over to the jury. On April 24, 2006, the jury returned a verdict in favor of the City on the plaintiffs' discrimination claims and a verdict in favor of the plaintiffs on their retaliation claims, awarding: (1) $225,000.00 to Nancy Lipman; (2) $50,000.00 to Diane O'Sullivan; and (3) $25,000.00 to Janice Roche. At the close of plaintiffs' case on April 19, 2006, defendant filed a Motion for Judgment as a Matter of Law that argued that none of the plaintiffs had made out a *prima facie* case of discrimination or retaliation.

Following the verdict, the City renewed its motion for judgment as a matter of law and also requested a new trial, arguing that it was unfairly prejudiced during the trial for the following reasons: (1) failure to sever the individual plaintiffs and require separate trials; (2) failure to allow the rebuttal testimony of Gary Yamashiroya, the EEO Officer with the Chicago Police Department;

(3) the introduction into evidence of a newspaper article regarding the lawsuit; (4) O'Sullivan's testimony regarding a telephone conversation she had with Roche; (5) failure to submit a special interrogatory to the jury regarding the alleged failure of police officers in the Second District to send "backup" to Roche during an altercation in the Robert Taylor Homes; (6) allowance of the plaintiffs' claims for damages, which the City claims it could not have anticipated; (7) introduction of evidence on the issue of race; (8) allowance of evidence on the failure to promote Lieutenant Lipman to Captain; (9) denial of a mistrial when Roche testified about four anonymous letters she sent to Superintendent of Police that were never produced or referenced until cross-examination; and (10) errors in various jury instructions.

For the reasons that follow, the Motion is denied.

## II.
## THE MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.
### The Standard Applicable To JMOL Motions

Pursuant to Rule 50(a)(1), Federal Rules of Civil Procedure, judgment as a matter of law is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [an] issue . . . ." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). Since "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge,'" *id.* at 150, the court must review the record as a whole, giving credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* at 151. *See also Waubanascum v. Shawano County*, 416 F.3d 658, 664 (7th Cir. 2005).

2

Thus, a jury verdict will be overturned only if it can be concluded that no rational jury could have found for the plaintiff. The standard is applied "stringently" in discrimination cases, which often involve sensitive and difficult issues of fact, resort to and reliance on circumstantial evidence, and witness credibility is often crucial. *Tart v. Illinois Power Co.*, 366 F.3d 461, 472 (7th Cir. 2004); *Collins v. Kibort*, 143 F.3d 331, 335 (7th Cir. 1998). It is against this analytical backdrop that the City's complaints about the trial must be considered.

## B.
## The Law Applicable To The Plaintiffs' Claims

The City's brief inexplicably spends most of time arguing that the plaintiffs failed to meet the *prima facie* burden that the City insists must be met under *McDonnell Douglas Corporation v. Green,* 411 U.S. 792 (1973). The argument ignores the Seventh Circuit's repeated admonition that:

> After a full trial, the only pertinent question is whether there was enough evidence to permit the jury to consider the ultimate questions of discrimination and retaliation. It is not, . . . , an occasion for the court to march back through the intermediary burden-shifting steps established by *McDonnell Douglas.* We instead look to the totality of the evidence to determine whether the plaintiffs presented sufficient evidence to support the jury's determinations that they were the victims of . . . retaliation.

*Harvey v. Office of Banks and Real Estate*, 377 F.3d 698, 707-708 (7th Cir. 2004). *See also Collins,* 143 F.3d at 335; *Hanmer v. St. Vincent Hosp. and Health Care Center, Inc.*, 224 F.3d 701, 705 n.3, 708 (7th Cir. 2000); *Piraino v. International Orientation Resources, Inc.*, 137 F.3d 987, 990 n.1 (7th Cir. 1998).

The argument is odder still in light of the defendant's counsel's admission prior to and during the trial that the *McDonnell Douglas* burden-shifting was not applicable to a trial. (*See e.g.,* 4/11/2006–1 p.m. Tr. 87-88).

3

Equally flawed is the argument that each plaintiff, to prevail on her retaliation claim, had to establish that she was subject to an *adverse employment action*, which the City defines as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (*Defendant's Motion for Judgment as a Matter of Law*, at 3)("Motion"). The Supreme Court has recently held that "Title VII's substantive provision and its anti-retaliation provision are not coterminous. The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2414 (2006). The Seventh Circuit has long held such a view, which it explained in *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742 (7th Cir. 2002):

> We do not mean to suggest by such citations that retaliation, to be actionable under Title VII (or other statutes), has to involve an adverse employment action. It does not. Some cases reach this conclusion by interpreting "adverse employment action" in the retaliation context as not requiring an actual *employment* action; an example is *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986-87 (10th Cir.1996), where the retaliation took the form of preferring charges of theft and forgery against an employee who had filed a charge of discrimination. As we explained in *McDonnell v. Cisneros,* 84 F.3d 256, 258-59 (7th Cir.1996), "No limiting language appears in Title VII's retaliation provision."

*Id.* at 745 (some citations omitted). *See also Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006)("Although hundreds if not thousands of decisions say that an "adverse employment action" is essential to the plaintiff's *prima facie* case, that term does not appear in any employment-discrimination statute or *McDonnell Douglas,* and the Supreme Court has never adopted it as a legal requirement.").

4

**C.**

## An Overview Of The Attack On The Evidence And The Verdict On The Retaliation Counts

The City's method of attacking the jury's conclusion that the City retaliated against the plaintiffs is to tendentiously select bits and pieces of testimony it finds favorable. This is a delusive and impermissible tactic and one forbidden by Rule 59. Whether a defendant is entitled to judgment as a matter of law depends on a review of all the facts in the record, construed favorably to the plaintiffs, not on snippets of testimony excised from the informing context of the entire case and applied to a version of the facts rejected by the jury. *Cruz v. Town of Cicero, Ill.*, 275 F.3d 579, 587 (7th Cir. 2001). [1]

---

[1] Initially, the plaintiffs and the City provided either little, or in the main, no record support for their factual assertions or their claims about jury instructions, and thus I requested that relevant portions of the transcript be provided to chambers. For a variety of reasons, it would take many months to obtain the transcript. But even then, portions of the Motion continued not to cite to the record. For example, the Motion did not identify the portions of the transcript dealing with the testimony of Gary Yamashiroya (*infra*, at 19); the admission of the newspaper article (*infra*, at 23); the ruling on testimony pertaining to the phone call between Roche and O'Sullivan (*infra*, at 27); and Roche's testimony regarding anonymous letters she claimed she wrote to the Superintendent of Police. (*infra*, at 41). When complaining about jury instructions, the City's Motion did not identify proposed or given instructions by number or refer to the trial transcript.

This approach to briefing is contrary to the repeated admonitions of the Seventh Circuit and serves to make a judge's job more difficult. *See Byrd v. Illinois Dept. of Public Health*, 423 F.3d 696, 700 (7th Cir. 2005)(noting the benefit of trial transcript in evaluation of a motion for judgment as a matter of law); *Petit v. City of Chicago*, 239 F.Supp.2d 761, 770 (N.D.Ill. 2002)(noting benefit of careful consideration of Rule 50 motions with the benefit of trial transcripts); *Spina v. Forest Preserve Dist. of Cook County*, 207 F.Supp.2d 764, 769 (N.D.Ill. 2002)(criticizing failure of movant for new trial to cite to relevant portions of trial transcript); *Compare LaFollette v. Savage*, 63 F.3d 540, 544 (7th Cir. 1995)(at appellate level, broad challenge to the sufficiency of the evidence generally requires submission of a complete transcript of the trial along with the exhibits properly admitted into evidence).

The Seventh Circuit's recent lament in *United States v. White*, 472 F.3d 458 (7th Cir. 2006) applies equally here:

> The Federal Rule and our Circuit Rule are not created for the purpose of imposing frivolous requirements on attorneys who are already busy. The purpose of these rules is to ensure that the court has "all necessary documents before it as it considers the parties' arguments and renders its decision." The requirement embodied in these rules "goes to the heart of this
> (continued...)

Justice Holmes' admonition that "the character of every act depends on the circumstances

in which it is done," *Shenck v. United States*, 249 U.S. 47 (1919), applies equally in Title VII cases.

As the Supreme Court recently put it, "[c]ontext matters." *Burlington Northern and Santa Fe Ry.*

*Co. v. White*, 548 U.S.\_\_, 126 S.Ct. 2405, 2415 (2006). The real social impact of workplace behavior

often depends "on a constellation of surrounding circumstances, expectations, and relationships

which are not fully captured by a simple recitation of the words used or the physical acts performed."

*Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 81-82 (1998). As the Court explained in

*Burlington Northern*:

> A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

126 S.Ct. at 2415 -2416 (citation omitted). Here, the jury was privy to the "constellation" of

circumstances at the plaintiffs' workplace, and it concluded that the plaintiffs were subjected to

retaliation by the City – that is, that the City's conduct would have dissuaded a reasonable worker

from making or supporting a charge of discrimination. *Id.* at 2415.

---

[1](...continued)

court's decision-making process." This is nothing new, but we have become more insistent "on meticulous compliance with rules sensibly designed to make appellate briefs as valuable an aid to the decisional process as they can be." This court's workload increases dramatically if an appeal is transformed into a scavenger hunt in search of a copy of the judgment below or the transcript page where a challenged decision was explained by the district court. (*Id.* at 465)(citations omitted).

*Cf. Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1224 (7th Cir. 1995)(Posner, J.)

The plaintiffs' case was based, in part, on what they contended were unwarranted and retaliatory formal complaints (Complaint Registers or "CRs") filed against them by Commander Perry and Agent Garcia. *O'Sullivan v. City of Chicago*, – F.Supp.2d –, 2007 WL 496783 (N.D.Ill. Feb. 16, 2007)). Jeff Wilson testified that in his 22 years on the force, Commanders did not take out CRs against officers unless the event was egregious or they intended to harass or "get" the officer. The plaintiffs had never had CRs filed against them in their long careers in the police department prior to their experiences with Commander Perry in the Second District.

The City attempted to argue that a CR did not count for much since it was merely an investigation that might or might not be sustained and that an officer's CR history was not taken into consideration by the Promotion Board. *See id.*, 2007 WL 496783. The jury was not required to view the CRs as cavalierly as the defendants, *Harvey*, 377 F.3d at 708, and even Lieutenant Lilly Krump-Hales, who had gone through the promotion process, conceded that CR records *were* reviewed in connection with promotions (Tr.1156).[2]

Whatever merit the City's argument might have had with regard to some minor, technical infraction (out of uniform, unshined shoes etc), the jury was entitled to conclude that it had none in this case. Indeed, in the times in which we live and in a "paramilitary organization" (which is how the City repeatedly described the Chicago Police Department), the charge that O'Sullivan and Lipman disobeyed a direct order by refusing to cooperate in an investigation that involved their charges of racism against their superior officer, Commander Perry, could scarcely have been more significant, more punitive, or more lethal to any chance of promotion within the Department. Not

---

[2] Krump-Hales was an African American officer in the Second District and a friend of Perry's who testified as a defense witness.

only were the officers insubordinate (according to the CR issued by Agent Garcia), but the insubordination could be viewed as an indication that they had no proof against Perry and thus that they had made false charges on the most serious of matters against their commanding officer.

