IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DIANE O'SULLIVAN, JANICE ROCHE, )
and NANCY LIPMAN )
)
Plaintiffs, ) No. 01 C 9856
)
vs. ) Magistrate Judge Jeffrey Cole
)
CITY OF CHICAGO, )
)
Defendant. )
)

**MEMORANDUM OPINION AND ORDER REGARDING NANCY LIPMAN'S MOTION FOR AN INJUNCTION ORDERING DEFENDANT TO PROMOTE HER TO CAPTAIN OR, IN THE ALTERNATIVE, FOR AN ORDER SETTING FRONT PAY**

I.
FACTUAL BACKGROUND

On April 24, 2006, the jury returned a verdict in favor of the City of Chicago on the plaintiffs' discrimination claims and a verdict in favor of the plaintiffs on their retaliation claims. In addition, the jury answered "yes" to a special interrogatory that asked whether Officer Lipman "failed to receive a promotion to Captain as a consequence of retaliation by Defendant for her filing of the grievance [with the Chicago Police Department on September 27, 2000] or [the] EEOC charge [that was filed on March 2, 2001]." The jury awarded Officer Lipman $250,000 for her emotional anguish on her retaliation claim. *See O'Sullivan v. City of Chicago*, 2007 WL 779142 (N.D.Ill. 2007); *O'Sullivan v. City of Chicago*, 2007 WL 671040 (N.D.Ill. 2007); *O'Sullivan v. City of Chicago*, 2007 WL 496783 (N.D.Ill. 2007). She now seeks either an injunction ordering the City to promote her to the rank of captain and award her resulting lost pay or an award of that lost pay and front pay until she is promoted to captain (presumably in connection with some further application by her) or until

she retires from the police force in 2014.

Commander Perry's testimony, which began the trial, provides context for the jury's verdict regarding Lieutenant Lipman's charges of retaliation. Her experience prior to being given command of the Second District included five years at the police department's Internal Affairs Division ("IAD"), where she became acquainted with fellow Internal Affairs Officer, Gerardo Garcia. (4/11/2006–9:30 a.m. Tr. 5-6). Early in Lipman's tenure at the Second District, in January of 2000, Commander Perry asked her and co-plaintiff, Diane O'Sullivan, to monitor a situation with white officers who were the subject of complaints of mistreatment by residents of the district. (4/11/2006–9:30 a.m. Tr. 19; Plaintiff's Ex. 30, at 15).

In a later letter to Superintendent of Police Hilliard, Commander Perry explained that she had heard nothing specific, but that there was "insensitivity to the community such as the personnel in question cutting their hair very short, particularly during warmer weather, in the style of skinheads, wearing their pants tucked into their boots as if they were storm troopers and going out into the CHA Developments along State and Federal [Streets] where they treated the residents as second class citizens." (Plaintiff's Ex. 30, at 15). To be sure, the white officers' appearance was not Commander Perry's only concern, but additional testimony indicating the varying reasons why those officers might wear a short haircut (hot Chicago summers, habit from military experience, or simply the fact – driven home by defense counsel again and again-- that the police department was a "paramilitary organization" or tuck their pants into their boots because the housing projects were rat-infested. Although there was testimony that black officers also wore their hair short, Commander Perry did not seemed bothered by their choice.

In any event, Commander Perry directed Lipman to look into the short hair and tucked-in-

pants situation, and she added the following ominous warning:

> I basically told her that if — well, if she condoned something, if something was going on that was wrong and she condoned it, then she would become a part of the situation and could jeopardize her career. Yes I told her that.

(Trial Transcript of 4/11/2006–9:30 a.m. Tr. 22). So early on, the jury heard evidence that Commander Perry made clear that if Officer Lipman was not on board with the way Commander Perry felt about the impropriety of a given situation, her career would be in jeopardy.

Commander Perry also testified that the plaintiffs were perceived as a group of racists unwilling to work for a black commander. (4/11/2006–9:30 a.m. Tr. 17). She reported as much to the IAD. (*Id.*). She said she had no choice but to believe this, but at the same time, she said she never believed that Lipman was a racist. (*Id.*; Tr. 18). Commander Perry testified that she felt Lipman was a decent person. (*Id.*; Tr. 37-38). But she indicated that Lipman was following along with others she felt were racists because they were her friends. (*Id.*; Tr. 18).

