IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DIANE O'SULLIVAN, JANICE ROCHE, )
and NANCY LIPMAN, )
 )
    Plaintiffs, )  No. 01 C 9856
 )
  v. )  Magistrate Judge Jeffrey Cole
 )
CITY OF CHICAGO, )
 )
    Defendant. )
 )

## OPINION RE: PETITION FOR AWARD OF ATTORNEY'S FEES
## PURSUANT TO 42 U.S.C. §1988

### I.
### BACKGROUND

Plaintiffs, Diane O'Sullivan, Janice Roche, and Nancy Lipman, are Caucasian females,

employed by the City of Chicago Police Department. O'Sullivan and Lipman currently hold the rank

of Lieutenant, while Roche holds the rank of Sergeant. The Plaintiffs all complained of racial

discrimination and retaliation on the part of one of their superiors, Commander Marienne Perry, an

African-American female. In December of 2001, Plaintiffs, represented by attorney Elisabeth

Shoenberger,[1] filed a complaint against the City of Chicago. The complaint also named as

defendants the City of Chicago Police Department (the Police Department) and Commander Perry,

in both her official and individual capacity. The complaint first alleged that Perry had discriminated

against Roche and other employees of the Police Department on the basis of race. Specifically,

---

[1] Ms. Shoenberger later obtained the assistance of Hubbard and O'Connor, Ltd., as trial counsel.

Plaintiffs alleged that Perry had "systematically removed Caucasian officers and replaced them with African-American officers," and that Roche had personally been subject to this treatment. (Complaint at ¶¶ 10–14.) The complaint further stated that all three Plaintiffs had lodged a formal grievance with the Police Department regarding that discrimination, and had been subject to retaliation for doing so. (Complaint at ¶¶ 15–20.) Allegedly, Perry and other officers began filing unfounded performance-related complaints ("Complaint Registers" or "CRs") against all three Plaintiffs, in addition to engaging in other forms of retaliatory action. (Complaint at ¶ 15–16.) The complaint, fairly read, stated five separate claims against the City, the Police Department, and Perry (the Joint Defendants), including (1) a violation of 42 U.S.C. § 1983; (2) a violation of 42 U.S.C. § 1981; (3) a violation of the Illinois Human Rights Act (IHRA), 775 ILCS 5/1-101 *et seq.*; (4) discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. 2000e; and (5) retaliation in violation of Title VII. (Complaint at ¶¶ 25–29.) It is important to note, however, that although Plaintiffs pleaded a variety of legal claims, all relied upon the same two sets of facts the discriminatory and retaliatory actions by Perry. The complaint also requested various forms of relief, including a declaratory judgment; an injunction; an order directing that the effects of the alleged practices be eliminated; compensatory damages for lost wages and other lost benefits; compensation for emotional and psychological damage; punitive damages; and costs, including reasonable attorney's fees. (Complaint at ¶¶ A–I.)

In February of 2002, the Joint Defendants filed a motion to dismiss several of the Plaintiffs' claims, including the IHRA claim, the Title VII claims against Perry individually, the § 1981 and § 1983 claims against Perry in her official capacity, all claims against the Police Department, and the

2

claim for punitive damages against the City.[2] In April of 2002, Judge Elaine Bucklo granted the motion as unopposed. Following discovery, the Plaintiffs § 1981 and § 1983 claims against the City were disposed of by summary judgment. Plaintiffs' remaining claims, for retaliation and discrimination in violation of Title VII, were tried to a jury from April 10, 2006, through April 24, 2006.

The jury found for the City on the Plaintiffs' Title VII discrimination claim, but found for the Plaintiffs on their Title VII retaliation claim. As a result of the retaliation verdict, the jury awarded the Plaintiffs compensatory damages in the amounts of $250,000.00 for Lipman, $50,000.00 for O'Sullivan, and $25,000.00 for Roche, for a total of $325,000.00. *See O'Sullivan v. City of Chicago*, 2007 WL 779142 (N.D.Ill.2007); *O'Sullivan v. City of Chicago*, 2007 WL 671040 (N.D.Ill.2007); *O'Sullivan v. City of Chicago*, 2007 WL 496783 (N.D.Ill.2007). The City was also enjoined from further retaliation. *See O'Sullivan v. City of Chicago*, 2007 WL 951941 (N.D.Ill.2007).

The plaintiffs have petitioned for an award of attorney's fees for Ms. Shoenberger and Hubbard & O'Connor, Ltd., totaling $737, 147, pursuant to 42 U.S.C. § 1988. This includes fees and costs as reflected in the petition and supplement thereto (filed 10/24/2006). Defendants object, on various grounds, to several portions of the fee request.

## II.
## LAW APPLICABLE TO PETITION FOR ATTORNEY'S FEES UNDER § 1988

The Civil Rights Attorney's Fees Act of 1976, 42 U.S.C. § 1988, authorizes district courts to award reasonable attorney's fees to "prevailing parties" in civil rights litigation. Status as a

---

[2] Defendants' Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

prevailing party is a threshold determination in awarding fees under § 1988. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The relevant inquiry is whether the Plaintiff "has succeeded on 'any significant issue in litigation which achieved some of the benefit the parties sought in bringing suit.'" *Tex. State Teachers Ass'n v. Garland Ind. Sch. Dist.*, 489 U.S. 782, 791–92 (1989). Here, there is no dispute that Plaintiffs are a prevailing party for purposes of § 1988, and the Defendant concedes as much.[3]

Once one has obtained prevailing party status under § 1988, a district court may award *reasonable* attorney's fees. *Hensley* teaches that the "most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." 461 U.S. 424, 433 (1983). This calculation results in the "lodestar" amount, which may be adjusted upward or downward based on other considerations unique to the specific case. These include the factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), which was cited with approval in the legislative history of § 1988 and *Hensley*, itself. 461 U.S. at 429–30 & nn.3–4.[4]

## A.
## The Lodestar Amount

*Hensley* requires that analysis begins with the calculation of the "lodestar" amount, which is determined by multiplying "the number of hours reasonably expended" by a "reasonable hourly

---

[3] Defendant's Objections to Plaintiffs' Motion for Attorney's Fees and Costs, at 2.

[4] The factors are (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717–19.

4

rate." 461 U.S. 424, 433 (1983). The burden is on the party seeking the fee award to "submit evidence supporting the hours worked and the rates claimed." *Id.* "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.* In calculating the lodestar amount, a court must first "eliminate all hours claimed that are either not 'reasonably expended' or inadequately explained." *Spanish Action Committee of Chicago v. City of Chicago*, 811 F.2d 1129, 1138 (7th Cir. 1987). Only the remaining hours should enter the lodestar calculation. The "reasonable hourly rate" is "to be based on market rates for services rendered." *Missouri v. Jenkins*, 491 U.S. 274, 283 (1989). The court must seek to determine "the rate that lawyers of similar ability and experience in their community normally charge their paying clients for the type of work in question." *Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 555 (7th Cir. 1999). In the Seventh Circuit, "[t]he attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate." *People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1310 (7th Cir. 1996).