Although the information regarding all facets of the promotion process was easily available to the City, it introduced no evidence to show that CRs of the magnitude of those against Lipman either would not count or that in fact in Lipman's case they did not when she was twice denied promotion to Captain. In place of proof that the CRs were of no moment, both at trial and in the post-trial motions, there are only "lawyers' arguments – talk about what *might* be, rather than [evidence] about what *is*." *United States v. Babul*, _F.3d._ , 2007 WL 420693 (7th Cir. Feb. 9, 2007)(Easterbrook, C.J.)(Emphasis in original).

In short, based on the evidence and the reasonable inferences the jury was told it was entitled to draw from it (Instruction 7), the jury could – as it did– properly conclude that the CRs were significant and were an actionable form of retaliation, the inevitable and intended effect of which was to harm the plaintiffs.[3]

## D.
## The Evidence That Was Before The Jury

### 1.
### The Evidence Relating To Lieutenant O'Sullivan

The City argues that O'Sullivan failed to present sufficient evidence of retaliation because she complained only that she was wrongfully recommended for a behavioral intervention program

---

[3] The jury was told to use common sense in weighing the evidence and consider the evidence in light of their own observations in life. (Instruction 7).

that, as it turned out, she did not have to attend. (*Motion*, at 5). The difficulty with the argument is it carefully puts out of view large portions of evidence the jury found compelling. To begin with, when the plaintiffs filed their grievance against Commander Perry, accusing her of racial discrimination, it mysteriously "fell through the cracks" and was not assigned a CR number as the Department's rules and regulations required be done even with the most insignificant of infractions. (4/11/2006--1 pm Tr. 81, 117-19). It was for the jury to determine, in light of all of the evidence, whether this was inadvertent or intentional and whether this was part of a broader retaliatory scheme.

When rumors circulated that certain white police officers under Commander Perry's command believed that she was making racially discriminatory employment decisions, (4/11/2006 9:30 am Tr. 10-13, 37)- Perry effectively commandeered the subject matter of their grievance and went on the offensive by filing on September 11, 2000, a CR which, although nominally "against" herself, (4/11/2006– 9:30 am Tr. 10-13; 4/11/2006--1 pm Tr. 119; Plaintiffs' Ex. 10), was in purpose and function a complaint against Lipman, O'Sullivan and Roche and constituted her rationalization of the questionable employment decisions she had made. Perry denied knowing who was involved prior to the CR against herself, but the jury was entitled to disbelieve her, and her CR made clear she knew the plaintiffs were the complainants.

Thus, rather than having their complaint (which was filed on September 27, 2000) addressed and thoroughly investigated through the ordinary, proper channels as required by the Department's own procedures, the plaintiffs had to settle for Commander Perry dictating the terms of battle, as it were, by having preempted them with her own anticipatory filing, which transformed them from accusers to accused. They, not Perry, had to defend themselves in an investigation that coincidentally was being conducted by Agent Garcia, Perry's former colleague at the Internal Affairs

9

Division, even though he had no prior experience in handling complaints of racism.

During his investigation, Agent Garcia issued a CR O'Sullivan (and Lipman) for purportedly failing to comply with an order to support her complaint against Commander Perry with requested documentation – an order that was not conveyed to her until it was too late for her to comply. (*Plaintiffs' Response*, Trial Ex. 9, at 30). *See O'Sullivan v. City of Chicago*, – F.Supp.2d – , 2007 WL 496783 (N.D.Ill. Feb. 16, 2007). Assigning employees tasks that cannot be accomplished and using that non-performance as a basis for discipline is a classic tactic in retaliation and discrimination cases. The jury was entitled to conclude that the CRs were pretextual and retaliatory.

In addition, the jury heard evidence indicating that, when O'Sullivan might speak with another white officer in her office with the door closed, it was referred to as a "Klan" meeting. (Tr. 134). Commander Perry also submarined O'Sullivan's ability to discipline the African-American officers and staff under her. This could come through the general atmosphere of the office, in which Commander Perry tolerated rude and disrespectful behavior the African-American staff visited upon O'Sullivan. (Tr. 159-61, 171-73). Indeed, the jury could easily infer from Commander Perry's own testimony that she was inflexibly in her African American staff's corner when it came to criticisms of their performance from any one of the plaintiffs. (4/11/2006–9:30 am Tr. 14-17).

It could come through Commander Perry undermining O'Sullivan's authority by repeatedly berating her and questioning her decision-making. (4/11/2006--1 pm Tr. 132-33). It could come through Commander Perry assigning CR numbers to the complaints of African-American officers that O'Sullivan was racially biased when disciplining them. (Tr. 120). In fact, the two officers – detention aides – had no white detention aides with whom to compare their treatment. (Tr. 120). As the evidence unfolded, it became apparent that this essentially meant that Commander Perry was

10

throwing her weight behind the complaint of one of O'Sullivan's subordinates against O'Sullivan. (4/12/2006 9:30 am Tr. 215).

## 2.
## The Evidence Relating To Lieutenant Lipman

The argument that there is insufficient evidence to sustain the jury's verdict in favor of Lieutenant Lipman because there was no evidence that the Board that did not recommend her for promotion to Captain was animated by a retaliatory motive is meritless and ignores the evidence in the case. The evidence as it pertains to Lieutenant Lipman is discussed in *O'Sullivan v. City of Chicago,* – F.Supp.2d –, 2007 WL 496783 (N.D.Ill. Feb. 16, 2007) and need not be repeated here. To that should be added the following:

On September 27, 2000, Officer Lipman joined several police officers, sergeants and lieutenants, in a grievance charging Commander Perry with racial discrimination. (4/12/2006–1 p.m. Tr. 54-55). Lipman left the second district, and Commander Perry's command, in March of 2001. (4/12/2006–1 p.m. Tr. 75). At about the same time, March 2, 2001, Lipman filed an EEOC charge against the defendant. (Plaintiffs' Ex. 33). She filed the instant suit on December 26, 2001. (4/13/2006–9:30 a.m. Tr. 13).

Thereafter, Lieutenant Lipman twice applied for a promotion to Captain, first in August 2004 and again in August 2005. (*Id.* Tr. 6-7). In so doing, she had to submit a multi-page application detailing her ability and experience to the office of the First Deputy. ( *Id.* Tr. 7). She was not even interviewed, (*id.* Tr. 19),[4] and was never told why or why she had not been promoted to Captain.

---

[4] Lipman testified that of the 44 lieutenants in Lipman's class, well over half were promoted to captain. (Tr. 16-17). Since she ranked first at the police academy, each of these individuals ranked behind her.

(4/13/2006– 9:30 a.m. Tr. 19). All she knew was that her application, which was reviewed by a

board made up of officers of different ranks, (4/13/2006– 9:30 a.m. Tr. 20-21), was not favorably

received.

The City's Exhibit 26 made clear that although it is the Superintendent of Police who makes

the ultimate determination of who is to be promoted, *Deloughery v. City of Chicago*, 422 F.3d 611,

614 (7th Cir. 2005), a Screening Board vets the applicants:

> Applications for Captain will be reviewed by a Screening Board appointed by the
> Superintendent of Police composed of at a minimum the following: two current
> Captains, two (2) District Commanders, and two (2) Deputy Chiefs of Patrol. The
> Screening Board will determine by a two-thirds vote in each case those applicants
> who are eligible for a promotion to Captain (SES). In determining eligible
> Lieutenants, the Screening Board will request recommendations from at least two of
> the Lieutenant's superiors. The Superintendent then takes the list and may assign the
> eligible candidates (at his discretion) for training. After receiving the results, the
> Superintendent shall elect among the candidates who successfully competed the
> above procedure and shall assign a successful candidate to an existing vacancy.

*(Defendant's Ex. 26).*

The jury could reasonably have concluded two things, either of which is sufficient to sustain

Officer Lipman's position. First, as in *Deloughery, supra,* the jury could have determined that the

City's refusals to have promoted Officer Lipman, notwithstanding her exemplary career prior to her

coming to the Second District, were in retaliation for her grievances against the City and her EEOC

complaint. *See* 422 F.3d at 615, 619.[5] Second, the jury could reasonably have concluded that the

CRs that had been filed against Officer Lipman were retaliatory within the meaning of Title VII and

---

[5] In *Deloughery,* Superintendent of Police Hilliard testified that *he* was unaware of the plaintiff's
internal and external complaints, and that he made promotion decisions solely on the strength of the
candidates' qualifications. 422 F.3d at 614. There was no such testimony in this case and, the evidence
rather conclusively refuted the notion that the *Screening Board* was unaware of internal and external
complaints.

12

that the CRs destroyed any chances for promotion, regardless of the good faith of the Board.

At the time of Lieutenant Lipman's applications, she had had three CRs formally against her and one that, although nominally was against Commander Perry, was in reality against Lieutenant Lipman and the other plaintiffs. (*Exhibit* 46). It effectively charged them with making false allegations of racism against a District Commander in a district that was plagued with racial strife.[6]

Out of that grew Garcia's CR that charged Lipman with refusal to obey a direct order to provide confirmation of her claims that Perry was guilty of racial discrimination. Agent Garcia's 10-day suspension recommendation on the CR he issued against Lipman for disobeying that order came down in April, 2003. That recommendation had not been acted on at the time of the trial. The City would wait until immediately after the trial to suddenly sustain it.[7] *See O'Sullivan v. City of Chicago,* – F.Supp.2d – , 2007 WL 496783 (N.D.Ill. Feb. 16, 2007)(discussing the purpose and effect of all this on Lipman).

What responsible Screening Board (on which sat two District Commanders) would interview, let along recommend for promotion in a "paramilitary organization" like the Chicago Police Department, a person who as charged with having disobeyed direct orders, especially where the nature of the disobedience could lead to the conclusion that Lipman had falsely charged her commanding officer with racism? (Plaintiffs' Ex. 9).

---

[6] Adroitness in drafting cannot be allowed to obscure the true nature of any written document. *Compare Whitaker v. Superior Court of California,* 514 U.S. 208, 209 (1995); *Pernice v City of Chicago,* 237 F.3d 783, 786 (7th Cir. 2001)("[A]rtful pleading cannot remove us entirely from reality."); *Parmelee Transportation Co. v. Keeshin,* 292 F.2d 794, 804 (7th Cir. 1961), *cert. denied,* 365 U.S. 944 (1962). Commander Perry's CR against herself is not an exception to this general interpretive principle, and the jury could use its experience in life to see through what Perry was attempting to do and what role the CR would play in all that was to come. (*See Instruction* No. 7).

[7] The legality of that action is the subject of a separate pending motion by Lipman.