During that time, Commander Perry lodged two formal complaints (called Complaint Registers or CRs) against Lipman. In her 14-year career prior to coming to the Second District, she had suffered no CRs, and has received none since leaving Commander Perry. In short, in Lipman's 21-year career, the only mark on her record came while she was under Commander Perry. (4/12/2006–1 p.m. Tr. 4, 6-7). While the City attempted at trial to characterize the CRs as trivial matters, the evidence was quite to the contrary, and the defendant's tendentious characterization was rejected by the jury, which could reasonably have come to the conclusion that common sense compelled, namely that CRs against a Lieutenant – especially the kind Perry lodged against the plaintiffs accusing them of having falsely accused her of racism-- could have a lethal effect on one's

3

career. At a minimum, the jury could have found that regardless of the outcome of any particular CR, the mere filing could stigmatize an officer's record. (4/12/2006–1 p.m. Tr. 77). According to Officer Jeff Wilson, CRs were not taken out against Lieutenants unless the involved some serious infraction. Absent that, they were intended to harass.

And that is to say nothing of the fact that the defendant's characterization of the CRs has been belied City's actions shortly after the trial, when it suspended O'Sullivan and Lipman based on the recommendations of Agent Garcia that the jury had determined were themselves retaliatory. On March 15, 2007, I granted the plaintiffs' Motion to enjoin the City from enforcing the suspensions. *See O'Sullivan v. City of Chicago*, 2007 WL 779142 (N.D.Ill. 2007).

After Lipman joined the other white police officers in filing a grievance with the police department on September 27, 2000 accusing Commander Perry of racial discrimination, Commander Perry treated Lipman differently than others in her command. For example, when it came to reviewing her paperwork, she lambasted Lipman's efforts and sent her complaints about Lipman up the chain of command. (4/12/2006–1 p.m. Tr. 58-59). This contrasted with her treatment of others who were given repeated chances to complete reports to her liking. Indeed, in some cases, she even did their work for them.

Commander Perry issued a CR against Lipman for failing to notify an officer of a court call when it had, in fact, been the responsibility of another lieutenant in the district to have done so. Lipman was not even in the district that evening. (Tr. 60, 62). On the other hand, when O'Sullivan, Lipman, and Roche filed their grievance on September 27, 2000 against Commander Perry, accusing her of racial discrimination, the grievance somehow "fell through the cracks." (4/11/2006--1 p.m. Tr. 81, 117-19). The inferences that the jury could draw were as adverse to the City as they were

4

obvious.

When rumors circulated that certain white police officers under Commander Perry's command were of the impression that she was making racially discriminatory employment decisions (4/11/2006 – 9:30 a.m. Tr. 10-13, 37), Commander Perry, anticipating the formal grievance that was to come on September 27th, effectively commandeered the issue and went on the offensive with a preemptive strike by issuing on September 11, 2000 a CR that nominally was "against" herself. (4/11/2006– 9:30 a.m. Tr. 10-13; 4/11/2006 – 1 p.m. Tr. 119; Plaintiffs' Ex. 10). As it read, however, it was in reality an indictment of the plaintiffs for having "conspired" to malign Perry by disseminating "false information" that charged her with being a racist.[1] Officer Jeff Wilson testified that Perry's CR against herself allowed her to control the scope of the investigation

The "CR," which was addressed to Terry Hilliard, Superintendent of Police, was full of self-adulatory comments and asked that a "thorough fair and unbiased investigation be conducted and, once my name is cleared, I ask that those who have made the false allegations be properly disciplined. (*Plaintiffs' Ex.* 10). Following her September 11th CR, the plaintiffs were suddenly and for the first time in their careers, the object of a rash of CRs, some from Perry and some from her African-American staff.[2]

---

[1]. *See discussion in O'Sullivan v. City of Chicago*, 2006 WL 3332788 (N.D.Ill. 2006).

[2] CR 264868 was initiated by Perry on September 21, 2000 against O'Sullivan and Roche relating to some claimed infraction regarding bond of a prisoner. This was 10 days after Perry filed her CR against herself that effectively was an indictment of the plaintiffs and accused them of racism and of having falsely accused her of racism. CR 264869 came on November 8, 2000 from Perry against O'Sullivan relating to an minor altercation she had with an African American Lieutenant, Lilly Krump-Hales, whos was a close friend of Perry. On December 21, 2000, Krump-Hales initiated a CR against Sergeant Roche and Lieutenant Lipman relating to a domestic violence incident and a subsequent investigation. On May 18, 2001, CR 271488 was initiated by Lang and Huddleston against O'Sullivan and Roche relating to an accusation of racial discrimination with respect to detention aides.