The fee applicant must "produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 (1984).

When the applicant has established that his "claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee" to be awarded. *Id.* at 897. At that point, "the burden shifts to the defendant to demonstrate why a lower rate should be awarded." *Spegon v. The Catholic Bishop of Chicago*, 175 F.3d 544, 554–55 (7th Cir. 1999). Fees have been requested for four attorneys who worked on the Plaintiffs' case: Elisabeth Shoenberger,

5

Elizabeth Hubbard, John O'Connor, and Brian Ekstrom, the latter three of whom are with the firm of Hubbard & O'Connor, Ltd. The lodestar amount is calculated for each below.

## 1.

## Elisabeth Shoenberger's Lodestar Amount

Ms. Shoenberger requests an hourly rate of $335.00. (Petition at 16.) In support of this rate, Ms. Shoenberger has submitted her own affidavit, along with those of Aaron B. Maduff and Michael Ponticelli, both employment law attorneys in the Chicago area. (Petition at Exhibit H & I.) These affidavits attest to Ms. Shoenberger's qualifications and the reasonableness of the rate she has requested. While not objecting to that rate, the City does object to the number of hours claimed by Ms. Shoenberger. Ms. Shoenberger claims total hours billed on this case of 1141.50. The City objects to over seventy entries in Ms. Shoenberger's billing records on the grounds that they are not explained in sufficient detail. The entries identified by the City as "vague" include seven hours spent on "[r]eview of documents tendered by Roche for production request," and eight hours spent on "[r]eview of discovery documents tendered by the city." (Objections at 14.) Other offending items include "[w]ork on response to Roche interrogatories" and "[i]ntegrating Wilson documents into timeline and questions." (Objections at 14.)

## a.

## Vague & Lumped Entries

It bears noting at the outset that although billing records supporting a fee request must be "adequate" and "detailed," *Hensley*, 461 U.S. 424, 433 (1983), those terms do not have fixed meaning. That is why the Seventh Circuit has adopted a market-based approach. *See In the Matter of Synthroid Marketing Litigation*, 264 F.3d 712 (7th Cir. 2001); *see also Pawell v. Metro. Pier and*

*Exposition Auth.*, No. 03 C 3158, 2005 WL 1902116, at * 5 (N.D. Ill. Mar. 4, 2005). In *In re Synthroid Marketing*—which neither party has cited —the court made clear that "the amount of itemization and detail required is a question for the market." *Id.* at 722. Thus, "[i]f counsel submits bills with the level of detail that paying clients find satisfactory, a federal court should not require more." *Id.* What the Plaintiffs in this case find satisfactory in a billing statement is, however, of limited significance. The Plaintiffs and their attorneys are operating on a "very modified contingency," under which it appears the only fees that Plaintiffs' counsel will collect are those awarded under this petition. (Petition at 17.) It is hard to imagine the Plaintiffs themselves being too concerned with the "level of detail" in the bills they receive, knowing that they will not have to pay them personally. More telling, though, is that the City has not objected to any of the entries in the billing records from the Hubbard & O'Connor attorneys. Many of their records are in language substantially similar to the language in Ms. Shoenberger's records.[5] Yet the City has not raised an objection to even a single entry by Ms. Hubbard and company on the grounds of inadequate detail. This fact counsels against accepting the City's argument that nearly 250 hours' worth of entries by Ms. Shoenberger are too lacking in detail to be compensated.

The same analysis applies to the City's attempt to reduce "lumped time entries," which attribute one block of time to two activities.[6] (Objections at 16–17.) The City's objection is that these lumped entries make it impossible to tell how much time was spent on each activity, and thus, whether the amount of time was "reasonable." The City has cited no case establishing a blanket

---

[5] "Review documents from defendants to find trial exhibits" (Feb. 4, 2006); "Deposition review on Perry and Lipman" (Feb. 4, 2006); and "Work on testimony for Nancy" (Mar. 28, 2006) are a few examples.

[6] For example, thirteen hours billed for "Lipman interrogatory revision and deposition preparation" (Sept. 3, 2003).

prohibition on such entries. The adequacy of these "lumped" entries should presumably be governed by the same "market" test governing billing records generally. *In re Synthroid Marketing Litigation*, 264 F.3d at 722.

Although this method of time recording prevents determination of how much time was devoted to each activity, both Lipman's interrogatory responses and depositions were necessary to her retaliation claim. Consequently, the fact that there is not an itemization of the two essential tasks would seem to be inconsequential. The City's seemingly arbitrary percentage reduction requests not only ignore this fact, but are, in addition, a bit perplexing. On what grounds, for example, does the City determine that the thirteen hours billed for "Lipman interrogatory revision and deposition preparation" warrants a twenty-five percent reduction? (Objections at 16.) The City offers no method for calculating the appropriate reduction for the lumped entries.[7]

Ms. Shoenberger has also submitted amended records with regard to the entries challenged by the City. She has clarified the allegedly vague language and separated the lumped entries, and has done much to address the bulk of the City's objections. However, there remain several entries that are simply too vague to be awarded. Specifically, Ms. Shoenberger billed 18.75 hours for work on what are referred to simply as "Post Trial motions." (Petition at Exhibit C, pg. 23.) This case involved a number of "post trial motions" by both parties—motions to set back pay, motions for remittitur, and the like. Ms. Shoenberger's records do not allow the court—or a client—to determine which of these motions she was working on, let alone what work she was doing. These entries are

---

[7] Although lump or block billing does not provide the best possible description, it is not a prohibited practice that inevitably necessitates reduction in the amount of fees requested. *Farafas v. Citizens National Bank & Trust Chicago*, 433 F.3d 558, 569 (7th Cir. 2006).

"inadequately explained," *Spanish Action Committee v. City of Chicago*, 811 F.2d 1129, 1138 (7th Cir. 1987), and the 18.75 hours will be excluded from the lodestar amount.

## b.

### Excessive or Unreasonable Hours

The City has also objected to a handful of specific entries by Ms. Shoenberger as "excessive" and requested deductions for them. However, the City has offered no explanation for why many of these hours were excessive, with the exception of Ms. Shoenberger's time spent researching the Defendants' initial motion to dismiss.[8] The City requests a 25% reduction of these hours because "[n]o reply to Defendant's [sic] motion to dismissed [sic] was filed." (Objections at 16.) But the mere fact that a response was not submitted does not render research of the relevant legal issues excessive. When faced with a motion to dismiss, a responsible attorney will examine the issues presented and evaluate the legal grounds for the motion. Upon encountering overwhelmingly unfavorable law, the appropriate response may be to decline to contest the motion, at least when the plaintiff has other claims that will survive. This course of action not only saves clients the billable hours that would otherwise be spent drafting a response, but also saves the courts from taking the time to hear and decide a contested motion. I will not reduce Ms. Shoenberger's hours simply because she did not draft a response.[9]

---

[8] Specifically, the City objects to five hours for "Research on issues regarding motion to dismiss" on Feb. 28, 2002, and six hours for "Completion of motion to dismiss research" on March 19, 2002.