13

The jury was instructed that to find for Lieutenant Lipman on her retaliation charge she had to prove by a preponderance of the evidence that the City retaliated against her because of her filing of a grievance with the police department and/or charges she filed with the EEOC. (Instruction 18). The jury was told that it should use its common sense in weighing the evidence and that it should consider the evidence in light of their own observations in life. (Instruction 7). The jury answered a special interrogatory that made it clear that it had determined that the defendant retaliated against Lipman by denying her a promotion to captain. The jury's finding that Lieutenant Lipman suffered retaliation by the City was supported by the evidence.

### 3.
### The Evidence Relating To Lieutenant O'Sullivan And Sergeant Roche

The evidence relevant to Sergeant Roche's claim of retaliation is also set forth in the 2/16/07 Memorandum Opinion and Order re Remittitur. *O'Sullivan v. City of Chicago*, – F.Supp.2d – , 2007 WL 496783 (N.D.Ill. Feb. 16, 2007).

### E.

The jury listened to the plaintiffs' testimony for days, considered the evidence presented, and came to the conclusion that the defendant had retaliated against the plaintiffs for accusing Commander Perry of racism. "'The relevant facts were fully aired before the jury, and it fell to the jury to sort out which side's version was more likely true . . . . The jury in this case resolved the credibility questions and competing inferences posed by the trial evidence in [the plaintiff's] favor, and we have no reason to disturb its assessment of the facts.'" *Harvey*, 377 F.3d at 713 (*quoting Appelbaum v. Milwaukee Metropolitan Sewerage Dist.*, 340 F.3d 573, 581 (7th Cir. 2003)). Accordingly, the defendant's motion for judgment as a matter of law must be denied.

14

# III.
# THE CITY'S MOTION FOR A NEW TRIAL

A court may grant a new trial pursuant to Rule 59 where the verdict is against the clear weight of the evidence, the damages are excessive or the trial was unfair to the moving party. *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004); *David v. Caterpillar, Inc.*, 324 F.3d 851, 863 (7th Cir. 2003). While a district court need not write a comprehensive opinion explaining why it denied a motion for a new trial, *Dunn v. Truck World, Inc.*, 929 F.2d 311, 313 (7th Cir. 1991), in what follows the defendant's numerous arguments as to why it did not receive a fair trial are addressed *seriatim.*[8]

## A.
## The Failure To Sever The Individual Plaintiffs

The City first argues that it was unfairly prejudiced because there should have been three separate trials for each plaintiff's claims. The purported prejudice stems from the fact that "there was no evidence produced by Plaintiffs at the trial which suggested that any of the Plaintiffs' claims arose out of the same transaction or occurrence." (*Defendant's Renewed Motion for Judgment as a Matter of Law*, at 4). As a result, the defendant submits that "[r]ather than each Plaintiff establishing their own *prima facie* case for discrimination and retaliation, the Plaintiffs' instead used collateral evidence of alleged discrimination and retaliation against others to help establish their claims." (*Id.*). The argument ignores the provisions of Rules 20 and 21, Federal Rules of Civil Procedure, the jury

---

[8] In seeking a new trial, the defendant does not argue that the verdict was against the weight of the evidence, although it did call the sufficiency of evidence into question in connection with its motion for judgment as a matter of law. (*Defendant's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for New Trial*, at 2-3). In any event, for the reasons discussed above, it is apparent that the verdict is not against the clear weight of the evidence. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 863 (7th Cir. 2003). The argument that the verdicts were excessive is decided at 2007 WL 496783 (N.D.Ill. 2007).

instructions, which repeatedly told the jury it must consider each plaintiff's claims separately (*see e.g., Instructions* 14, 17, 18, 20),[9] and basic evidentiary principles that would have allowed the complained of evidence to be admitted even if there were separate trials.

The argument for severance is a renewal of the City's unsuccessful motion to sever the individual plaintiffs under Rules 20(a) and 21 filed on December 1, 2005. Although the case had been pending for four years, the City brought the motion a month before trial. The defendant argued then, as now, that it would be prejudiced if the jury heard all the evidence pertaining to each of the plaintiffs together in one proceeding. At the hearing on its motion, however, the City's counsel conceded that if the plaintiff's claims were heard in separate trials, evidence pertaining to all three plaintiff would be admissible under Rule 404(b), Federal Rules of Evidence. Other-acts evidence, such as discriminatory acts directed at employees other that the plaintiff, may be relevant and admissible in a discrimination case to prove, for example, intent or pretext. *Manuel v. City of Chicago*, 335 F.3d 592, 596 (7th Cir. 2003); *Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1511 n. 5 (11th Cir.1989); *Hawkins v. Groot Industries, Inc.*, 210 F.R.D. 226, 230 (N.D.Ill. 2002). Since separate trials would not have changed the evidentiary presentation, the City was not prejudiced by a denial of its severance motion and is not entitled to a new trial.

Federal policy favors joinder: "Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724 (1966). It is within the court's broad discretion whether to sever a claim under Rule 21. *Rice v.*

---

[9] A jury is presumed to understand and abide by the instructions the are given. *Shea v. Galaxie Lumber & Const. Co., Ltd.*, 152 F.3d 729, 734 (7th Cir. 1998).

*Sunrise Express, Inc.*, 209 F.3d 1008, 1016 (7th Cir. 2000). "As long as there is a discrete and separate claim, the district court may exercise its discretion and sever it," but, by the same token, the court ought not "attempt to separate an essentially unitary *problem*." *Id.* (Emphasis supplied).

Because Rule 21 does not include a standard for proper joinder, courts use the permissive joinder standards contained in Rule 20(a). *See Hawkins*, 210 F.R.D. at 229-30; *Bailey v. Northern Trust Co.*, 196 F.R.D. 513, 515 (N.D.Ill.2000); 7 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1683, p. 475 (3rd ed.2001). Under Rule 20(a), joinder of defendants in one action is permitted if: (1) the plaintiffs assert against the defendants "any right to relief . . . arising out of same transaction, occurrences, *or series of transactions or occurrences*," and (2) "*any question* of law or fact *common to all defendants* will arise in the action." (Emphasis supplied).

While the City admits that the plaintiffs met the second requirement, (*Defendant's Renewed Motion for Judgment as a Matter of Law*, at 4), it argues that the plaintiffs failed to present any evidence that their claims arose out of "the same transaction or occurrence." The argument ignores the plain language of the Rule, which requires only that the claims arise out of the same *series* of transactions or occurrences. When considering the issue of joinder in cases such as this, courts look to "[whether] the discrimination took place at roughly the same time, if it involved the same people, whether there is a relationship between the discriminatory actions, whether the discriminatory actions involved the same supervisor or occurred within the same department, and whether there is a geographical proximity between the discriminatory actions." *Presto v. Illinois Dept. of Human Services*, No. 00 C 7429, 2003 WL 21196237, *1 (N.D.Ill. May 21, 2003). Each of these factors is present here.

17

The plaintiffs all worked in the Second District and were supervised by Commander Perry during the same time period. (*Defendant's Renewed Motion for Judgment as a Matter of Law*, at 4). All three joined in a charge of racial discrimination against Commander Perry. All three submitted evidence that they were retaliated against for their complaints of discrimination through, among other things, CRs filed against them by Commander Perry and/or Agent Garcia. (*Id.* at 5-6; *Plaintiffs' Response to Defendants' Motion* at 3-4).[10] And all three submitted evidence that Commander Perry presided over and influenced a work environment that was hostile to them. (*Plaintiffs' Response to Defendants' Motion* at 3-4). These factors support joinder, not severance. *Presto*, 2003 WL 21196237, *1; *Hawkins*, 210 F.R.D. at 230 (". . . the allegations refer to discrimination during the same general time period, allege the same type of adverse employment actions, allege the same type of discrimination (race), and appear generally to accuse the same set of supervisors at the same work location, all factors favoring joinder."); *Smith v. Northeastern Illinois University*, No. 98 C 3555, 2002 WL 377725, *2 (N.D.Ill. Feb. 28, 2002)(joinder favored where alleged acts of discrimination occurred over two-year time period, type of discrimination was similar, same two supervisors involved, and plaintiffs worked in same department).

The failure to sever the plaintiffs was neither inappropriate, nor resulted in any prejudice to the City. The City has not cited one case that supports its contention that failure to sever the individual plaintiffs was inappropriate in a case such as this.

---

[10] Apart from the fact that the evidence was admissible on both the discrimination and retaliation counts and/or the evidence of discrimination was inextricably linked to the evidence on retaliation, *see infra* at 38, the City never asked for any cautionary instruction that would have limited the applicability of the evidence to a particular claim.

## The Failure To Allow Rebuttal Testimony Of Gary Yamashiroya

Officer Jeffrey Wilson testified about a conversation he had with EEO Officer, Gary Yamashiroya, regarding Wilson's concerns that Roche had not received any backup aid in an alleged emergency "10-1" call for help she claimed she made from the Robert Taylor Homes. Wilson testified that when he told Officer Yamashiroya his concerns, Yamashiroya responded: "what do you expect when you go to the newspaper." According to Wilson, this comment referred to a Sun Times article in April, 2001 that reported the charges of discrimination against Perry. Following Wilson's testimony, the City attempted to call Yamashiroya as a witness. Purportedly, he would have denied having made the comment. Since Yamashiroya was not on the defendant's witness list as part of the Final Pre-Trial Order, he was not allowed to testify.

Under Local Rule 16.1's Final Pretrial Order requirements, each party must provide "a list or lists of names and addresses of the potential witnesses to be called by each party, with a statement of any objections to calling, or to the qualifications of, any witness identified on the list." L.R. 16.1, Final Pretrial Order, 2(d). The requirement is further explained:

> Each party shall indicate which witnesses *will* be called in the absence of reasonable notice to opposing counsel to the contrary, and which *may* be called as a possibility only. Any witness not listed will be precluded from testifying absent good cause shown, except that each party reserves the right to call such rebuttal witnesses (*who are not presently identifiable*) as may be necessary, without prior notice to the opposing party.

L.R. 16.1, Final Pretrial Order, 2(d) n.6 (emphasis partly in original and partly supplied).[11] The

---

[11] The local rule reflects a slight departure from the Federal Rules, which impose similar requirements and provide for the exclusion of a witness, but inject the consideration of prejudice to the opposing party into the analysis. Thus, Rule 26(a)(3) provides:

In addition to the disclosures required by Rule 26(a)(1) and (2), a party must provide to
(continued...)

limitation on a party's liberty to call a rebuttal witness without notice to its opponent, then, is two-tiered. First, was the witness identifiable at the time the witness list was compiled? Second, if the witness was known at that time, has the proponent of the witness shown good cause for its failure to have included the witness on the list? *Braun v. Lorillard Inc.*, 84 F.3d 230, 236 (7th Cir. 1996).

The defendant admits that it knew about Yamashiroya and the critical conversation Wilson claimed he had since 2003. (*Defendant's Renewed Motion for Judgment as a Matter of Law*, at 8). Yet, the City offers no justification for the omission from the witness list of Yamashiroya. (*Defendant's Renewed Motion for Judgment as a Matter of Law*, at 7-9; *Defendant's Reply to Plaintiffs' Response*, at 3-6).