5

Although he had no training in employment discrimination matters and had never handled a race discrimination case, the investigation was assigned to Perry's former colleague at IAD, Agent Garcia.[3] In support of the ostensible CR against herself, Perry wrote a long, elaborate supporting memorandum in the form of a letter. So rather than have their complaint addressed through the ordinary, proper channels, the plaintiffs, including Lipman, had to settle for Commander Perry dictating the terms of battle, as it were. The 28-page single spaced letter/memorandum accused the plaintiffs of all manner of misdeeds. (*Plaintiffs' Ex.* 30).[4]

On November 1, 2000, at 5 a.m., Lipman was ordered by Garcia to report to IAD with a thorough, written report to back up her claims that Commander Perry was racially biased. (4/12/2006– 1 p.m. Tr. 63-64). Officer Lipman was unprepared on short notice to comply. Unwilling to give her a reasonable period to respond, and despite the absence of any exigencies that made an immediate response imperative, Garcia charged Lieutenant Lipman with having disobeyed a direct order to provide a detailed report supporting her charges of racism. (Tr. 63-65). The pretextual nature of Garcia's insistence on immediacy, was, the jury could find, evidenced by the fact that Garcia's "investigation" dragged on for 942 days.

Eventually, on April 11, 2003, Garcia recommended that Lipman be suspended for ten days for her purported violation of his 5 a.m. order. (Tr. 66-67; Plaintiffs' Ex. 9, at 31). As it turned out,

---

[3] Agent Garcia admitted his total lack of experience in employment discrimination matters and claimed that he did not know Perry from her days at IAD.

[4] In reality, there were three CRs involving Lipman and her colleagues (prior to November 2000), although only two were formally against them. The other was a CR Commander Perry nominally filed against herself, but which effectively charged Lipman and her fellow white officers, who are the plaintiffs in this case, with having falsely accused her of a being a racist and of causing strife in the Second District. *See O'Sullivan v. City of Chicago*, 2006 WL 3332788 (N.D.Ill. 2006).

6

the notice to Lipman was actually sent to the second district a day in advance, but the staff there failed (inexplicably) to forward the notice to her. (Tr. 64).

Lipman had many such problems with Commander Perry's African American staff, and would, in fact, often be given bogus assignments, sending her to other districts where she was not needed. (Tr. 36-39). The staff, essentially, acted as an obstacle to getting work done, and it was Lipman who was threatened with disciplinary action for their recalcitrance. (4/13/2006–9:30 a.m. Tr. 2-3). She also had similar problems when she attempted to discipline African American subordinates. (4/12/2006–1 p.m. Tr. 67-69, 71-72, 79). The jury could fairly conclude that Commander Perry undermined Lipman's authority, and that Commander Perry used CRs as a form of retaliation against her and the other plaintiffs. (Tr. 70).

The jury could find that the CRs against Lipman, and especially Garcia's charge, would inevitably factor into and doom Lipman's applications for promotion to Captain. Lipman left the Second District, and Commander Perry's command, in March of 2001. (4/12/2006–1 p.m. Tr. 75). At about the same time, March 2, 2001, Lipman filed an EEOC charge against the defendant. (Plaintiffs' Ex. 33). She filed the instant suit on December 26, 2001. (4/13/2006–9:30 a.m. Tr. 13).

Thereafter, Officer Lipman twice applied for a promotion to Captain, first in August 2004 and again in August 2005. (*Id.* Tr. 6-7). In so doing, she had to submit a multi-page application detailing her ability and experience to the office of the First Deputy. (*Id.* Tr. 7). Despite have graduated first in her class from the Police Academy and having had a lustrous career before her encounter with Commander Perry, she was not even interviewed, and was never told why. (*Id.* Tr.

7

19).[5] Nor was she ever told why she had not been promoted. (4/13/2006– 9:30 a.m. Tr. 19). All she knew was that her application was reviewed by a Promotion or Screening Board made up of officers of different ranks. (4/13/2006– 9:30 a.m. Tr. 20-21).