[9] It is important to distinguish between the pre-lodestar and post-lodestar calculus. At this point, I find it inappropriate to reduce the hours that enter the *lodestar* calculus simply because no response was filed. The lack of a response does not foreclose the conclusion that the hours spent on research were "reasonably expended." But the dismissal of several of the Plaintiffs' claims will be taken into account in the post-lodestar adjustment, since their dismissal helps to place the Plaintiffs into the "partially successful" category under *Hensley*.

9

The City also objects to the Plaintiffs' use of a focus group and "mock trial" to prepare for the case.[10] Ms. Shoenberger spent approximately 43.75 hours on this mock trial, including preparing the witnesses and drafting scripted testimony for an actor representing Perry. (Petition at Exhibit C, pp. 16–17). There is no established rule either allowing or disallowing these costs. The City argues that use of a focus group is appropriate only in "complicated cases," and this case was not "novel or complicated." (Objections at 12.) The Plaintiffs' counter is that the focus group allowed them to "prepare for trial with increased and significant effectiveness."[11] Beyond this self-assessment, there is no explanation of how the focus group contributed to the plaintiffs' trial strategy or how that strategy was affected in any way either by the process or the result of the mock trial.

While "the line between ample preparation and excessive preparation is, at the margin, a fine one," *Charles v. Daley*, 846 F.2d 1057, 1076 (7th Cir. 1988), it is not invisible. It may well be that the use of a focus group would enhance, in varying degrees, trial preparedness in any case. But that cannot be the test, or the compensability of expenditures for a focus group would cease to be a matter for a court's discretionary judgment and would instead result in a mandatory rule. *Compare Pruitt v. Mote*, 472 F.3d 484, 486 (7th Cir. 2006) ("If the difficulty that a *pro se* litigant encounters in conducting such a trial were enough to require the district judge to recruit counsel, then we would have a *per se* rule rather than a discretionary choice...."). No such rule exists.

_____

[10] The City addresses the focus group costs separate from the lodestar determination. (Objections at 12.) But in substance, the City's argument is that the hours spent on the focus group were not "reasonably expended," and so the objection will be treated as part of the lodestar calculation.

[11] Plaintiffs' Reply to Defendant's Objections to Plaintiffs' Petition to Award Attorney's Fees to Hubbard & O'Connor, Ltd. and Elisabeth Shoenberger, Co-Counsel for Prevailing Plaintiffs, at 7.

The claims in this case were not so complex – indeed they were not complex at all – that an expenditure of over $14,000.00 in fees (for Ms. Shoenberger alone) for a mock trial can be deemed compensable. *See Vitullo v. Borough of Yeadon*, No. 04-3929, 2006 WL 1789031 (E.D. Pa. June 21, 2006) (straightforward nature of reverse-discrimination claim did not warrant use of focus group); *with Majestic Box Co. v. Reliance Ins. Co. of Ill.*, No. 96-8118, 1998 WL 720463 (E.D. Pa. Sept. 2, 1998) (complicated nature of defense justified use of mock trial). Thus, the 43.75 hours expended by Ms. Shoenberger on the mock trial will be excluded from the lodestar amount.[12]

The remaining "excessiveness" challenges do not require extended discussion. The City offers only a bare list of entries that it deems excessive, and no rationale for reaching that conclusion. The implication is that Ms. Shoenberger spent an unreasonable amount of time on certain tasks. "Lawyers do not come from cookie cutters. Some are fast studies and others require extra preparation." *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1150 (7th Cir. 1993). The City has offered no objective standard, no "reasonable" number of hours to spend on a given activity, with which to compare Ms. Shoenberger's records. The City could have submitted affidavits of experienced attorneys, attesting to the time required to complete various tasks. These may have established a legitimate basis for concluding that Ms. Shoenberger spent an excessive amount of time on the challenged tasks. But the City has not offered them, and the court will not engage in an arbitrary determination of how long a "reasonable" attorney would spend on, say, deposition preparation. The allegedly excessive hours will be included in Ms. Shoenberger's lodestar amount.

---

[12] It follows that the $549.57 in costs related to the mock trial are also not recoverable.

11

With all reductions to Ms. Shoenberger's hours addressed, the rate is $335.00, and 1079 hours billed. This results in a lodestar amount for Ms. Shoenberger of $361,465.

## 2.

### Hubbard & O'Connor, Ltd.'s Lodestar Amount – Elizabeth Hubbard

Ms. Hubbard, of Hubbard & O'Connor, Ltd., requests an hourly rate of $450.00. In support of this rate, Ms. Hubbard has submitted her own affidavit, as well as those of Penny Kahan and Robin Potter, both employment law attorneys in the Chicago area. These affidavits attest to Ms. Hubbard's qualifications and the reasonableness of the rate she has requested. The City raises no objection to that rate, nor does it raise any objection for lodestar calculating purposes to the time Ms. Hubbard claims to have expended in this case totaling 658.15 hours. Ms. Hubbard has documented her hours with records exceeding the detail of Ms. Shoenberger's. However, for the reasons set forth in the discussion of Ms. Shoenberger's hours, the 21.5 hours Ms. Hubbard expended on the mock trial will be excluded. For Ms. Hubbard, this leaves 638.65 hours, multiplied by an hourly rate of $450.00, resulting in a lodestar amount of $287,392.50.

## 3.

### Hubbard & O'Connor, Ltd.'s Lodestar Amount – Brian Ekstrom

Brian Ekstrom, also of Hubbard & O'Connor, Ltd., requests an hourly rate of $250.00. The City objects, arguing that Ekstrom has "provided no support for [his] hourly rate." (Objections at 5.) What Mr. Ekstrom has provided is his own affidavit, in which he states that $250.00 is his standard rate. (Reply at Exhibit A.) But the cases are uniform in requiring something beyond the attorney's affidavit to establish a reasonable hourly rate. *See, Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) ("[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to

12

the attorney's own affidavits—that the requested rates are in line with those . . . for similar services by lawyers of comparable skill, experience, and reputation."). *Accord Harper v. City of Chicago Heights*, 223 F.3d 593, 604 (7th Cir. 2000); *Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 556 (7th Cir. 1998).

There is also the affidavit of Penny Kahan, which asserts that Ekstrom's rate is "fair and reasonable and well within the prevailing market rates in the Chicagoland area for this type of representation." (Petition at Exhibit F). This unamplified statement, however, does no more than express an opinion about prevailing market rates for a certain kind of case. It says nothing about Mr. Ekstrom's ability either on an individual or a comparative basis. Yet, the critical inquiry is "the rate that lawyers of similar ability and experience [to Mr. Ekstrom] in their community normally charge . . . for the type of work in question." *Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 555 (7th Cir. 1999).

The difficulty in this case is that the plaintiffs have done nothing beyond proving that Mr. Ekstrom graduated in 2001 from the University of Iowa and was admitted to the Illinois Bar in 2002, and that the services he performed spanned the end of 2005 and the beginning of 2006. That is all that is known about him. It would stretch Ms. Kahan's affidavit to the breaking point to conclude that it was sufficient to allow me to find that it is reasonable for Mr. Ekstrom to be awarded an hourly rate of $250. (Petition at Exhibit J).