The only nod the defendant even gives to its noncompliance with the LR16.1 is to characterize it as a "technical oversight." (*Defendant's Reply to Plaintiffs' Response*, at 6). Making light of their failure as a "technical oversight" however, is not demonstrating "good cause." The defendant must offer a "compelling excuse" for their failure to list "so promising a potential witness for their side." *Braun*, 84 F.3d at 237. As the defendant fails to even attempt to do so here,

---

[11](...continued)
other parties and promptly file with the court the following information regarding the evidence that it may present at trial other than solely for impeachment:

> (A) the name and, if not previously provided, the address and telephone number of each witness, separately identifying those whom the party expects to present and those whom the party may call if the need arises;

Rule 37( c)(1) sets forth the corresponding sanction:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, . . . any witness or information not so disclosed.

exclusion of the witness was proper.[12]

*Spray-Rite Service Corp. v. Monsanto Co.*, 684 F.2d 1226, 1245 (7th Cir. 1982) does not justify granting the City a new trial. (*Defendant's Renewed Motion for Judgment as a Matter of Law*, at 8). That case turned on Rule 16, not the local rule applicable here. Indeed, the court's ruling was clearly not informed by the local rule, as it drew the standard it applied from the Third Circuit. *See Spray-Rite*, 684 F.2d at 1245 (*citing Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904 (3rd Cir. 1977)). And, while it is true that the standard applied in those two Rule 16 cases requires the court to assess the prejudice to the party against whom the excluded witness would have testified, there is no such requirement under the local rule. L.R. 16.1, Final Pretrial Order, 2(d) n.6; *Braun*, 84 F.3d at 237. [13]

The prejudice to the plaintiffs seems obvious. By keeping Yamashiroya off the witness list, the City gained a tactical advantage in that the plaintiffs' counsel did not have the time it otherwise would have to prepare to cross examine him or contradict his testimony. That inured to the detriment not merely of the plaintiffs, but to the system itself, for, as the Supreme Court has said in

---

[12] In other contexts, such an unilluminated excuse would not amount to "good cause." *United States v. Alvarez-Martinez* , 286 F.3d 470, 473 (7th Cir. 2002)(simple case of miscalculation does not amount to good cause under Fed.R.App.P. 4(b)(4)); *Prizevoits v. Indiana Bell Telephone Co.*, 76 F.3d 132, 133 (7th Cir. 1996)(to the extent "good cause" equates with "excusable neglect," it cannot be shown by inability or refusal to read and comprehend the plain language of rules); *Powell v. Starwalt*, 866 F.2d 964 (7th Cir. 1989)(attorney's neglect cannot be "good cause" under Federal Rule of Civil Procedure 4(j)); *Tso v. Delaney*, 969 F.2d 373, 376 (7th Cir. 1992)(simple attorney neglect, without more, cannot serve as the basis for a finding of good cause under Rule 4(j)).

[13] In other contexts, the Seventh Circuit has made clear that district courts can and should enforce local rules. *See, e.g., Smoot v. Mazda Motors of America, Inc.*, 469 F.3d 675 (7th Cir. 2006)(discussing compliance with Seventh Circuit rules); *FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627 (7th Cir. 2005)(same); *Roger Whitmore's Automotive Services, Inc. v. Lake County*, 424 F.3d 659, 664 n.2 (7th Cir. 2005)(same). *Compare United States v. White*, 472 F.3d 458, 465 (7th Cir. 2006)(same); *Meyerson v. Harrah's East Chicago Casino*, 299 F.3d 616 (7th Cir. 2002)(same); *Hill v. Porter Memorial Hospital*, 90 F.3d 220 (7th Cir. 1996)(same).

another context, "the attempted presentation of cases without adequate preparation... obstructs the administration of justice." *New York Central Railroad Co. v. Johnson*, 49 S.Ct. 417 (1929)(Mem)

Finally, errors in the admission or exclusion of evidence cannot be grounds for a new trial if they constitute harmless error. Rule 61, Federal Rules of Civil Procedure; *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608-609 (7th Cir. 2006). As the verdict for Roche reveals – and as the City emphasizes – the jury was apparently not overly impressed with Roche's story about being left to fend for herself in the Robert Taylor Homes. Thus, the question of whether Yamashiroya did or did not make the comment attributed to him by Wilson was largely irrelevant.[14] If the incident did not occur – and the City insists the jury's verdict shows it concluded it never happened – then Wilson's personal view of things could not have mattered. Indeed, by the end of the trial, the incident had virtually vanished from the scene, at least as far as Roche's counsel was concerned, as evidenced by the failure of the plaintiffs' closing argument even to mention it.

## C.
## The Admission of Evidence Over Hearsay Objections

The defendant next complains that the hearsay rule was violated by the admission 1) of an April 13, 2001 Sun-Times article that reported prominently on page 3 the undisputed fact that charges of racial discrimination had been made against Commander Perry (*Plaintiffs' Ex.* 44); and 2) O'Sullivan's testimony about a telephone conversation she had with Roche regarding the incident

---

[14] In its closing argument, the City argued forcefully that the incident never occurred. It pointed out that there was no arrest report, that Roche had no recollection of the names of the officers she claimed she went to help, no identification of the officers working on the third watch on April 13, 2001, that she made no report of the incident to the Watch Commander, or anyone else, there was no completed Supervisor's Log, and no attempt to identify the location of the beat cars under her supervision. In short, there was simply no evidence to support what Roche claimed was the most horrific event of her life. In other cases where the jury believed that a police officer had been left stranded in retaliation for complaints, the jury has awarded very high damages. *See Spina v. Forest Preserve Dist. of Cook County*, 207 F.Supp.2d 764, 775 (N.D.Ill. 2002).

22

where Roche claims to have been left without backup at the Robert Taylor Homes. (*Plaintiffs' Ex.* 44).

## The Newspaper Article Describing The Grievance Filed By The Plaintiffs

The article was published on Friday, April 13, 2001, the day Roche claims she was left without backup at the Robert Taylor Homes. It reported that: (1) seven white supervisors filed EEOC charges; (2) charging Perry with favoring black officers for promotion; (3) a source identified two of the complainants as Roche and O'Sullivan; (4) seven white lieutenants left the Second District due to claimed harassment from Perry; (5) who was accused of giving preferential treatment in performance ratings; (6) and was blamed for launching unfounded internal investigations against white officers because of bias; (7) Perry allegedly told a white tactical sergeant never to come to the Bud Billikin parade "unless you have people of color on your tact team."; and (8) Jeff Wilson, president of the Chicago Police Lieutenants Association, said some black commanders have been "promoted beyond their competency level because of pressure to increase minority participation." The article concluded with a summary of Department statistics showing the percentage of White, Hispanic and African American supervisors and a statement that the Superintendent of Police holds race relation forums to reach out to Chicago's minority communities. (*Plaintiffs' Ex.* 44).

Newspaper articles that are being offered for the truth of the matters asserted are hearsay. *Chicago Firefighters Local 2 v. City of Chicago,* 249 F.3d 649, 654 (7th Cir. 2001); *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997); *Larez v. City of Los Angeles,* 946 F.2d 630, 642 (9th Cir. 1991). The article describing the existence of the charges of discrimination against Perry was not offered for the truth of the matters asserted, but merely to show that the Department and those in the Second District were on notice of the EEOC complaint filed by the plaintiffs. In this context,

the article – and its prominent placement in the newspaper – tended to demonstrate that the EEOC charges and Roche's complaint were generally known in the department and might have provided the motive for her fellow officers not to respond to her calls for help as she claimed. It did not matter whether the statements in the article were true. (*Tr.* 303-306; 380-381).[15] What mattered was the effect on the reader. For that purpose it was not hearsay. *Martin v. City of Indianapolis*, 192 F.3d 608, 613 (7th Cir. 1999)(newspaper article about a piece of public sculpture could not be employed to prove the truth of the matters asserted but it could be employed to demonstrate that the sculpture was generally known –that it "had not gone unnoticed.")(*Plaintiffs' Ex.* 44).[16]

The liberalization of the rules for admission of relevant evidence accomplished by Article IV of the Federal Rules of Evidence, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 587 (1993), requires that relevant evidence, as expansively defined by Rule 401, be admitted, subject to Rule 403. *United States v. Kapp*, 419 F.3d 666, 677 (7th Cir. 2005). The district court has broad discretion to determine admissibility. *United States v. Abel*, 469 U.S. 45, 54 (1984); *Kapp*, 419 F.3d at 677. Here, the issue was whether the plaintiffs' charges against Perry were likely to have been generally known in the Police Department or the Second District when Roche was purportedly left to fend for herself in a dangerous situation. It was not an abuse of discretion to admit the evidence

---

[15] Certain of the transcripts that I was provided bore no date. It is for that reason that the page numbers only are cited.

[16] The hearsay rule is premised on the obvious, common sense principle that where out-of-court statements are offered for their assertive content, the credibility of the declarant is critical. That credibility is subject to all manner of hazards: the declarant might be lying; he might have misperceived that which is the subject of the declaration; his memory may have been faulty or his faculties impaired, or his words misunderstood or taken out of context by the listener (i.e., the witness). *Williamson v. United States*, 512 U.S. 594, 598 (1994). Where the only question is whether the statement was made, these factors do not come into play, and the hearsay rule has no application. *United States v. Cardascia*, 951 F.2d 474, 486 (2d Cir. 1991).

for that limited purpose.

I was concerned, however, about the statements regarding Perry's comments about the Bud Billikin parade and Wilson's comments about the role of ethnicity in promotions. I concluded under Rule 403 that those portions of the article should be redacted. (Tr. 303-306; 370-380). I told counsel that I would give whatever limited instructions they thought appropriate. (*Tr.* 303-306; 4/12/2006 – 1 p.m. Tr. 20, 22-25). The limited purpose of the article was explained to the jury at the time it was admitted. (4/17/2006 – 9:30 a.m. Tr. 37).[17] "Juries may not be familiar with the hearsay rule, but the law assumes that they can and do follow the limiting instructions issued to them." *United States v. Linwood*, 142 F.3d 418, 426 (7th Cir. 1998).

Finally, the City ignores the fact that its counsel insisted that the two redacted portions of the article be included in Exhibit 44 in order to support the City's claim of bias against Wilson. (Tr. 372-380). Thus, the only arguably prejudicial portions of the article went to the jury because the City insisted they do so. The City can scarcely be heard to complain of the conscious choice it made.[18]

As with a number of the City's other contentions, the argument that the jury could not follow the limiting instruction "because people tend to give greater credence to information contained in a newspaper article" has nothing to support it beyond its mere utterance. It consists of "lawyers' arguments – talk about what *might* be, rather than [evidence] about what *is.*" *Babul, supra.* (Emphasis in original). Unsupported arguments like the City's current one are waived. *Perry v.*

---

[17] The City did not seek any further or additional instructions.