The City's Exhibit 26 explained the promotion application review process:

Applications for Captain will be reviewed by a Screening Board appointed by the Superintendent of Police composed of at a minimum the following: two current Captains, two (2) District Commanders, and two (2) Deputy Chiefs of Patrol. The Screening Board will determine by a two-thirds vote in each case those applicants who are eligible for a promotion to Captain (SES). In determining eligible Lieutenants, the Screening Board will request recommendations from at least two of the Lieutenant's superiors. The Superintendent then takes the list and may assign the eligible candidates (at his discretion) for training. After receiving the results, the Superintendent shall elect among the candidates who successfully competed the above procedure and shall assign a successful candidate to an existing vacancy.

Exhibit 26 makes clear that it is the Superintendent of Police who makes the ultimate determination of who is to be promoted. See Deloughery v. City of Chicago, 422 F.3d 611, 614 (7th Cir. 2005).

The jury could reasonably have concluded two things, either of which is sufficient to sustain Lieutenant Lipman's position. First, as in *Deloughery*, the jury could have determined that the City's refusals to have promoted her, notwithstanding her exemplary career prior to her coming to and after her leaving the Second District, were in retaliation for the plaintiffs' grievance against the City and their EEOC complaint. See 422 F.3d at 615, 619.[6] Alternatively, the jury could reasonably have concluded that Garcia's charge of insubordination and disobedience against Officer Lipman and

---

[5] Officer Lipman testified that approximately half of her graduating class had been promoted over her.

[6] In *Deloughery*, Superintendent of Police Hilliard testified that he was unaware of the plaintiff's internal and external complaints and that he made promotion decisions solely on the strength of the candidates' qualifications. 422 F.3d at 614.

8

Perry's CR were retaliatory within the meaning of Title VII and that they and the other CRs resulted in Lipman's not being promoted.

Those charges could scarcely have been more serious. They did not merely accuse Lipman of insubordination, although one who would not follow orders in a paramilitary organization could not be expected to lead. It was the nature of the insubordination that allowed if it did not compel the most damning of inferences, namely that Lipman's charge of racism against a superior officer was baseless–just as Perry contended in her CR. Why else not support the charges that had been made? Garcia's charge of direct disobedience was unresolved at the time of Officer Lipman's applications in 2004 and 2005. Even if the Reviewing Board were totally free of retaliatory motives, what responsible group of police officers would select for promotion in a "paramilitary organization" like the Chicago Police Department an officer who, Garcia concluded, disobeyed direct orders in violation of Departmental regulations and, it appeared, had made false charges of racism against her superior officer. (Plaintiffs' Ex. 9).

The jury was instructed that to find for Officer Lipman on her retaliation charge she had to prove by a preponderance of the evidence that the City retaliated against her because of her filing of a grievance with the police department and/or charges she filed with the EEOC. (Instruction 18). The jury was told that they could use its common sense in weighing the evidence, and that they could consider the evidence in light of their own observations in life. (Instruction 7). The jury answered a special interrogatory that said explicitly that the defendant had retaliated against Lipman for her claims of discrimination by refusing to promote her to Captain. In finding that Officer Lipman suffered retaliation by the City, the jury acted within its proper scope, and I am bound by

that determination.[7]

## II.
## ANALYSIS

Congress specifically characterized backpay under Title VII as a form of "equitable relief." 42 U.S.C. § 2000e-5(g) (1982 ed.): "[T]he court may . . . order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriate." *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 572 (1990). It is settled practice that "[w]here both legal and equitable relief are sought by a plaintiff, the Seventh Amendment right to a jury trial requires that the legal claims be tried first, to a jury." *Miles v. Indiana*, 387 F.3d 591, 599 (7th Cir. 2004)(*citing Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 844 (7th Cir.1978)). In *Miles*, the Seventh Circuit explained that:

> [a]fter a trial on the legal issues, any issues necessarily and actually decided by the jury are foreclosed under settled principles of collateral estoppel from subsequent reconsideration by the district court. The court may not make findings "contrary to or inconsistent with the jury's resolution ⋯ of that same issue as implicitly reflected in its general verdict ⋯ on the damages claim." The judge is bound by the issues necessarily decided by the jury, and, therefore, the jury's determination often affects the judge's disposition of the accompanying equitable claim. However, when the basis of the jury's verdict is unclear, each of the potential theories supporting the verdict is open to contention "unless this uncertainty be removed by extrinsic evidence showing the precise point involved and determined." Therefore, when

---

[7] That the Perry CR came days before the plaintiffs filed their grievance does not prevent the CR from being retaliatory. Title VII's concern is with causality not with chronology, as Instruction 18 recognized. The evidence was sufficient to allow the jury to conclude that Perry knew what was coming and sought to beat the plaintiffs to the punch. To immunize a retaliatory act merely because the defendant anticipated the charges of discrimination he knew were coming would result in unscrupulous but prescient defendants being able to evade Title VII. Just as the Constitution forbids sophisticated as well as simpleminded modes of discrimination, *Reynolds v. Sims*, 377 U.S. 533, 563 (1964), so too does Title VII.