There is some judicial discussion of what fourth year associates in the area were billed at in 1999. At that time, an associate in a firm of comparable size to Hubbard & O'Connor charged $160 per hour. *Connelly v. National School Bus, Inc.*, 177 F.3d 593 (7th Cir. 1999). A fourth year associate in the much larger firm of Seyfarth Shaw billed $185 per hour. *Cunningham v. Gibson*

13

*Elec. Co., Inc.*, 63 F.Supp.2d 891 (N.D.Ill. 1999). These rates were deemed reasonable for the particular lawyers. Judicial notice may be taken of the undeniable fact that in the last nine years billing rates (like all other costs in our society), have increased significantly. But how much, and what is a reasonable rate for Mr. Ekstrom? Unfortunately, no help has been provided by the plaintiffs on this question beyond the Kahan affidavit, which has limited utility.

The December 11, 2006 issue of the National Law Journal gives a sampling of hourly rates charged by Chicago and other law firms for fourth year associates. The firms range from Jenner and Block (with 467 lawyers in Chicago) to Brinks, Hofer, Gilson & Leone (with 151 lawyers). The fourth year associates at the latter were billed at $285 an hour in 2006, while at Jenner, the rates were from $325 to $330. Neal Gerber & Eisenberg (with 170 lawyers) charged $300 per hour for its fourth year associates.[13]

Of course, the fact that large law firms generally charge rates higher than those of small firms (or sole practitioners) does not mean that a particular rate is unreasonable when charged by lawyers from small firms or that a lower rate is automatically reasonable. The quality of one's work is not a function of the size of the law firm with which the petitioning lawyer is associated. Indeed, Judge Posner has said that the briefs of lawyers from small firms in civil cases are often good, while those from the large firms tend to be "workmanlike though rarely inspired." Jeffrey Cole, *Economics of Law: An Interview With Judge Posner*, 22 LITIGATION, 23, 31 (Fall 1995). The question is the rate

---

[13] The National Law Journal article lists 36 firms in its sample. While the relevant rates are those charged in the Chicagoland area, it may be noted that Mr. Ekstrom's $250 per hour rate for work that was done in 2005 and 2006 equals or exceeds the rates charged by 38% of the listed firms for fourth year associates. While the others are higher, most are just barely so, (i.e., $255 per hour for associates at Buchalter Nemer (139 lawyers in Los Angeles); $260 per hour for associates at Locke Liddell & Sapp (370 lawyers); and $270 per hour for associates at Jenkins & Gilchrist (268 lawyers in Dallas)). *See* The National Law Journal/ www.nlj.com - December 11, 2006 at s 5-s 6.

14

that lawyers of similar ability and experience to Mr. Ekstrom in their community normally charge for the type of work in question. The plaintiffs have not provided sufficient information to conclude that the rate requested for Mr. Ekstrom is reasonable.

The City has asked that Mr. Ekstrom be awarded nothing. The request ignores the fact that Mr. Ekstrom's services have some value and that there is some rough basis for evaluating the appropriate rate. In light of all this, I have concluded that a rate of $190 per hour is a reasonable hourly rate for Mr. Ekstrom's services. This lodestar yields a figure of $24,272.50.($190 x 127.75 hours).

### 4.

### Hubbard & O'Connor, Ltd.'s Lodestar Amount – John O'Connor

Finally, John O'Connor of Hubbard & O'Connor, Ltd. requests an hourly rate of $350.00. The City again objects based on lack of support for O'Connor's rate. (Objections at 5). As with Mr. Ekstrom, little support has been offered for Mr. O'Connor's rate. He has, of course, submitted his own affidavit establishing that $350.00 is his hourly rate. (Reply at Exhibit B). As with Mr. Ekstrom, this alone is insufficient. *Harper v. City of Chicago Heights*, 223 F.3d 593, 604 (7th Cir. 2000). Supplementing Mr. O'Connor's affidavit is a printout of his Martindale-Hubbell listing, which (though recounting more of his experience than Mr. Ekstrom's) sheds no light on the reasonableness of his claimed rate. No evidence has been submitted of the rates commanded by attorneys of comparable experience.

The Plaintiffs also rely on two other pieces of "evidence" to support Mr. O'Connor's rate. First, the Plaintiffs point to a statement in Ms. Hubbard's affidavit noting that Mr. O'Connor is "a very talented and competent attorney." (Reply at 2 (citing Petition at Exhibit D)). But that bare and

15

undoubtedly partisan opinion does little to attest to the market rate for his services. And in any event, Ms. Hubbard's affidavit is nearly as self-serving (and thus as ineffectual) as Mr. O'Connor's own, since any fees awarded for Mr. O'Connor would presumably end up in the coffers of the firm in which they are the two named partners. Second, the Plaintiffs note that "the [Fee] Petition itself . . . sets forth Mr. O'Connor's . . . hourly rate." (Reply at 2). This apparently is meant to suggest that the mere fact that a particular hourly rate has been requested establishes its reasonableness. This goes beyond bootstrapping, and requires no further discussion. No award will be made for Mr. O'Connor's hours.

## B.

### Adjustment of the Lodestar Amount

We are left with a lodestar amount of $673,130, the product of the reasonable hourly rate and hours reasonably expended by both Ms. Shoenberger and Ms. Hubbard. This is, presumptively, the reasonable fee to be awarded the Plaintiffs. *Blum v. Stenson*, 465 U.S. 886, 897 (1984). Having established the lodestar, it must next be determined whether there are other considerations that warrant adjusting the fee upward or downward. *Hensley*, 461 U.S. 424, 434 (1983). This includes reference to the *Johnson* factors, if warranted. *Id.* at 434 n.9.

### 1.

### The Johnson Factors Generally

The parties fill a significant amount of space in their briefs arguing over these factors. This is due primarily to the Plaintiffs' misapprehension of the *Hensley* methodology: they assert that "[t]he starting point for any analysis of legal fees . . . in a Title VII case is [*Johnson*]." (Petition at 2). The starting point under *Hensley* is the calculation of a lodestar amount. 461 U.S. at 433. The

parties' discussion of the *Johnson* factors is of little value, since "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley*, 461 U.S. 424, 434 n.9. Thus, a separate consideration of the *Johnson* factors is not required in calculating the lodestar.

For example, the first factor, "time and labor required" is reflected in the "hours reasonably expended," which is in turn a product of the second factor, "the novelty and difficulty of the questions." And the reasonable hourly rate used in the lodestar determination is itself a product of several of the *Johnson* factors, including the level of skill required, the time limitations involved in the representation, the undesirability of the case, and the experience, reputation and ability of the attorneys. *Copeland v. Marshall*, 641 F.2d 880, 892 (D.C. Cir. 1980).[14] Because of this, a court in adjusting the lodestar amount must be careful not to account for any one *Johnson* factor twice.