[18] In discussions with counsel, I noted that unless there was testimony or a stipulation that Wilson actually said what was attributed to him in the paper, the redacted statement could not come in even to show bias. *See Larez v. City of Los Angeles, supra,* It ultimately stipulated that the statement attributed to him was actually made, and the provisions the City wanted included in Exhibit 44 were not redacted. (Tr. 370-380).

25

*Sullivan*, 207 F.3d 379, 383 (7th Cir. 2000)("Even if this argument made sense, Perry cited no authority for this proposition...."). In any event, there are any number of public surveys that indicate precisely the opposite of the City's *ipse dixit* that the public uncritically credits what is reported. The skepticism is anything but new. A number of years ago, Judge Will sagely observed that "all Americans grow up with a kind of slowly developing, built-in, press-wise compensator." Hubert Will, *A Free Press and a Fair Trial*, 40 Miss. L.J. 495, 501 (1969). (*See Tr.* 303-304).

What the cautionary instruction told the jury it must do was not "a feat beyond the compass of ordinary minds." *Shepard v. United States*, 290 U.S. 96, 104 (1933)(Cardozo, J.). Indeed, in cases calling for infinitely greater discernment than that required here, courts have recognized the efficacy of limiting instructions in the context of evidence claimed to violate the hearsay rule. *See, e.g., United States v. Hartmann*, 958 F.2d 774, 779, 782-83 (7th Cir. 1992); *Smith v. Great American Restaurants, Inc.*, 969 F.2d 430 (7th Cir. 1992); *Katt v. City of New York*, 151 F.Supp. 2d. 313 (S.D.N.Y. 2001).

It is only when "the reverberating clang of those accusatory words would drown all weaker sounds" and "the risk of confusion is so great as to upset the balance of advantage [that], the evidence goes out." *Shepard*, 290 U.S. at 104. In the less elegant prose of Rule 403, Federal Rules of Evidence, evidence may be excluded "if its probative value is *substantially* outweighed by the danger of *unfair* prejudice...." (Emphasis supplied). In the context of this case, any fair balancing of prejudice and benefit tilted strongly in favor of admissibility.[19]

Even if the jury credited the article in the form the plaintiffs submitted it, the article did no

---

[19] All evidence is prejudicial in the sense that it influences the jury's opinion, otherwise it would not be relevant. "'That's the idea.'" *United States v. Gougis*, 432 F.3d 735, 743 (7th Cir.2005). *See* Ronald Allen & Richard B. Kuhns, An Analytical Approach To Evidence 104-06 (1989).

26

more than report the existence of events about which there was no dispute and which were part of the evidence in the case. The article did not take a position on the merits of the plaintiffs' grievance or Commander Perry's denials (which were included in the article). Thus, the article was not in the least prejudicial, let alone unfairly prejudicial, and the City's unexplained conclusion to the contrary is insufficient. *United States v. Thompson,* 286 F.3d 950, 970 (7th Cir. 2002).

## 2.
## O'Sullivan's Telephone Conversation With Roche

Lieutenant O'Sullivan testified about a telephone conversation she had with Roche in April of 2001 in which Roche allegedly said that when she was in the Robert Taylor Housing Project that evening, no one from the Second District responded to her urgent requests for backup. The City claims the hearsay rule was violated and the infraction was so serious as to warrant a new trial — apparently against not only Roche, but all the plaintiffs.

Where a defendant argues that an error was made in the admission or exclusion of evidence, a new trial is warranted only if the error had a substantial influence over the jury, and the result reached was inconsistent with substantial justice. *Farfaras v. Citizens Bank and Trust of Chicago,* 433 F.3d 558, 564 (7th Cir. 2006); *Cerabio LLC v. Wright Medical Technology, Inc.,* 410 F.3d 981, 994 (7th Cir. 2005). By a substantial margin, the jury awarded Roche the least amount of damages among the three plaintiffs. The City insists that the verdict demonstrates that the jury did not believe that the incident occurred. That conclusion leads inexorably to the conclusion that the jury was not influenced by O'Sullivan's testimony recounting what she had allegedly been told by Roche on the evening of the incident. Phrased differently, if the jury did not believe the incident occurred, it would have given no credit to the fact of the phone call. Under the City's own reasoning, a new trial is not warranted. Any error was harmless. Rule 61, Federal Rules of Civil Procedure.

27

Although the analysis can end here, the City's sketchy and inaccurate argument requires a more extended explanation. The facts are these. O'Sullivan was asked whether she had a telephone conversation on April 13th with Roche and what was said. *There was no objection from the City to this question.* O'Sullivan said that "Janice" was extremely distraught and crying and went on to begin to describe a petition that was being circulated in the Second District at this time. It was only then that the City's lawyer objected "to the hearsay nature of the testimony." I sustained the objection. (*Tr.* 130, 4/11/06, 1:00 p.m.). The very next question, "What did Janice tell you?" was objected to on hearsay grounds, and I cautioned the plaintiffs' lawyer: "I sustained the objection on hearsay grounds." Counsel for the plaintiffs responded, "Okay." (*Tr.* 131).

The next sentence in the transcript quotes me as saying: "*She* can testify." Counsel for the plaintiffs responded, "Yes, *she* can." (*Tr.* 131)(Emphasis supplied). The she to whom I was referring obviously was "Janice Roche," not O'Sullivan, for I would not have sustained two hearsay objections and then immediately and without anything further happening permitted O'Sullivan to give the testimony I had just excluded and about which I had cautioned the plaintiffs' lawyer. That the "she" was Roche, not O'Sullivan was made clear in a colloquy with counsel on April 17, 2006, where I explained that I had sustained the earlier hearsay objections since "I thought... Roche was going to be here." (*Tr.* 154-4/17/06, 1:15).

That the plaintiffs' lawyer understood the "she" to be referring to Roche is evidenced not only by her response, but by her next question, which asked O'Sullivan to describe Roche's emotional state. *There was no objection to this question.* The plaintiffs' lawyer then returned to her mission of having O'Sullivan repeat what Roche told her during the phone conversation. This time the question came in the guise of seeking to determine whether Roche explained the reasons

28

for her emotional distress. *Despite two prior objections, both of which had been sustained on hearsay grounds, there was no objection from the City's counsel* to this question. O'Sullivan recounted what Roche told her during the telephone conversation, namely how she had been left in the lurch at the housing project, her reaction, etc. (*Tr.* 131-132).

Any objection to the testimony on hearsay grounds is waived. *United States v. Church*, 970 F.2d 401, 408-409 (7th Cir. 1992). However, assuming counsel for the City misinterpreted what I said as referring to O'Sullivan, not Roche – although such an interpretation seems exceedingly strained in view of what had actually occurred – and that the record is not sufficiently clear to conclude the point was waived, the argument is not a basis for granting a new trial to the City against Roche, let alone Lipman and O'Sullivan.

The difficulty with the argument is that it ignores the fact that Roche, herself, thereafter testified on direct examination about the incident at the Robert Taylor homes, and, *without any objection from the City's lawyer,* that she called O'Sullivan and "told [her] everything that happened" that night. (*Tr.* 43).[20] Thus, the jury was not presented merely with O'Sullivan's hearsay rendition of what occurred; it heard Roche's actual account of the incident and was able to make a fully informed determination about Roche's credibility. (*See Tr.* 1026). *See Indiana Metal Products v. NLRB,* 442 F.2d 46 (7th Cir.1971); *Pinpoint Inc. v. Amazon.Com, Inc.,* 347 F.Supp.2d 579, 583 (N.D.Ill.2004) (Posner, J.) (sitting by designation); *O'Sullivan v. City of Chicago,* 2007 WL 496783 (N.D.Ill. 2007)(collecting cases).

In sum, even if the objection were not waived, any error is harmless, for, "[t]he admission

---

[20] It was precisely because Roche was going to testify about what she claimed happened at the Robert Taylor homes that I twice sustained the City's hearsay objections during O'Sullivan's examination and made the comment, "She can testify."

of hearsay evidence that is cumulative of earlier trial testimony by the declarant or cumulative of other hearsay evidence to which no objection was made is not likely to influence the jury and is therefore harmless error." *United States v. Londondio*, 420 F.3d 777, 789 (8th Cir. 2005). *See also United States v. Gettel*, 474 F.3d 1081, 1090 (8th Cir. 2007); *United States v. Trujillo*, 376 F.3d 593, 612 (6th Cir. 2004)(admission of hearsay deemed harmless where it was merely cumulative of other significant evidence). As Justice Breyer observed in his dissenting opinion in *Tome v. United States*, 513 U.S. 150 (1995), "even in cases where the [prior consistent] statement is admitted as significantly probative... the effect of admission on the trial will be minimal because the prior consistent statements will (by their nature) do no more than repeat in-court testimony." *Id.* at 176 (Parenthesis in original). This is such a case.

In light of Roche's testimony about the incident, the difficulty with O'Sullivan's testimony is not *that* it was admitted, but *when* it was admitted. Phrased differently, the error, if there be error, and that if it be unwaived, is largely was one of timing: O'Sullivan could have testified to the claimed prior consistent statement to O'Sullivan *after* the cross-examination of Roche, if – as it clearly did – it suggested that the story of being abandoned on the street was fabricated. *Tome*; *United States v. Anderson*, 303 F.3d 847, 858 (7th Cir. 2002).[21] But O'Sullivan's testimony came first and thus was premature. IV Wigmore, Evidence §1124 (Chadbourne rev. 1972); 5 Weinstein's Evidence §801.22[1][b] at 801-31; *Grisanti v. Cioffi*, 38 Fed. Appx. 653, 2002 WL 1159621 (2nd Cir. 2002) (unreported); *United States v. Simonelli*, 237 F.3d 19, 27 (1st Cir. 2001) ("Prior consistent

---

[21] O'Sullivan was an appropriate witness to relate the conversation, *United States v. Green*, 258 F.3d 683, 690-691 (7th Cir. 2001), assuming that the requirements for the admissibility of a prior consistent statement were otherwise met. That is, use of prior consistent statements is only proper *after* there has been a suggestion that the story told on direct is a recent fabrication.

statements still must meet at least the standard of having 'some rebutting force beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with his trial testimony.'"). *See United States v. Rubin*, 609 F.2d 51, 66 (2nd Cir. 1979) (Friendly, J., concurring). But the City never objected on this ground, and thus the objection is waived. It is, moreover, not a basis for a new trial.

The seemingly inevitable admissibility of O'Sullivan's (or Roche's) testimony about the call depends on whether Roche had the motive to fabricate the story attributed to her by the City. The theory is that Roche, having filed an EEOC discrimination charge, decided to take the opportunity of the publication of the newspaper article about charges against Perry to manufacture a story to support a second charge – this one about retaliation – that she would bring sometime in the future. To do so, she called O'Sullivan so she would have her "in the bank" so to speak, when her credibility about the backup incident was attacked at some point down the line. This is, to put it mildly, a convoluted and highly speculative argument that depends upon Roche's knowledge of the prior consistent statement doctrine and an intent to bring in the future a claim of retaliation.