10

several issues have been litigated, and the jury may have supported its verdict by finding in the plaintiff's favor on any one of the issues but which one is not clear, the court is free to determine the basis of the jury's verdict unless extrinsic evidence clearly resolves the issue.

387 F.3d at 599-600 (citations omitted).

Despite the jury's verdict, the defendant argues that Lipman has neither demonstrated that she is entitled to any lost pay, nor that she deserves to be promoted to captain. Relying on *Miles*, the City contends that there must be an evidentiary hearing to determine whether the "Chicago Police Department's decision not to promote Lipman was based on retaliation, or if she was not promoted because there were better qualified candidates or some other non-retaliatory reason." and whether Lipman deserves any promotion or back/front pay, and, if she does, the actual amount of pay to which she is entitled. (*Defendant's Response to Plaintiffs' Motion on Behalf of Nancy Lipman to Set Lost Pay*, at 2; *Defendant's Response to Plaintiffs' Motion on Behalf of Nancy Lipman to Set Front Pay*, at 2). It argues that "[i]n order to determine whether she was even deserving of a captain's position, the court must compare her qualifications with the qualifications of those in her class who were promoted to captain." (*Id.* at 3; *see also Defendant's Response to Plaintiffs' Motion on Behalf of Nancy Lipman to Set Front Pay*, at 3).

But the jury already specifically determined that the decision not to promote Lipman *was* retaliatory. To follow the course suggested by the City would be to nullify the jury's verdict and give the City a second trial, this time without a jury. That course is forbidden by *Miles*. The court may not make findings "contrary to or inconsistent with the jury's resolution" of that same issue as reflected in its verdict on the retaliation claim. The City had every opportunity to demonstrate to the jury that its decision not to promote Lippman was not animated by retaliatory motives. Unlike

11

*Deloughery*, it chose not to do so. Like all strategic decisions, this one has consequences. Cf., *United States v. Saunders*, 359 F.3d 874, 877 (7th Cir. 2004).

In *Miles*, a post-trial evidentiary hearing was required because of the ambiguous nature of the verdict itself. The jury had responded affirmatively to the question of "whether [plaintiff] had 'proven that his complaints of discrimination were, more likely than not, a motivating factor in the decision of the defendant . . . to transfer him . . . *or* fail to promote him?'" 387 F.3d at 596 (Emphasis supplied). Because of the disjunctive phrasing, it was impossible to know whether the jury's determination that the defendant had retaliated against the plaintiff took the form of a failure to promote or to transfer the plaintiff to a job with no supervisory responsibilities. As the district court recognized, only a hearing could resolve that question. *Id.* at 597-98.

At the hearing, the district court heard evidence as to why the plaintiff had not been promoted, among other evidence. *Id.* Following the hearing, the court denied front or back pay, and refused to enjoin future retaliation. The court did order the defendant to restructure plaintiff's position so that he could exercise supervisory responsibilities similar to those that he had exercised before his transfer. The Seventh Circuit affirmed:

> Because of the phrasing of the special verdict inquiry, the jury verdict can be read in three possible ways. The jury could have found retaliation in the transfer of [plaintiff] to the Records Division, retaliation in failing to promote [plaintiff], or retaliation in both the reassignment and failure to promote. If the jury only found retaliation in the reassignment to a position that lacked any supervisory responsibility then providing equitable relief of supervisory responsibility would make [plaintiff] whole without the need for either a promotion or front pay. By contrast, if the jury had found retaliation in failing to promote . . . , then the provision of supervisory duties alone would not make [plaintiff] whole. *The jury found retaliation, but did not reveal the basis for that finding.*

387 F.3d at 600 (Emphasis supplied).

12

In the instant case, there is no ambiguity in the verdict, and thus a hearing is not necessary to determine whether the City retaliated against Lieutenant Lipman when it denied her promotions.