In addition, the arguments of the parties regarding these factors are either equivocal or simply not significant enough to warrant adjustment. For instance, the Plaintiffs submit that the time and labor required was substantial because the case involved the "complex jargon" of the police department, including "bidding v. assignment, time off v. days off, CRs v. other discipline," et cetera. (Petition at 6). This argument is unpersuasive. There is nothing arcane or difficult about these concepts. Even the concept of CRs does not require substantial contemplation. True, they may have particular meaning within the police department, but the Plaintiffs themselves were familiar enough with these terms to give their attorneys an adequate explanation without requiring a substantial investment of time. The City, for its part, counters that learning the "culture of the workplace" is the "normal course of work" for an employment attorney; the involvement of police

---

[14] *Copeland* was relied upon by the Court in *Hensley*. *See* 461 U.S. at 434 n.9.

17

jargon "did not make this case difficult." (Objections at 7.) But that does not mean that any reduction of the lodestar amount is warranted. The ability of the Plaintiffs' attorneys may have enabled them to navigate police culture more efficiently than some. But that would suggest only that these attorneys were worth what they were paid, not that they should have been paid less.

To recount each party's characterizations of the various *Johnson* factors would be a fruitless exercise. These factors, for the most part, do not support any adjustment upwards or downwards in the lodestar amount. The parties' arguments only demonstrate the extent to which these factors are "subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley*, 461 U.S. at 434 n.9. The lone exception, to some extent, is "the amount involved and the result obtained."

## 2.

### The Amount Involved and the Results Obtained

"The amount involved and the results obtained" are "particularly crucial" factors where, as here, the Plaintiffs are "deemed 'prevailing' even though [they] succeeded on only some of [their] claims for relief." *Hensley*, 461 U.S. at 434. As discussed above, several of the Plaintiffs' claims were either dismissed or disposed of by summary judgment, and only one of the two claims that went to trial was successful. This is, then, a case of "partially prevailing plaintiffs" under § 1988. *Hensley* envisions two possible scenarios. The first question is whether the claims that the Plaintiffs failed to prevail on were *unrelated* to the successful claims. *Id.* at 435. In this situation, the unrelated claims must "be treated as if they had been raised in separate lawsuits," with no award made for the unsuccessful claims. *Id.* But if the unsuccessful and successful claims *were* related, the court must determine whether the Plaintiffs "achiev[ed] a level of success that makes the hours reasonably

18

expended a satisfactory basis" for determining the appropriate fee award. *Id.* at 434; *see also Lenard v. Argento*, 808 F.2d 1242, 1246 (7th Cir. 1987). The goal is to ensure that a prevailing plaintiff under § 1988 is "compensated for the legal expenses he would have borne if his suit had been confined to the ground on which he prevailed plus related grounds within the meaning of *Hensley*." *Ustrak v. Fairman*, 851 F.2d 983, 988 (7th Cir. 1988); *see also Jackson v. Ill. Prisoner Rev. Bd.*, 856 F.2d 890 (7th Cir. 1988). As discussed below, this case involves both situations envisioned in *Hensley*: some of the unsuccessful claims were related to the successful claim, while some were not.

a.

### Related vs. Unrelated Claims

The initial question is which, if any, of the plaintiffs' unsuccessful claims are related to their successful Title VII retaliation claim. No fees will be awarded for "[t]ime spent on claims for relief that are unsuccessful and unrelated to the ultimate result achieved." *Jackson*, 856 F.2d at 894. Claims that are "based on different facts and legal theories" are unrelated for purposes of *Hensley*, and "no fee may be awarded for services on the unsuccessful claim." *Hensley*, 461 U.S. at 435. On the other hand, fees for claims that "involve a common core of facts or [are] based on related legal theories" should be awarded with an eye to "the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* The Plaintiffs in this case brought fifteen claims based on five separate theories of recovery, four of which were based on the Defendants' discriminatory acts.[15] Specifically, the Plaintiffs' § 1983 claim (alleging deprivation

---

[15] This number is reached by multiplying the number of plaintiffs by the number of theories. Although the Plaintiffs' Title VII discrimination and retaliation claims are stated in a single paragraph under the heading "Third Claim of [sic] Relief" (Complaint at ¶ 27), they will be treated as two distinct theories for purposes of the *Hensley* analysis.

of rights because Defendants "bas[ed] their decisions to an impermissible extent *on Plaintiffs' race and color*" (Complaint at ¶ 25) (emphasis added)); their § 1981 claim (alleging deprivation of rights by Defendants "because of *Plaintiffs race and national origin*" (Complaint at ¶ 26) (emphasis added)); their IHRA claim (alleging "unlawful *discriminatory* employment practices" (Complaint at ¶ 28) (emphasis added)); and their Title VII discrimination claim (Complaint at ¶ 27) were all based on the alleged discrimination. The fifth theory was that the Defendants retaliated against the Plaintiffs for complaining about the racial discrimination.

There is of course a difference between "a claim of discrimination and a claim of retaliation for opposing that discrimination." *Lenard v. Argento*, 808 F.2d 1242, 1246 (7th Cir. 1987); *see also Merriweather v. Family Dollar Stores of In.*, 103 F.3d 576, 583 (7th Cir. 1996). Because the Plaintiffs' retaliation claim was their sole ground for success, the court may only award reimbursement for legal work that would have been necessary if they had brought that claim alone. *Id. See also Ustrak v. Fairman*, 851 F.2d 983, 988 (7th Cir. 1988); *Jackson v. Ill. Prisoner Rev. Bd.*, 856 F.2d 890 (7th Cir. 1988).

The Plaintiffs' unsuccessful claims were disposed of at various points in the case. Because of this, the portion of their attorney's time that was spent on successful versus unsuccessful claims varied throughout the course of the litigation. For purposes of determining the compensable portion of the attorney's time, it is useful to divide the case up into four stages: (1) initiation through filing of the complaint; (2) complaint through motion to dismiss; (3) discovery through summary judgment; and (4) trial. Before turning to the calculation of the compensable hours, however, it should be noted that "[t]here is no precise rule or formula for making these determinations."

20

*Hensley*, 461 U.S. at 437. The court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for limited success." *Id.*

The City, in its brief, implicitly suggests that the court look to the bare number of successful versus unsuccessful claims. For example, since summary judgment was granted against two of the Plaintiffs' four then-remaining claims, the City requests a 50% reduction in the award for period (3). (Objections at 18.) Likewise, because only one of the Plaintiffs' two claims to go to trial was successful, the City requests a 50% reduction for period (4). (Objections at 18.) What the City fails to note, however, is that *Hensley* expressly rejected this mechanical, "claim-chopping" approach. *Hensley*, 461 U.S. at 435 n.11; *see also Lenard v. Argento*, 808 F.2d 1242, 1245 (7th Cir. 1986). *Hensley* remarked that this method "provides little aid in determining what is reasonable in light of all the relevant factors." 461 U.S. at 435 n.11. Thus, the focus must be more discerning and must look to the hours that would have been expended had the Plaintiffs only brought their retaliation claim.