In considering arguments regarding when a motive to falsify can be said to have existed, some courts have asked when the declarant's credibility first came under attack. *United States v. Ruiz*, 249 F.3d 643, 648 (7th Cir. 2001). In this case, when Roche was describing the events of her day to her friend and colleague, her credibility had not yet been challenged. It did not come under attack until the trial – or at least at some point long after the call. Under this analysis, the prior consistent statement to O'Sullivan antedated the motive to fabricate.

In *United States v. Fulford*, 980 F.2d 1110 (7th Cir. 1992), the court commented on the varying points where one might argue a motive for fabrication could arise. There, the witness made

the prior statement just after he was arrested. The opponent of the testimony argued that the witness fabricated the post-arrest statements in hopes that he would receive a lighter sentence if he cooperated. The trial court allowed the testimony, and the Seventh Circuit affirmed that ruling. The appellate court thought it just as likely that the witness first possessed a motive to fabricate when he entered into a cooperation agreement with the government, well after his post-arrest statements. 980 F.2d at 1114.

In every such case, it could be argued that the motive to fabricate arises upon arrest; just as City argues that there is always a financial incentive to make up a story to drive a lawsuit. Perhaps, but that is not a necessary inference – especially in this case. The question is, instead, what inference is more likely in light of the evidence in the case. *United States v. Cherry*, 938 F.2d 748, 756 (7th Cir. 1991). There is generally more than one entirely plausible possibility. *United States v. Williams*, 128 F.3d 1128, 1133 (7th Cir. 1997). Here, it is more likely that the motive attributed to Roche by the City arose long after her conversation with O'Sullivan; perhaps when she filed her EEOC retaliation charge or this lawsuit. Accordingly, Rule 801(d)(1)(B) was not a bar to the admissibility of the testimony – only to its timing. For the reasons discussed above, even if there had been no waiver, any error in prematurely admitting O'Sullivan's testimony was harmless.

What the Seventh Circuit recently said can apply equally well to the City's claim that the timing error in this case requires that there be a new trial as to all plaintiffs: "...[A] remand on such an issue could well impugn the reputation of the courts among the public. The public is, we think, somewhat fatigued by expensive, technical, but essentially meaningless do-overs." *United States v. Tejeda,* _F.3d_ 2007 WL 398137 at *3 (7th Cir. Feb 7, 2007).

**D.**
**The Special Interrogatory Regarding Roche's Claim Of Abandonment**

The City claims it requested that the jury be given a Special Interrogatory regarding Roche's

claims that she was retaliated against when her request for backup went unanswered:

Do you find from a preponderance of the evidence that Defendant intentionally failed
to provide back up to Janice Roche on April 13, 2001.

_____Yes      _____No

If you answered yes, do you find from a preponderance of the evidence that the
intentional failure to provide backup was due to retaliation.

_____Yes      _____No

(*Defendant's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for

a New Trial*, at 13). The plaintiff objected to the interrogatory and it was not given. (Tr. 1496,

1500).

A trial court has wide discretion in submitting special verdicts or interrogatories to the jury

in order to facilitate its comprehension of the issues. *Matter of CLDC Management Corp.*, 72 F.3d

1347, 1353 (7th Cir. 1996); *United States v. $94,000 in U.S. Currency*, 2 F.3d 778, 790 (7th

Cir.1993). *See generally* 1 O'Malley, Grenig, & Lee, Federal Jury Practice and Instructions, § 8:5

at 829, *et seq*. (6th ed. 2006). The incident to which the interrogatory related was but only one facet

of the claim of retaliation, and by focusing on it, the interrogatory had the potential to mislead the

jury into thinking her claim rested exclusively on the incident at the Robert Taylor Homes. *See id.*

at 841-842 (collecting cases)(*See Tr.*, 10/10/06 - 1496-1497, 1500).

The only prejudice claimed by the City resulting from the refusal to give the interrogatory

33

is that the jury awarded $25,000 to Roche.[22] But that is not so much an argument as it is a factual observation. More importantly, the City's prejudice argument is self-defeating. It contends that the fact that Roche received the lowest award of the three plaintiffs indicates that the jury did not believe her story about being left without backup. (*Defendant's Renewed Motion for Judgment as a Matter of Law*, at 7-9; *Reply*, at 14). Wherein then does the prejudice lie? If the City's analysis is correct, the size of the verdict answers in the negative the question posed by the interrogatory.[23] Conversely, if the jury credited the story, there could not have been any prejudice from a failure to have given the interrogatory to the jury, for it simply would have answered the question asked in the affirmative, thereby leaving unexplained the amount of the verdict, which the City attributes to its having disbelieved Roche's tale of abandonment. In short, the City's argument is a *non sequitur* that proves the absence, not the existence, of prejudice and demonstrates that there could have been no prejudice from the failure to submit the interrogatory.[24]

## E.
## The Hostile Work Environment Instruction

We come then to the contention that "[t]he hostile work environment instruction should never

---

[22] Sergeant Roche, like the other plaintiffs, was subjected to CRs and the day-to-day, retaliatory stresses of Commander Perry and to Garcia's retaliatory behavior.

[23] At one point during her testimony regarding the incident, Sergeant Roche began to cry. This sensitivity was, the jury could find, feigned in light of her failure ever to file a formal complaint (a CR) and in light of her intrepidity in dealing with Marcie Campbell, Commander Perry's administrative assistant. She described how Roche had yelled and screamed at her during a dispute over some administrative matter. Perhaps the jury sensed what Judge Posner believes, namely that we fool ourselves if we think we can infer sincerity from "weepy" performances. *United States v. Wells*, 154 F.3d 412, 414 (7th Cir. 1998)(Posner, C.J.).

[24] The defendant relies on *Biggs v. Village of Dupo*, 892 F.2d 1298, 1304 n. 4 (7th Cir. 1990), where the court suggested that it might be prudent – not that it is required – for a court to give a special verdict form when faced with a colorable objection on an element of damages. *Id.* at 1304 n. 4. Here, however, there was no such objection, and there was evidence to support Roche's claim that she was purposely left in the lurch. There was other evidence that contravened the claim, and it was for the jury to sort it all out.

34

have been given" because it was a theory of recovery that Plaintiffs did not introduce until the next to the last day of trial. The timing the City says led it "to believe that hostile work environment was not part of the case, irrespective of the fact that evidence on Plaintiffs' race and retaliation claims could also form the basis of a hostile work environment claim." (*Defendant's Renewed Motion for Judgment as a Matter of Law*, at 14). According to the defendant, it was "fundamentally unfair to surprise it by allowing such an instruction, and "was extremely prejudicial." The argument is stunning given the history of the case.

The defendant was aware of the plaintiffs' assertions that they were subjected to a hostile work environment from the beginning. In mid-2004, when the parties briefed the City's motion for summary judgment, the issue was addressed at length in the City's reply brief, under the bold-faced heading, "**The Plaintiffs Were Not Subjected To Harassment And A Hostile Work Environment**." (*Defendant City of Chicago's Reply Memorandum of Law in Support of Its Motion for Summary Judgment*, at 8-11). Following briefing, Magistrate Judge Levin – then presiding over this case – ruled that "[t]he court finds upon review that genuine issues of material fact exist as to plaintiff[s'] hostile work environment, racial discrimination and retaliation claims." (Minute Order of September 21, 2004). This alone is enough to dispose of the issue. But there is more.

In a pre-trial conference, the City made the identical argument it makes here. When I pointed out to the City's counsel the City's own brief in the summary judgment proceedings and the court's opinion, counsel acknowledged his error and conceded that the argument was contrary to the record. In light of all this, that the City has resurrected the argument is disturbing, to say the least.

**F.**
**The Plaintiffs' Damages Claims**

Interrogatory Number 7 asked the plaintiffs to:

> State the amount of damages you are claiming in this case and describe in detail for each element of those damages the method by which the amount of damages has been calculated, the particular claims on which it is based, and identify any documents concerning these damage claims.

Plaintiffs' responded:

> Answer to Interrogatory 7 Determination of damages is ongoing, as damages continue to accrue, and further investigation is warranted as to the position Plaintiffs' careers are in as opposed to those who entered the police at the same time. Plaintiffs are claiming compensatory damages as well as lost pay.

(*Defendant City of Chicago's Reply Memorandum of Law in Support of Its Motion for Judgment as a Matter of Law or, in the Alternative, a New Trial*, at 18). As a result of this answer, the City submits that it was unaware of the damages being claimed by plaintiffs and was unfairly prejudiced when they were allowed to present claims for damages. (*Id.* at 19).

The argument, like the City's contention that it was unaware of the hostile environment element of plaintiffs' case, is singularly unpersuasive. The interrogatory answer made clear that plaintiff would be seeking compensatory damages (obviously for mental anguish) and lost pay. The latter was a matter all agreed was for the court, not the jury, and the jury was not asked to calculate any damages relating to past or future earning.

The City did not object to what it now says is an inadequate answer and did not seek to compel a responsive one, as it had the right to do. A party faced with what it deems to be an inadequate discovery response cannot remain quiescent and then claim after a trial that the non-compliance by the answering party results in a waiver of the issue that was the subject of the discovery request. *Cf. In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 331, 337 (N.D.Ill. 2005). Any waiver should run in the opposite direction.

Moreover, the City did not even raise the argument until its reply brief. But that is too late; "[a] reply brief is for replying" not for raising essentially new matter that could have been advanced

36

in the opening brief. *Hussein v. Oshkosh Motor Truck Company,* 816 F.2d 348, 360 (7th Cir.1987). Thus, the argument is waived. *Harper v. Vigilant Insurance, Co.,* 433 F.3d 521, 528 (7th Cir.2005); *Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc.,* 235 F.R.D. 435, 437 (N.D.Ill.,2006).

But even the defendant's reply brief is unconvincing. Like other portions of the City's Motion, the claim that the City was blindsided by Lipman's claim of nonpromotion ignores the record. The complaint alleged that the City irreparably harmed the plaintiffs' careers in the Chicago Police Department and adversely affected their chances for future promotions. (*Complaint,* ¶ 23). Among the relief requested was that the City place them in the positions they would have occupied had it not been for defendant's misconduct, with respect to lost wages and commissions. (*Complaint,* Prayer for Relief). Career hindrance and lack of advancement were also a subject of the summary judgment proceedings. (*Plaintiffs' Rule 56.1(b)(3) Statement,* at 40-42).

## G.
## The Evidence Of Racial Discrimination

The City contends that a new trial is required because supposedly irrelevant evidence on the issue of race was admitted that may have had a "spill over" effect on the Plaintiffs' retaliation claims. (*Reply,* at 19). The Motion spends two pages needlessly recounting how the evidence of racial discrimination was insufficient for the jury to return a verdict favorable to the plaintiffs on that claim – a claim on which the City won. Then the City speculates that the cumulative effect of the discrimination evidence "*may* have caused the jury to return a verdict against the [defendant] on the Plaintiffs' retaliation claim," even though the jury was discerning enough to return a verdict favorable to the City on the discrimination claim. (Emphasis supplied).