Nor can it be argued persuasively that there is some ambiguity in the verdict because the special interrogatory did not ask when Lipman was retaliated against. It is the City's position that a hearing is necessary to determine whether the retaliation was in 2004 or 2005 or both. At the hearing, the City proposes to prove that neither was retaliatory. But that would simply allow a circumvention of the jury's verdict – the very thing *Miles* forbids.[8]

In the instant case, unlike *Miles*, the evidence did not differ as it related to the arguably separate acts of retaliation in 2004 and 2005. Thus, the jury in this case could not consistently have concluded that the City retaliated in 2004 but not 2005 or *vice versa*. When Lipman applied for promotion in 2004, Perry had already accused Lieutenant Lipman of having falsely accused her of being a racist in a formal grievance, and Garcia had already recommended a 10-day suspension for her alleged failure to have complied with his direct order to provide a detailed and comprehensive written report supporting her charges against Perry.[9] The jury could reasonably find that these CRs were intended to and did preclude her advancement in the Department. The charges could not have been more consequential: Lipman was effectively being charged with racism, with being a malcontent, and a troublemaker, and with having falsely made the most serious of charges against a commanding officer and then disobeyed a direct order to support those charges. These were hardly

---

[8] Lipman applied for captain in August of 2004 and again in August of 2005. The plaintiffs ask for back pay stemming from August of 2004. This could mean that Lipman suffered retaliation in 2004, or 2005, or both. The difference in dates could directly affect the amount of any back pay award by over $8000.

[9] The recommendation came in April 2003, following a three year "investigation." *See* Order of Injunction and Other Equitable Relief Against The City of Chicago. (March 21, 2007).

13

the kinds of characteristics that would commend themselves to the police Review Board, which was charged with deciding who to promote to the few captain spots in the Department. Indeed, the charges implicated precisely the qualities of character that made disqualification from consideration for captaincy a virtual certainty. *See O'Sullivan v. City of Chicago*, 2007 WL 496783, *14 (N.D.Ill.) (N.D.Ill.,2007). The jury heard evidence that CRs and an applicant's personnel history were appropriate matters to be considered by the Review Board. *O'Sullivan v. City of Chicago*, 2007 WL 671040 at *4 (N.D.Ill. 2007).

The evidence as it related to the 2005 failure to promote was identical to that the jury heard in connection with the 2004 rejection. The recommendation by Garcia was still in place and unresolved, and the nature of the charges that underlay the recommended 10-day suspension were every bit as lethal in 2005 as they were in 2004. In short, nothing had changed, and the City introduced no evidence that might have given the jury a reason to conclude that one or the other of the rejections was for a non-retaliatory reason. Consequently, there was nothing either in the evidence that allowed for any interpretation but one. Consequently, unlike *Miles*, the basis of the jury verdict is luminously clear, and the verdict necessarily included a finding that the City in 2004 and 2005 had retaliated against Lieutenant Lipman by failing to promote her. I am bound by the issues necessarily decided by the jury. *Miles*, 387 F.3d at 599-600.

## III.
## THE EQUITABLE REMEDY THAT IS APPROPRIATE IN THIS CASE

While the award of either promotion or front pay is left to the very substantial discretion of the trial court, that discretion must be guided by legal principles and exercised in a manner consistent with the objectives of Title VII. *Miles*, 387 F.3d at 599. The exercise of discretion often involves

an analysis of variables that frequently appear equally balanced and compelling. Since reasonableness is a range, not a point, there is no ready answer in a particular case. *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)(Posner, J.). *See also United States v. Bullion*, 466 F.3d 574, 577 (7th Cir. 2006)("The striking of a balance of uncertainties can rarely be deemed unreasonable...."); *Rogers v. Loether*, 467 F.2d 1110, 1111-12 (7th Cir.1972)(Stevens, J.)(Discretion can go either way), *aff'd*, *Curtis v. Loether*, 415 U.S. 189 (1974).

One of the major objectives of Title VII "is to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975). The "preferred remedy" to achieve that goal in cases involving discriminatory or retaliatory failure to promote is a court-ordered promotion (or reinstatement) to the position the plaintiff would have held absent the discrimination. *Miles*, 387 F.3d at 599.[10] But not always. Other considerations may make that course infeasible. For example, decreeing a promotion may create hostility or friction in the work environment. *Id.*; *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 861 (7th Cir. 2001).