## (1)

### Initiation through filing of the complaint

Ms. Shoenberger recorded 23 hours billed to the plaintiffs from the date of their initial consultation (Oct. 11, 2001) to the date of filing the complaint (Declaration. 26, 2001). These hours, for the most part, fell into two categories: meetings with the plaintiffs and drafting the complaint. Client meetings accounted for 7.5 hours of the time billed for this period. These meetings were necessary to hear the Plaintiffs' account of events, assess their claims, and get the information necessary to draft the complaint. Even had the Plaintiffs ultimately brought only a retaliation action, it would still have been necessary for them to discuss with Ms. Shoenberger the events leading them

21

to seek legal redress. This would have had to include a discussion of the alleged discrimination: had the Plaintiffs not perceived discrimination, they would not have complained; had they not complained, they would not have been retaliated against. *Cf. Merriweather v. Family Dollar Stores of In., Inc.*, 103 F.3d 576, 583 (7th Cir. 1996). Therefore, no reduction in the 7.5 hours of meeting time is warranted. The same is true of the combined half-hour spent determining the statute of limitations and drafting a letter to O'Sullivan.

The remaining fifteen hours billed for this period were spent drafting and filing the complaint. Ms. Shoenberger's records do not make explicit how much time was devoted to drafting each claim, but about half of the complaint was devoted to the background and facts of the case. (Complaint at ¶¶ 7–23). Of this, approximately 50% was spent discussing the various facts that formed the basis of the discrimination claims.[16] (Complaint at ¶¶ 10–15). Even if the Plaintiffs had claimed only retaliation, they would have alleged some of the background of discrimination that prompted their grievance and EEOC complaint. But I do not think they would have pleaded the same level of detail as they did in bringing the discrimination claims. In addition, about one-fifth of the complaint was spent laying out the Plaintiffs' various claims for relief, only one of which was successful. (Complaint at ¶¶ 24–28). In sum, approximately 40% of the complaint was devoted to facts and claims that would not have been necessary had the Plaintiffs proceeded on their retaliation claim alone.

In the absence of any specific indication to the contrary, it must be presumed that Ms. Shoenberger dedicated to each claim an amount of time that corresponds with the amount of space

---

[16] For example, nearly a full page of the Complaint recounted a sequence of events in which Perry allegedly prevented Roche from receiving a particular assignment because Roche is Caucasian. (Complaint at ¶¶ 11–14.)

22

it occupies in the complaint. As such, the time spent on the complaint will be reduced by 40%, or 6 hours. While this is admittedly an estimate, Ms. Shoenberger has given the court no more accurate information to work with. Her claimed experience and ability was the basis for her "reasonable" hourly rate in this case. Given those attributes, Ms. Shoenberger was amply equipped to foresee the potential for a fee petition in this case, and she no doubt has submitted fee petitions in other cases pursuant to § 1988. Because she failed to keep more detailed records, it is appropriate to place the risk of miscalculation on the Plaintiffs. *See Hensley*, 461 U.S. at 438 n. 12 (citing *Nadeau v. Helgemoe*, 581 F.2d 275, 279 (1st Cir. 1978) ("As for the future, we would not view with sympathy any claim that a district court abused its discretion in awarding unreasonably low attorney's fees in a suit in which plaintiffs were only partially successful if counsel's records do not provide a proper basis for determining *how much time was spent on particular claims*.") (emphasis added)).

After this reduction, the court will award fees for 17 hours of Ms. Shoenberger's time, or $5,695.00, for this first phase of the litigation.

### (2)

### Complaint through motion to dismiss

Ms. Shoenberger recorded 20.25 hours billed from just after the filing of the complaint (Declaration. 26, 2001) until the granting of the Defendants' motion to dismiss (Apr. 30, 2002). Approximately 8.25 hours were attributable to somewhat general activities that follow filing, such as discussions with opposing counsel, drafting settlement letters, and the like. These activities would likely have been undertaken regardless of the nature or number of the Plaintiffs' claims and the hours spent on them will be awarded without reduction.

23

The remaining twelve hours were spent on research and other activities stemming from the Defendants' motion to dismiss. The motion addressed the Plaintiffs' IHRA claim; their § 1981, § 1983, and Title VII claims against Perry individually; and all claims against the Police Department. Thus, any time spent researching the motion to dismiss those claims (i.e., the IHRA, § 1981, and § 1983 claims) is not reimbursable. But the Title VII retaliation claims against the Police Department and Perry individually are clearly related to the successful retaliation claim against the City: they relied on the same facts and are based on the same or related legal theories. The fact that the City was found liable while Perry and the Police Department were not does not render the retaliation claims against them "unrelated." *See Mary Beth G. v. Chicago*, 723 F.2d 1263, 1280 (7th Cir. 1984). "When defendants are not named frivolously in connection with the same illegal conduct, it follows that the matters involving the different defendants will always be 'related.'" *Id.*

The question is how much time would have been spent reacting to the motion to dismiss if the Plaintiffs had brought only the claim of retaliation against each Defendant. The answer is "very little." Again, I am unaided by any clear, explicit records from Ms. Shoenberger; all that is offered are two blocks of time spent on "motion to dismiss research." (Petition at Exhibit C, p.1). But several considerations lead to this conclusion. First, most of the claims targeted by the motion to dismiss were unrelated to the Plaintiffs' retaliation claim. The § 1981, § 1983, and IHRA claims all fall into this category. Limited to related claims, the only research required vis-à-vis the motion to dismiss would have been on the retaliation claims against the Police Department and Perry individually. Further, the dismissal of those claims was based on two narrow issues: (1) the fact that Perry did not fit the statutory definition of an "employer" under Title VII, and (2) the fact that the Police Department is an "organizational subdivision" of the City, making the claims against the

24

Police Department redundant. (Motion to Dismiss at 3–4). Based on these considerations, it is appropriate to reduce the award for hours spent related to the motion to dismiss by 75%, or nine hours.

After this reduction, the court will award fees for 11.25 hours of Ms. Shoenberger's time, or $3768.75, for this second phase of litigation.

### (3)

### Discovery through summary judgment

For the period following the granting of the motion to dismiss (Apr. 30, 2002), and including discovery through the granting of summary judgment (July 29, 2004), Ms. Shoenberger billed a total of 509.9 hours. These hours were billed in the course of discovery, including drafting and responding to interrogatories, document production and review, and depositions, as well as responding to the City's motion for summary judgment.

Approximately 91.45 of the hours billed in this period were related to the City's motion for summary judgment. The City moved to dismiss all of the Plaintiffs' then-remaining claims: the §1981 claim, the §1983 claim, the Title VII discrimination claim, and the Title VII retaliation claim. As explained above, the §1981, §1983, and Title VII discrimination claims are, for present purposes, unrelated to Plaintiffs' successful retaliation claim. Thus, any time spent defending against summary judgment on those claims may not be awarded. This time may be divided between Plaintiffs' actual response to the summary judgment motion and Plaintiff's response to the City's statement of facts, pursuant to Fed. R. Civ. P. 56.1. However, Ms. Shoenberger's records are less than clear in this regard. Several entries refer to work on the "statement of facts," but it is ambiguous whether she is

25

referring to the statement of facts contained in her response[17] or the general response to the City's statement of facts under Rule 56.1.[18] Because only one entry, of eleven hours, refers specifically to "Rule 56," it will be assumed that those were the only hours spent on the Rule 56 Statement, while the remaining 80.45 hours were spent on the Summary Judgment Response. Given that Ms. Shoenberger could have avoided any inaccuracy in this assumption by keeping more precise records, it is again appropriate to place the risk of error on the Plaintiffs.