In any event, the Motion's speculation does not merit a new trial. To win a new trial, a

37

defendant must demonstrate prejudice, not just wonder about it. *Boyd v. Illinois State Police*, 384 F.3d 888, 896 (7th Cir. 2004); *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001)(speculation that the jury might have decided the case differently is insufficient to establish prejudice). The City has failed to sustain this burden.

The jury was instructed on what plaintiffs had to show to prevail on their discrimination and retaliation claims. (*Instructions No.* 17 and 17A). A jury is presumed to understand and abide by the instructions. *Shea v. Galaxie Lumber & Const. Co., Ltd.*, 152 F.3d 729, 734 (7th Cir. 1998). That the jury – which was, as I noted during the trial, both exceedingly attentive and intelligent (*Tr.* 380; 1503) – understood and abided by the instructions is obvious: as reflected by its verdicts, the jury carefully differentiated between the discrimination and retaliation claims, returning a verdict favorable to the City on the former and adverse to the City on the latter. "Such a discriminating verdict is strong evidence that the jury successfully compartmentalized the evidence and applied the appropriate evidence to the appropriate counts and defendants." *United States v. Bailey*, 405 F.3d 102, 112 (1st Cir. 2005). *See also United States v. Griffin*, 148 F.3d 850, 854 (7th Cir. 1998)(rejecting argument that acquittal on one count casts doubt on conviction on another count: "If anything, it reveals a discriminating jury able to distinguish among various counts . . . .").

In any event, the evidence of discrimination was inextricably linked to the evidence of retaliation. *Cf. United States v. Holt*, 460 F.3d 934 (7th Cir. 2006). Even if there were a way to limit the evidence to the separate claims, the City never sought to do so, and any limitation would not have made the evidence inadmissible, it would merely have told the jury for what purpose the evidence could be used. *Cf.* Rule 105, Federal Rules of Evidence. Thus, the argument now raised, which in any event is mistaken and undeveloped, is waived. *See Kramer v. Banc of Am. Sec., LLC*, 355 F.3d

961, 964 n. 1 (7th Cir.2004) ("We have repeatedly made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).")(Parenthesis in original).

## H.
## The City's Awareness Of Lieutenant Lipman's Failure To Promote Claims

The City argues that until March of 2006, it had no notice that there would be a failure to promote theory in the case, and that the introduction of evidence on that issue caused it irreparable prejudice. (*Reply*, at 21).[25] As already noted, the complaint included in substance such a theory. The City's suggestion that the complaint was deficient because it did not spell out in detail the theory ill accords with this Circuit's consistent holdings that:

> all a complaint in federal court need do to state a claim for relief is recite that the employer has caused some concrete injury by holding the worker's religion against him. Federal complaints plead *claims* rather than facts. The appendix to the Rules of Civil Procedure contains models that illustrate the short and simple allegations that Fed.R.Civ.P. 8(a) calls for. It is enough to name the plaintiff and the defendant, state the nature of the grievance, and give a few tidbits (such as the date) that will let the defendant investigate. A full narrative is unnecessary.

*Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 714 (7th Cir. 2006).

That the City knew that one or more of the plaintiffs were going to advance a failure to promote theory at trial is evidenced by the City's December 1, 2005 Motion to Sever the Individual Plaintiffs, which expressly noted "[t]he plaintiff's claims of failure to be promoted" and argued that those and other claims involved different circumstances and comparisons with other similarly situated non-white police officers. (*Id.* at 8).

---

[25] The City's brief puts the date in March 2005 but that is obviously a typographical error as revealed by page 22 of the City's Renewed Motion for Judgment as a Matter of Law, which correctly states the date as March 2006. That date accords with my order of December 14, 2005 extending the date for the filing of the pre-trial order.

The defendant also complains that it was unaware that Lipman applied for captain in 2004 and again in 2005. Uncorroborated statements in briefs are not to be considered. *United States ex rel. Feingold v. AdminaStar Federal, Inc.*, 324 F.3d 492, 494, 497 (7th Cir. 2003); *Car Carriers Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984); *Alioto v. Marshall Field's & Co.*, 77 F.3d 934, 935 (7th Cir. 1996). The applications for promotion came while the litigation in this court was pending and were made to the Chicago Police Department. Moreover, the City does not point to any particular discovery request that would have required the kind of supplementation it contends ought to have been made. Judges are not like pigs hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). *See also Alexander v. City of South Bend*, 433 F.3d 550, 552 (7th Cir. 2006)("'We will not scour a record to locate evidence supporting a party's legal argument.'"); *Roger Whitmore's Automotive Services, Inc. v. Lake County*, 424 F.3d 659, 664 n.2 (7th Cir. 2005)(same). [26]

In any event, the plaintiffs' response to defendant's interrogatory number 7, which sought a computation of damages, stated that damages were ongoing "as to the position Plaintiffs careers are in as opposed to those who entered the police at the same time." Under all these circumstances, it is idle to suggest that Lipman's claim came as a surprise to the City.

The City has not explained what specific prejudice it suffered, nor has it demonstrated an inability to respond in a meaningful way to Lieutenant Lipman's claim that the City failed to promote her in retaliation for her grievance and EEOC filings. Unsupported and unspecific claims of

---

[26] Rule 37(c)(1), Federal Rules of Civil Procedure, provides that a party "that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) or to amend a prior response to discovery as required by Rule 26(e)(2)...is not, unless such failure is harmless, permitted to use as evidence at a trial.. any witness or information not so disclosed." Rule 26(e)(1) requires supplementation of incomplete discovery responses unless the additional corrective information has not otherwise been known to the other parties during the discovery process or in writing.

prejudice are not enough. *Cf. Morgan Precision Parts v. N.L.R.B.*, 444 F.2d 1210, 1215 (5th Cir. 1971); *Jeffries v. United States*, 477 F.2d 52, 55 (9th Cir. 1973). The City never asked to retake Lipman's deposition on the question of her two unsuccessful applications for promotion, never asked for a continuance of the trial, and never sought to introduce any evidence to explain why she was not promoted, although that evidence was uniquely available to it. Under these circumstances, the claim of prejudice has a hollow ring to it.

Finally, the defendant again argues that Lipman failed to establish a *prima facie* case of retaliation. As discussed earlier, after a full trial, the only question is whether there was enough evidence to permit the jury to consider the ultimate questions of discrimination and retaliation. *Harvey*, 377 F.3d at 707-708; *Hamner*, 224 F.3d at 705 n.3. The jury heard the evidence and found for the plaintiffs on the retaliation claim, as the evidence allowed it to do.

## I.
## Sergeant Roche's Testimony Regarding Her Anonymous Letters

The defendant next argues that it was prejudiced by the denial of its request for a mistrial based on Roche's testimony on cross-examination that she wrote four anonymous letters to the superintendent of police complaining of discrimination.[27] The defendant contends that it was prejudiced because the anonymous letters might have led the jury to conclude that the Superintendent was "on notice of the alleged acts of discrimination, and he did nothing about the complaints." This, the City speculates, was "highly prejudicial and quite probably contributed to the jury's verdict against the City on retaliation." (*Reply*, at 23-24).

---

[27] Initially, the defendant failed to cite the portion of the record where this testimony occurred or where it requested a mistrial, and a digital search of the 175 pages of Roche's testimony for the word mistrial failed to reveal such a request. Finally, approximately five months after filing this motion, the parties were able to obtain the transcript which supported their claims.

Apart from being utterly speculative, the argument ignores the fact that the City and the

Superintendent were already on notice and that the letters added nothing in that regard. Here is the

exchange that occurred at trial:

> THE COURT: The next question then is the more difficult one, and that is are you
> prejudiced? I would think sort of on a realistic appraisal of things that she perhaps
> is much more prejudiced than you, and you may not be prejudiced at all. Here is a
> woman who supposedly writes letters, suddenly can't come up with any copies. And
> I don't know what the jury's reaction is. It could be highly negative.
>
> I think that all the jury is going to conclude is that she sent some anonymous letters.
> And as you quite readily pointed out, they were anonymous. They were
> contemporaneous with already pending complaints, I use the word colloquially, the
> grievance and the EEOC complaint, *which as every single witness has said when you
> recalled them, put the entire department and the entire City of Chicago on notice.
> There wasn't any more need for any notice. The fact that some anonymous letters
> were sent wouldn't have been any more or less than what everybody has testified to
> and what the grievances are that are part of this record.*
>
> * * *
>
> The testimony as the jury heard is, so she wrote some letters that were consistent with
> but probably not as compelling and as great as what was already on file. *So this isn't
> a question of they should have known because of my letters. They were already on
> notice. The anonymous letters added nothing to the mix. And they don't prejudice, in
> my judgment, your case in the slightest.*
>
> MS. SCHOENBERGER: Your Honor, can I just say one thing? I'd like to state for
> the record, I never saw a letter. Obviously if I had I would have turned it over if I
> thought that it was proper because I turned over things that were far in excess of
> specific requests simply because I turned over every document that she gave me.
>
> THE COURT: * * * So I just don't see that there is any prejudice to you all in
> this at all. And if you want to call her and question her to your heart's content about
> these letters, I am happy to have you do that, the missing letter or the letter she sent.
> I am happy to have you do that. And you certainly have unlimited freedom to do so.
> I won't entertain -- I won't say that. You have unlimited freedom to do so. It's really
> your call.
>
> So the motion for mistrial is denied. I am not going to give any kind of cautionary
> instruction. You can argue to the jury anything you want, Mr. Lee, in an unfettered
> way about the inferences they should draw from this failure to have. And I can think
> of a whole bunch of arguments that you can make that are all very, very helpful to

you and very harmful, to the plaintiff from her failure to have these so-called letters. They are effectively in this case cyphers. They don't say anything. Nobody knows what's in there. There is not a claim, for example, that isn't in the EEOC claim. There is not anything that would have put somebody, on greater notice than the grievance and the EEOC claim already did where you can say, wait a minute. This is a whole new thing.

\* \* \*

MR. LEE: Okay. And as far as postulating at, this late juncture about the -- there is no harm because the letters only say X, well, the entire trial process is so that we can get to the truth. We are never required to only accept one side of the story. That's her recollection of letters that are several years old. It may or may not be right. There maybe more in there; there may be less in there. We don't know because we've never seen the letters. And from my experience sometimes -

THE COURT: So you are speculating then too. You don't know.

MR. LEE: Absolutely, absolutely.

(Undated Transcript, Tr. 1260-1262).

A trial judge has particularly broad discretion in determining whether an incident, in the context of an entire trial, is so serious to warrant a mistrial. *United States v. Schimmel,* 943 F.2d 802, 806 (7th Cir.1991); *Testa v. Village of Mundelein, Ill.,* 89 F.3d 443, 445 (7th Cir. 1996). The exercise of this discretion includes determining whether giving a cautionary instruction, rather than ordering a mistrial, can prevent any possible prejudice. *See United States v. Ferguson,* 935 F.2d 1518, 1527 (7th Cir.1991); *Testa,* 89 F.3d at 445. Here, the City's claim of prejudice is unconvincing. The far more likely conclusion is that Roche's testimony about the anonymous letters hurt rather than helped her case. The jury's verdict at a minimum belies any claim of prejudice. Indeed, it bears repeating that it is that very verdict that underlies the City's repeated contention that the jury did not believe much of Roche's testimony.