In those situations, among others, decreeing a promotion may be an inappropriate remedy. *Miles*, 387 F.3d at 599. In *Bruso*, in the context of reinstatement, the court observed:

> On the one hand, reinstatement is the preferred remedy for victims of discrimination, and the court should award it when doing so is feasible. On the other hand, a court is not required to reinstate a successful plaintiff where the result would be a working relationship fraught with hostility and friction. Reinstatement in such situations could potentially cause the court to become embroiled in each and every employment

---

[10] There is often more to a promotion than enhanced compensation. There are the heightened and varied responsibilities, and the honor and stature of the job, which have value quite beyond the additional pay. Being the Chief Justice of the United States is not prized because it pays more than being a Circuit or District Judge. In the same vein, a promotion to Captain in the Chicago Police Department (much like a promotion to a high rank in the armed services) is valued for more than the increased salary that comes with the job. If all that counted in promotion cases was the value of the lost pay, promotion would not be the "preferred remedy," and front and back pay would do as well to make a plaintiff whole.

dispute that arose between the plaintiff and the employer following the plaintiff's reinstatement. A court must be careful, however, not to allow an employer to use its anger or hostility toward the plaintiff for having filed a lawsuit as an excuse to avoid the plaintiff's reinstatement.

239 F.3d at 861-862 (citations omitted).

These concerns become more critical when the promotion is to a management position, or when the plaintiff might not enjoy the confidence and respect of superiors. *Bruso*, 239 F.3d at 862. Serving as a Captain in the Chicago Police Department would appear to fall within the class of managerial positions in the sense *Bruso* envisioned. Lipman would be only 1 of 75 Captains in a department of 13,000 officers. The very nature of the wrong done to her gives some credence to the argument that at least some of her superiors might be resentful if she were promoted pursuant to a court order.[11] Apart from being speculative, the argument cannot be carried too far, for if it is accorded primacy, a successful Title VII plaintiff would almost never be promoted, and the defendant would thereby have achieved the goal of the whole enterprise.

In the plaintiffs' view, "[h]olding some showcase hearing to ameliorate the speculative feeling of bitterness among some unnamed, unknown 'other officers' is just silly . . . ." (Reply at 3). Commander Perry has retired, and the uncontradicted proof at the trial was that Lipman has fine working relationships with commanders and peers both before and after her time at the Second District. (*Id.* at 4). The concerns raised by the City were not issues that the jury was called upon to decide. Whether the City can make the case that promoting Lieutenant Lipman would be an

---

[11] Resentment might exist among some in the ranks of those she would command as well as those who prior to the court-ordered promotion were equal in rank – especially since the court may be viewed as assuming the role of a "super-personnel department." *Keri v. Board of Trustees of Purdue University*, 458 F.3d 620, 648 (7th Cir. 2006). But all this is speculative, and equally possible that the rank and file would rejoice at Lipman's victory.

16

inappropriate remedy because it would undermine morale or result in serious and irremediable inefficiencies in the Department remains to be seen. But it ought to have that opportunity.

Case law ignored by both sides indicates that, at this point, an award of front pay is foreclosed. A plaintiff who seeks an award of front pay must provide the district court "with the essential data necessary to calculate a reasonably certain front pay award." *Bruso*, 239 F.3d at 862; *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992) *cert. denied*, 507 U.S. 915 (1993). Such information includes the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate. *Bruso*, 239 F.3d at 862. After all, front pay is the difference between what Lipman would have earned in the future as a captain and what she can be expected to earn after proper discounting to present value. *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1231 (7th Cir. 1995).

If the plaintiff fails to provide this necessary information to the district court, it is not an abuse of discretion to deny the request for front pay. *Bruso*, 239 F.3d at 862-63; *McKnight*, 973 F.2d at 1372. Here, the plaintiff falls short of providing this requisite information. Instead, despite the relevant case law, the plaintiff incorrectly contends that all she need do is inform the court of the "captain's pay amount." (Reply at 4).

Lieutenant Lipman's back pay motion notes that had she been promoted to Captain in August of 2004 – her first application – her increased pay would have been an additional $682 per month. (*Plaintiffs' Motion on Behalf of Nancy Lipman to Set Lost Pay as Captain*, at ¶ 6). In her front pay motion, she simply submits that "in the event this Honorable Court does not enter an order appointing Plaintiff Lipman to the next available captain position, Plaintiff Lipman requests the she be awarded front pay either until she is promoted to captain or her retirement in 2014, whichever

17

comes first. . . . *whatever said amount may be."* (*Plaintiffs' Motion on Behalf of Nancy Lipman to Set Front Pay*, at ¶ 4). [12]