All eleven hours spent on the Rule 56 Statement will be awarded. The factual issues discussed in that statement were intertwined in a way that prevents characterization as "discrimination-related" or "retaliation-related." And many of the same facts would have been relevant even in the absence of the discrimination claims, because they establish the predicate for the Plaintiffs' complaints. As such, these hours will be awarded in full.

The Summary Judgment Response is similar, in that much of it is related to the case as a whole, rather than particular claims. There are, however, several portions that relate specifically to the discrimination claims.[19] In sum, approximately six of the thirteen pages of the response would not have been necessary had Plaintiff brought only the retaliation claim. Again the court will assume that Ms. Shoenberger devoted an equal amount of time to each page of the response, as her billing records give no indication otherwise. As such, 6/13, or 37 of the 80.45 hours spent on the Summary Judgment Response will be disallowed.

---

[17] Plaintiff's Response to Defendant City of Chicago's Memorandum of Law in Support of Its Motion for Summary Judgment at 1–5.

[18] Plaintiff's Rule 56.1(b)(3) Statement and Evidentiary Appendix ("Rule 56 Statement").

[19] See, e.g., Summary Judgment Response at 6–9.

26

The remaining 418.45 hours were devoted to discovery. Unfortunately, there is no easy way to allocate these hours among the various claims that the Plaintiffs brought. Even had Ms. Shoenberger kept meticulous, detailed records, the nature of discovery precludes assigning certain tasks to certain claims. It is difficult to distinguish time spent producing documents relevant to retaliation from those relevant to discrimination. For example, even if only the retaliation claim were at issue, the parties would undoubtedly attempt to discover information about the perceived discrimination. A showing that the Plaintiffs' complaint of discrimination was warranted may lend credibility to the claim that they were retaliated against for speaking out. *Cf. Merriweather v. Family Dollar Stores of In.*, 103 F.3d 576, 584 (7th Cir. 1996) ("That Merriweather's claim of discrimination was not frivolous . . . enhanced her credibility."). Likewise, if the Defendant established that there was no discrimination to begin with, the allegation that the Plaintiffs had been punished for exposing discriminatory practices may seem less believable to a jury. In either event, the perceived discrimination is highly relevant to the claim of retaliation.

Put another way, the evidence of discrimination was inextricably linked to the retaliation claim. Quite obviously, and quite apart from any matter of formal pleading, the plaintiffs could not plausibly have started their story *in media res* with the filing of their grievance against Perry and the EEOC claim. Rather, it was essential that the plaintiffs attempt prove the claimed discrimination if their story was to be intelligible to the jury and was to have any cogency. *Cf. Merriweather*, 103 F.3d at 583 ("[H]ad the district court simply decided to grant attorney fees for time spent on the discrimination claim, without making a finding that the facts underlying the discrimination were necessary to prove retaliation, we would be constrained to vacate the reward."). *Compare United*

*States v. Chavis*, 429 F.3d 662, (7th Cir. 2005)(explaining the doctrine of inextricably intertwined evidence under the Federal Rules of Evidence). *See* discussion *infra* at 30.

While it is possible that some minimal amount of time might have been saved in discovery absent the discrimination claims in the complaint, it is not a certainty and, in any event, it is virtually impossible to quantify. There is no argument from the City that seeks to delineate what hours were inappropriate or unnecessary to the retaliation claim. Indeed, the City resorted exclusively to its "claim-chopping" approach, despite the Supreme Court's rejection in *Hensley* of that approach. (Objections at 18.) Because the evidence discovered likely would have been relevant even to the retaliation claim alone, and the City has pointed to no specific exceptions, no reduction in these hours is appropriate.

After the reduction related to the summary judgment motion, the court will award fees for 472.9 hours of Ms. Shoenberger's time, or $158,421.50, for this third period of litigation.

At the end of this same period, Ms. Shoenberger sought and received the assistance of Ms. Hubbard as co-counsel. Ms. Hubbard recorded six hours billed during this period related to the initial conference with Ms. Shoenberger, as well as reviewing the facts and pleadings in the case. These tasks would have been necessary even absent Plaintiffs' discrimination claim. These six hours, or $2700.00, will be awarded for this phase of the litigation as well.

### (4)

### Trial

For the period following summary judgment (July 29, 2004) through the final date of billing for post-trial motions, including the fee petition (October 24, 2006), Ms. Shoenberger billed a total

28

of 490.25 hours.[20]  Ms. Hubbard billed a total of 630.65 hours for this same period.  Mr. Ekstrom billed 127.75 hours during this period.  The work consisted primarily of trial preparation, drafting various pretrial motions and orders, and the trial itself.  For the reasons that follow, there should be no reduction in the combined 1248.65 hours billed during this final period.

The trial itself consisted of the testimony of several witnesses.  Each discussed not only the alleged retaliation, but also the discrimination of which the plaintiffs complained.  But this testimony did not come in the form of neatly divisible halves, one allocable to discrimination and the other to retaliation.  And to the extent that any part of it was capable of characterization as "discrimination testimony" or "retaliation testimony," such labels provide little aid in answering the *Hensley* question, for even had the Plaintiffs brought only a retaliation claim, the evidence regarding discrimination would still have been relevant under Rule 401, Federal Rules of Evidence.

"A competent attorney must do more at trial than present just the bare bones of his *prima facie* case, particularly where the case rests heavily on the credibility of the witnesses." *Merriweather v. Family Dollar Stores of In.*, 103 F.3d 576, 584 (7th Cir. 1996)–as it most assuredly did here.  Here, the plaintiffs simply could not have fairly and effectively presented their case for retaliation without presenting evidence of the claimed discrimination, which was the impetus for the Plaintiffs filing a grievance and the EEOC complaint, which in turn resulted in the retaliation.  The jury was instructed that, for the Plaintiffs to succeed on their retaliation charge, the jury had to find the plaintiffs' grievances and EEOC complaint were "motivated by a good faith belief that the defendant's actions violated the law." (Instruction No. 18).  That element of the claim could not have

---

[20] Both Ms. Shoenberger's and Ms. Hubbard's totals reflect the hours eliminated in the lodestar discussion, *supra*.

been proved without antecedent proof of events from which the jury could have concluded the plaintiffs had the requisite good faith belief.