It was undisputed that, quite apart from the claimed anonymous letters, the City was on notice

43

of the plaintiffs' charges of discrimination and retaliation. As explained in the colloquy quoted above, the anonymous letters added nothing to the claim that the City was on notice and did nothing. Lieutenant Lipman's testimony about First Deputy Jablon's treatment of her request for transfer to escape Perry's clutches might be a basis for the jury's conclusion of the City's insensitivity to the plight of the plaintiffs. The anonymous letters were surely not enough on which to conclude that the jury was prejudiced against the City for the Superintendent's failure to respond. Indeed, the very anonymity of the letters precluded the Superintendent from being able to respond either in kind or degree beyond the response required by the grievance and the EEOC complaint, themselves.

### J.
### The Jury Instructions

Finally, the City argues that "there were various problems with the jury instructions that caused the trial not to be fair to Defendant under the Federal Rules of Civil Procedure." (*Defendant's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial*, at 24). If the jury instructions, taken as a whole, fairly and accurately inform the jury about the law, a new trial is not warranted. *Hernandez v. HCH Miller Park Joint Venture*, 418 F.3d 732, 738 (7th Cir. 2005); *Trident Inv. Mgmt., Inc. v. Amoco Oil, Co.*, 194 F.3d 772, 780 (7th Cir.1999). If the instructions fail this test, the court must still ascertain whether the instructions so misguided the jury that a litigant is prejudiced. *Maltby v. Winston,* 36 F.3d 548, 560 (7th Cir. 1994). Here, however, the defendant does not argue that the instructions as a whole failed to accurately inform the jury. It simply points to three specific instructions that it claims caused it prejudice.

First, there was the absence of an instruction on the failure to promote issue while at the same time allowing plaintiffs' special interrogatory – *to which the City did not object* – regarding Lipman's promotion claim on this issue. The defendant does not cite to either instruction, nor does it cite to

44

any ruling on its proposed instruction. The special interrogatory merely asked the jury whether it found "[t]hat Plaintiff Nancy Lipman failed to receive a promotion to Captain as a consequence of retaliation by the Defendant for her filing of the grievance or the EEOC charge." As the defendant would have it, the jury was given a special interrogatory without being given the appropriate instructions in regards to how to assess the failure to promote issue. But even if true, the fault would then be with the instruction, not with the special interrogatory, which the City does not claim was intrinsically improper and which it agreed should be given.

Second, defendant claims it was unfairly prejudiced when the court denied its scope of employment instruction, which it proposed quite late in the proceedings. The problem with the instruction is that it was drawn from the Restatement of Agency's "scope of employment" rule, which has been rejected or, at the least, significantly modified, in the Title VII context. *See Kolstad v. American Dental Ass'n*, 527 U.S. 526, 545 (1999)(without modification, Restatement's "scope of employment" rules undermine the objectives underlying Title VII); *Faragher v. City of Boca Raton*, 524 U.S. 775, 804-06 (1998)("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."). The defendant's proposed instruction ignored these holdings and was, consequently, a misstatement of the applicable law.

Finally, there is the complaint that the City was unfairly prejudiced when the court allowed a retaliation instruction that did not require an adverse employment action for a finding of retaliation. The retaliation instruction offered by the defendant stated:

> To demonstrate a prima facie case of retaliation, each Plaintiff must show: 1) she engaged in statutorily protected activity; 2) she suffered adverse employment actions; and 3) a causal link existed between the protected activity and the adverse action.

45

The burden then shifts to Defendant to produce a legitimate, non-discriminatory reason for the adverse action. If Defendant does so, Plaintiffs then bear the burden of showing that the employer's proffered reason is pretextual.

For the reasons discussed earlier, the instruction was an inaccurate statement of law. *See Burlington Northern*, 126 S.Ct. at 2414; *Herrnreiter*, 315 F.3d at 745.

In order to fully comprehend the lack of merit of the City's argument it is important to briefly review the facts leading up to the giving of the instruction. The instructions originally provided in the final pre-trial order were inadequate, as both sides ultimately agreed. Consequently, there were a series of instruction conferences both prior to and during the trial, itself. The instructions went through enumerable drafts. (*Tr.* 794-797; 1247-1253; 1340-1341; 1390-1391). I informed counsel of the Sixth Circuit's *en banc* decision in the *Burlington Northern* case, the fact that the case had just been argued in the Supreme Court, and Judge Posner's decision for a unanimous panel concluding that retaliation to be actionable under Title VII did not have to involve an adverse employment action. (*Tr.* 795-797).

Ultimately, it was agreed by both sides that the instructions that were to be given to the jury (including the retaliation instruction) were appropriate:

THE COURT: I wanted jury instructions long in advance of this case. I didn't get them.

What I ultimately got, and without attribution – actually the plaintiffs' – was all sorts of stuff that talked about the jury being instructed that [what] they [had to] find was unfair harassment. I told you at the time that I wouldn't give those instructions. I didn't think they were accurate.

So what we did is, we had had an extended series of meetings in an attempt to finally hammer out a set of distributions [sic]. And what, we were here last night to 8:30?

MR. LEE: 8:00 o'clock.

46

THE COURT: 8:00 o'clock at night. Finally we have a set of instructions that – and this is sort of my last point and I can do it now. *We have now a set of instructions to which both sides are fully agreed. There are no objections to any of the distributions [sic] that are going to be given.* But they are radically different than what I was presented with that essentially was unusable.

(*Tr.* 1248)(Emphasis supplied).[28]

The City did not disagree with this statement except to say that "the main thrust of our point" is that the plaintiffs' hostile work environment theory could not have been anticipated by the City and that it had not been able to defend itself on that theory. (*Tr.* 1248; *see also Tr.* 1392; 1247; 1340-1341; 1380). But this was not an argument that the retaliation or other instructions were wrong, merely that the City had been ambushed.

I responded by saying that I would look at whatever cases either side had that would be of assistance to me on the question of whether the hostile work environment theory really took the City by surprise and then said: "But we agreed that as to the jury instructions that are going to be given and the verdict forms that were going to be used that both sides had agreed to those instructions and there are no objections to them?" (*Tr.* 1249). When counsel for the plaintiffs adverted to an unspecified objection to two sentences in the discrimination instruction, I said:

"THE COURT: ...You left last night at 8:00 o'clock telling me you thought those instructions were fine. If you think they are not you submit an instruction marked in the appropriate way as your alternative instruction to what I plan to give and make it part of the record....

\* \* \*

When we left last night, we worked these out as we have worked out these instructions for days. Instead of them being done before trial we have been working

---

[28] In the pretrial order, the City's retaliation instruction read: "To demonstrate a prima facie case of retaliation, each Plaintiffs must show: 1) she engaged in statutorily protected activity; 2) she suffered adverse employment actions; and 3) a causal link existed between the protected activity and the adverse action. The burden then shifts to Defendant to produce a legitimate, non-discriminatory reason for the adverse action. If Defendant does so, Plaintiffs then bear the burden of showing that the employer's proffered reason is pretextual."

47

on these things every night or every third night to get these done.

\* \* \*

Do you have any other objections to any of the instructions?

MS. HUBBARD: No.

THE COURT: Okay. Then submit for the record the instruction you think you want me to give and I will look at it again. But what I told you last night is I thought the sentence that I suggested be take out is confusing and didn't add anything to what was in the seceding sentences that in fact are now in. *And you agreed, Mr. Lee, that the instructions that I planned to give you have no objection to?*

MR. LEE: Yes. There was one caveat. *It's not a specific problem with the instruction that we have.*"

(*Tr.* 1249-1250)(Emphasis supplied). The problem that Mr. Lee explained dealt not with the retaliation or other instruction that was to be given but with my refusal to give the scope of employment instruction. *Id.*

Thus, the argument that the retaliation instruction was incorrect is waived. *United States v. Anifowoshe*, 307 F.3d 643, 650 (7th Cir. 2002). "Waiver means that there was no error; even plain-error review is unavailable." *United States v. Babul*, _F.3d_ (7th Cir. 2007)(slip op. 05-4538 at 2).

The City's agreement with the retaliation instruction moots the remaining argument that: "Even if the term adverse employment action is not used, the jury should have been instructed that there must be factual circumstances which amount to an adverse employment action. Although the case of [sic] suggests on its face that [sic]. Otherwise, something as innocuous as a failure to greet an employee could be viewed as unlawful retaliation." (*Defendant's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial*, at 25). Although the argument is muddled by typographical errors, it is made clear in defendant's reply brief, where the defendant submits that the "[p]laintiffs' claims are very similar to the Supreme Court's example of a supervisor's failure to invite an employee to lunch, which the court found to be nonactionable." ( Reply at 18). This

48

contention is unsupportable.

The core of the plaintiffs' retaliation claims dealt with the retaliatory CRs, the day-to-day treatment by Perry and her subordinates of the plaintiffs, the abandonment of Roche in the Robert Taylor homes, and Lipman's 2004 and 2005 non-promotions. Lunchtime snubs were not what the case was remotely about. The defendants did not submit an instruction that would have told the jury what it now claims it should have been told, and the instruction it submitted was improper.

The jury was under no illusions about what constituted actionable misconduct by the City. In the context of the discrimination counts, the jury was told that each plaintiff must prove that she suffered a materially adverse employment action by the defendant because of her race. The jury was told that not everything that makes an employee unhappy is a materially adverse employment action. It must be something more that a minor or trivial inconvenience. As an example, the jury was instructed that a materially adverse employment action occurs when someone's pay or benefits are decreased, when her job is changed in a way that significantly reduces her career prospects, or when job conditions are changed in a way that significantly changes her work environment in an unfavorable way. Mere unhappiness or inconvenience are not actionable under federal law prohibiting discrimination in employment because of race, the jury was instructed. Likewise, general hostility and comments do not qualify as materially adverse employment actions unless the hostility was severe and pervasive. (*Instruction* No. 17).

The jury was also instructed that in order to find a "hostile and abusive environment," the plaintiffs had to prove six things, among which were conduct that was sufficiently severe or pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive. That inquiry required an examination of all the circumstances, including

49

the frequency of the conduct; its severity; its duration; whether it was physically threatening or humiliating; and whether it unreasonably interfered with the Plaintiff's work performance. (*Instruction* No. 18).

In short, neither the evidence, the arguments of counsel, nor the instructions taken as a whole allowed the jury to have found for the City based upon lunchtime snubs or their equivalent.

## CONCLUSION

For the foregoing reasons, the defendant's motions for judgment as a matter of law or for a new trial [# 78; #107] are DENIED.

**ENTERED:** _____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 3/1/07

50