Proceeding on the assumption that Lieutenant Lipman is seeking $682 a month until 2014, the request nonetheless cannot be granted, because the Motion fails to provide the discount rate necessary to establish the proper amount of the total award. Under both *Bruso* and *McKnight*, given this failure, the plaintiffs' request for front must be denied. *See also Mattenson v. Baxter Healthcare Corp.*, No. 02-3283, 2004 WL 1244016, *4 (N.D.Ill. June 4, 2004)(denying motion for front pay where plaintiff failed to provide necessary information under *Bruso* and *McKnight*); *Place v. Abbott Laboratories, Inc.*, No. 94-5499, 1999 WL 301654, *16 (N.D.Ill. April 30,1999)(denying motion for front pay under *McKnight*); *Barbour v. Merrill*, 48 F.3d 1270, 1279 (D.C.Cir. 1995)(discussing plaintiff's burden of proof in establishing front pay award).

The goal of front pay is to put the victim in the financial position she should have enjoyed, when circumstances make court-ordered promotion infeasible. *Biondo v. City of Chicago*, 382 F.3d 680, 691 (7th Cir. 2004); *Williams v. Pharmacia*, 137 F.3d 944, 954 (7th Cir.1998). Front pay awards, while often speculative, cannot be unduly so; the longer a proposed front pay period, the more speculative the damages become. *McKnight*, 973 F.2d at 1372; *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1056 (7th Cir.1990). Thus, the question is what is the probability that Lieutenant Lipman will remain with the police force for the next eight years? Eight years is a long time, and much can happen. Do police officers generally work to retirement age, or due to the stresses and dangers of

---

[12] On one level, the request as phrased seems internally inconsistent: it assumes there will not be an appointment to Captain, but then seeks a front pay award until 2014 *or* until the very appointment it assumes will not occur. Perhaps what the motion had in mind is some future, non-court ordered appointment. If not, the request is difficult to understand.

18

the job, do they burn out long before? Are there personal circumstances that make it unlikely that Lipman will work to 2014? Plaintiff leaves this, inappropriately, to speculation. *See Hybert*, 900 F.2d at 1056-57 (vacating front pay award where there was no record evidence as to whether individuals in plaintiff's profession worked to a certain age, or whether plaintiff in particular could or would have done so); *Coston v. Plitt Theatres, Inc.*, 831 F.2d 1321, 1333 (7th Cir. 1987) *cert. denied*, 485 U.S. 1007, *vacated on other grounds*, 486 U.S. 1020, *on remand*, 860 F.2d 834 (7th Cir.1988)(trial court well within discretion to deny front pay award where "neither party specifically address[ed] the issue of whether the plaintiff intended to work, or was physically capable of working, until his full retirement age.").

In *Biondo*, the court discussed a front pay award in a failure to promote case involving firefighters, albeit in the context of a case involving standardized tests and racial quotas. The court noted that the plaintiffs would have opportunities, post-trial, to seek promotions, requiring a limit to any front pay award. "Setting this limit also gives plaintiffs an incentive to compete for promotions, unlike the district court's remedy, which all but guaranteed plaintiffs the highest possible salary through retirement without the need to seek advancement or perform the duties of the higher positions." *Biondo*, 382 F.3d at 691-92.

The plaintiff's Motion does not advert to, let alone answer these and related questions because, according to the Motion "[t]he issue is not really complicated . . . ." (Reply at 2). The result is that the Motion has not meet the burden in establishing Lipman's front pay award," thereby foreclosing front pay as an available remedy in this case, " *Bruso*, 239 F.3d at 862; *McKnight*, 973

F.2d at 1372-- at least for now.[13]

## CONCLUSION

For the foregoing reasons, the plaintiffs' motions for an order setting back pay and promoting Nancy Lipman to captain [# 111] and for an order setting front pay in the event the court does not order Lipman promoted are [# 118] are DENIED. A hearing on the question of the feasibility of promoting Lipman to Captain will be scheduled at the next status date. At that hearing, Lieutenant Lipman can introduce evidence relating to her claim for front pay.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 3/26/07

---

[13] The current motions are exceedingly brief, and neither was accompanied by a supporting memorandum, notwithstanding the court's standing order. This method of briefing does little to help "the court rule in [counsel's] client's favor." *Dal Pozzo v. Basic Machinery Co., Inc.*, 463 F.3d 609, 613-614 (7th Cir. 2006).