A parallel is found in the "inextricably linked" doctrine in the law of evidence. Rule 404(b), Federal Rules of Evidence, prohibits the admission of "evidence of a defendant's history of illegal or unethical acts to prove that he is a person of bad character." *United States v. Hale*, 448 F.3d 971, 985 (7th Cir. 2006). But if the evidence is "so 'inextricably intertwined' with, or 'intricately related' to, charged conduct that it helps the fact-finder form a more complete picture of the criminal activity," it may be admitted despite Rule 404(b). *Id.* The question is whether the acts "complete the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they are so blended or connected that they are so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of, the charged crime." *United States v. Gougis*, 432 F.3d 735, 742 (7th Cir. 2005)(quoting *United States v. Senffner*, 280 F.3d 755, 764 (7th Cir. 2002)). *See also United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006); *United States v. Holt*, 460 F.3d 934 (7th Cir. 2006).

The present case does not involve a 404(b) issue, but the principle is analogous. The evidence of the alleged discrimination provided the jury a complete picture of the retaliation claim; indeed, it was the factual predicate for the retaliation. It was, by any measure, so inextricably related to the retaliation claim that it would be inappropriate to deduct attorney's fees for time spent at trial in attempting to prove the discrimination. The endeavor would have been the same even had there been no *formal* claim of discrimination.

Thus, in making the key determination under *Hensley* · what "legal expenses [the plaintiffs] would have borne if [their] suit had been confined to the ground on which [they] prevailed," *Ustrak*

30

v. *Fairman*, 851 F.2d 983, 988 (7th Cir. 1988)—it is clear that the cost of the trial would have been the same even without the discrimination claim. The same witnesses would have offered the same testimony, and the same documentary evidence would have been introduced. That being the case, it follows that the time spent on pretrial preparation and motions would have been the same, as well. Because the same testimonies would have been offered, the same deposition review and preparation of witnesses would likely have been necessary. The same evidence would have been offered, so the same motions *in limine* (and responses thereto) would have been drafted. And so forth. Therefore, no reduction is warranted in the hours billed for the trial period. Fees for Ms. Shoenberger's 490.25 hours, or $164,223.75, for Ms. Hubbard's 630.65 hours, or $283,792.50, are awarded for this period. Mr. Ekstrom is awarded $ 24,272.50 for his 127.75 hours. The total award for this period is $472,288.75.

### b.

### The Overall Relief Obtained

The next task is to evaluate the fee award in light of the overall "level of success" attained by the Plaintiffs. *Hensley*, 461 U.S. at 434. This is required where some successful and unsuccessful claims relied on "a common core of facts" or "related legal theories." *Id.* at 435; *see also In re Burlington Northern, Inc., Emp. Prac. Litigation*, 832 F.2d 430, 435 (7th Cir. 1987); *Ill. Welfare Rights Org. v. Miller*, 723 F.2d 564 (7th Cir. 1983). Plaintiffs' unsuccessful retaliation claims against Perry and the Police Department, along with their successful retaliation claim against the City, fall into this category. Thus, this Court must inquire whether the hours spent on all "related" claims provide "a satisfactory basis for making the fee award." *Hensley*, 461 U.S. at 434. Where "a plaintiff has achieved only partial or limited success," such an award may be excessive. *Id.* at

31

436. True, in this case the Plaintiffs prevailed on only one of the three "related" claims; in this sense, one could characterize their success as "limited." But *Hensley* makes clear that the "award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Id.* at 435. In this regard, the "results obtained" factor is *itself* subsumed within the lodestar calculation, and "normally should not provide an independent basis" for adjusting an award except in rare or exceptional cases. *Blum v. Stenson*, 465 U.S. 886, 900 (1984); *see also Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564 (1986).

The plaintiffs' petition fails to address this prong of *Hensley* altogether. The City argues that, because "plaintiffs' § 1981, § 1983, and race discrimination claims" were unsuccessful, "the *relief* obtained by the plaintiffs was limited in relationship to the total relief sought." (Objections at 4.) But this confuses "claims" and "relief." It is perfectly possible to prevail on only one of several *claims*, and still obtain every bit of *relief* sought. Had Plaintiffs here been seeking *solely* an award of $325,000.00 in damages—which they in fact received—their "relief obtained" would have been 100% of that sought, notwithstanding the fact that they only prevailed on one claim. This is why the "award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley*, 461 U.S. at 435.

In assessing the extent of success, this Circuit utilizes a three-step approach. "First, the district court should assess the results obtained by the litigation." *Ill. Welfare Rights Org.*, 723 F.3d at 568. This was a fiercely litigated case, with the City contesting virtually every move the plaintiffs made. More importantly, the Plaintiffs exposed certain practices of the Police Department that may have prevented victims of discrimination from coming forward—thus providing a benefit to current and future members of the force. On top of that, the plaintiffs received compensatory damages

totaling $325,000. This amount was awarded notwithstanding the fact that the plaintiffs had not lost their jobs. Finally, the plaintiffs have also received an injunction against any disciplinary action by the Police Department based on the retaliatory CRs filed against them. This effectively grants the plaintiffs a full remedy for the retaliation they suffered. *O'Sullivan v. City of Chicago*, 2007 WL 779142 (N.D.Ill. 2007).

Next, "the extent of the plaintiffs' success" must be measured "by comparing the results obtained from the lawsuit with the relief plaintiffs sought." *Illinois Welfare Rights Org.*, 723 F.3d at 569. The Plaintiffs here sought a host of remedies, including a declaratory judgment, an injunction, damages for pecuniary losses, damages for emotional harms, punitive damages, and attorney's fees. (Complaint at ¶¶ A–I.). The Plaintiffs have only failed to attain two of the forms of relief they sought: punitive damages and a declaratory judgment. They have been awarded an injunction against the retaliatory disciplinary actions against them. They have been awarded significant compensatory damages for emotional harm. And they are being awarded sizeable attorney's fees. In light of this success, their failure to obtain punitive damages and declaratory relief is not a basis to reduce the fee award.

Finally, a court must "structure an award that is reasonable in light of the plaintiffs' success." *Ill. Welfare Rights Org. v. Miller*, 723 F.3d 564, 569 (7th Cir. 1983). A reduction is "appropriate only 'if the relief, however significant, is limited in comparison to the scope of the litigation as a whole.'" *Id.* (citing *Hensley*, 461 U.S. at 435). The Plaintiffs have obtained substantial monetary and injunctive relief. This is not a case where the Plaintiffs sought "X dollars" and walked away with less than half that amount. *Cf. In re Burlington Northern, Inc., Emp. Prac. Litigation*, 832 F.2d 430, 435 (7th Cir. 1987). Nor is it a case where the Plaintiffs sought primarily equitable relief, and

33

ended up with only nominal damages. The "award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley*, 461 U.S. at 435. Modifications based on the results obtained "are proper only in certain 'rare' and 'exceptional' cases." *Delaware Valley Citizens' Council*, 478 U.S. at 565. This is not such a case. In sum, the plaintiffs have "obtained excellent results," *Hensley*, 461 U.S. at 435, and the fees for all time spent on the successful and related retaliation claims is an appropriate award.

## CONCLUSION

After eliminating all hours that were inadequately explained or excessive, or unrelated to the claim upon which the plaintiffs ultimately prevailed, and considering the level of success attained, the plaintiffs are entitled to fees in the amount of $642,874.00.

ENTERED: _____
                UNITED STATES MAGISTRATE JUDGE

DATE: 4/18/2007

34